ACCEPTED
13-15-00312-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
8/19/2015 6:10:46 PM
CECILE FOY GSANGER
CLERK

## NO. 13-15-00312-CV

### IN THE COURT OF APPEALS
### FOR THE THIRTEENTH JUDICIAL DISTRICT OF TEXAS
### AT CORPUS CHRISTI

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
8/19/2015 6:10:46 PM
CECILE FOY GSANGER
Clerk

### BRIAN O'GRADY, M.D. AND
### THE O'GRADY FAMILY PARTNERSHIP, LTD.
*Appellants*,

**v.**

### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A.,
*Appellee*.

**Appealed from the 53rd District Court of Travis County, Texas**

### APPELLANTS' BRIEF

**RICHIE & GUERINGER, P.C.**
**SHELDON E. RICHIE**
**State Bar No. 16877000**
**EMILY J. SEIKEL**
**State Bar No. 24072331**
**100 Congress Avenue, Suite 1750**
**Austin, Texas 78701**
**512-236-9220 telephone**
**512-236-9230 facsimile**
**srichie@rg-austin.com Email**
**eseikel@rg-austin.com Email**
**ATTORNEYS FOR APPELLANTS**

### ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1(a), the following is a complete list of all parties, and the names and addresses of all counsel, involved in this case:

*Appellants:*

Brian O'Grady, M.D.

The O'Grady Family Partnership, Ltd.

*As owners of the claim of David Miller, Brett Schulick, and River Oaks Capital, Inc. per the June 28, 2013 Turnover Order of Judge Tim Sulak*

*Counsel for Appellants:*

Sheldon E. Richie
State Bar No. 16877000
Emily J. Seikel
State Bar No. 24072331
Richie & Gueringer, P.C.
100 Congress Avenue, Suite 1750
Austin, Texas 78701
512-236-9220 Telephone
512-236-9230 Facsimile
srichie@rg-austin.com Email
eseikel@rg-austin.com Email

*Appellee:*

National Union Fire Insurance Company of Pittsburgh, P.A.

*Counsel for Appellee:*

      Robert S. Harrell
      Jon C. Rice
      Andrea L. Fair
      Norton Rose Fulbright US LLP
      1301 McKinney, Suite 5100
      Houston, Texas  77010
      713-651-5151 Telephone
      713-651-5246 Facsimile
      robert.harrell@nortonrosefulbright.com Email
      jon.rice@nortonrosefulbright.com Email
      andrea.fair@nortonrosefulbright.com Email

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL.........................................................2

TABLE OF CONTENTS ...................................................................................4

INDEX OF AUTHORITIES..............................................................................5

STATEMENT OF THE CASE............................................................................8

REQUEST FOR ORAL ARGUMENT..............................................................10

ISSUE PRESENTED FOR RELIEF..................................................................11

Did the Arbitration Panel exceed the powers delegated to them at summary judgment by making fact-findings on disputed issues, where the parties had authorized the summary judgment proceeding as an *initial* stage of insurance coverage arbitration for determinations as a matter of law based on the applicable insurance policy and an underlying arbitration award, *after* which discovery specific to the coverage dispute and arbitration on the merits on remaining claims were to proceed, and did the trial court err in affirming the award and refusing to vacate or modify it based on Appellants' *excess of powers* argument?

PRELIMINARY STATEMENT ........................................................................12

STATEMENT REGARDING THE RECORD.....................................................18

STATEMENT OF FACTS................................................................................21

SUMMARY OF THE ARGUMENT ................................................................27

ARGUMENT ..................................................................................................28

PRAYER .........................................................................................................46

CERTIFICATE OF COMPLIANCE ................................................................48

CERTIFICATE OF SERVICE .........................................................................49

APPENDIX .....................................................................................................50

# INDEX OF AUTHORITIES

## Cases

*Advanced Micro Devices, Inc. v. Intel Corp.*,
885 P.2d 994 (1994) ...............................................................................37

*Ancor Holdings, LLC v. Peterson, Goldman & Villani, Inc.*,
294 S.W.3d 818 (Tex.App.—Dallas 2009, no pet.) .............................................29

*Armstadt v. U.S. Brass Corp.*,
919 S.W.2d 644 (Tex. 1996) ....................................................................40

*Barsness v. Scott*,
126 S.W.3d 232 (Tex.App.—San Antonio 2003, pet. denied) ...........................29

*Bonshire v. Thompson¸*
60 Cal. Rptr. 2d 716 (Cal. App. 1997) .................................................36

*Brockman v. Tyson*,
No. 01-03-01335-CV, 2005 WL 2850128 (Tex.App.—Houston [1ˢᵗ Dist.]
Oct. 27, 2005) ...................................................................... 17, 30

*Busse v. Pacific Cattle Feedings Fund No. 1, Ltd.*,
896 S.W.2d 807 (Tex. App. 1995) ......................................................40

*Centex/Vestal v. Friendship West Baptist Church*,
314 S.W.3d 677 (Tex.App.—Dallas 2010, pet. denied) ................... 18, 19, 35, 36

*Chem-Met Co. v. Metaland Intern., Inc.*,
No. Civ. A. 96-02548, 1998 WL 3572368, *4 (D.D.C. filed Mar. 25, 1998) .....38

*City of Houston v. Clear Creek Basin Auth.*,
589 S.W.2d 671 n.5 (Tex. 1979) .......................................................28

*Collins v. County of El Paso*,
954 S.W.2d 137 (Tex.App.—El Paso 1997, pet. denied) .................................28

*D.R. Horton-Texas, Ltd. v. Bernhard*,
423 S.W.3d 532 (Tex.App.—Houston [14th Dist.] 2014, pet. filed)...................18

*Duperier v. Texas State Bank*,
28 S.W.3d 740 (Tex. App.  2000) .......................................................40

*Leshin v. Oliva*,
--- S.W.3d ---, 2015 WL4554333 (Tex.App.—San Antonio,
July 29, 2015, no pet. h.) ........................................................... 17, 19

*Luna v. North Star Dodge Sales, Inc.,*
667 S.W.2d 115 (Tex. 1984) ...................................................................43

*Major League Baseball Players Ass'n v. Garvey,*
523 U.S. 504 (2001) ...............................................................................35

*McKinney Drilling Co. v. Mach I Limited Partnership,*
32 MD App 205, 359 A.2d 100 (176) ....................................................37

*Myers v. Hall Columbus Lender LLC,*
437 S.W.3d 632 (Tex.App.—Dallas 2014) .............................................44

*Nafta Traders, Inc. v. Quinn,*
339 S.W.3d 84 (Tex. 2011) .....................................................................35

*National Union Fire Ins. Co. of Pittsburgh, P.A. v. Puget Plastics Corp.,*
532 F.3d 398 (5th Cir. 2008) ........................................................... 27, 41

*Pope v. Rollins Protective Serv. Co.,*
703 F.2d 197 (5th Cir. 1983) ..................................................................41

*St. Paul Surplus Lines Ins. Co., Inc. v. Dal-Worth Tank Co., Inc.,*
974 W.S.2d 51 (Tex. 1998) ............................................................. 41, 43

*Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.,*
559 U.S. 662, 130 S.Ct. 1758 (2010) .....................................................35

*Szuts v. Dean Witter Reynolds, Inc.,*
931 F.2d 830 (11th Cir.1991) .................................................................37

*T&M Properties v. ZVFK Architects & Planners,*
661 P.2d 1040 (Wyo. 1983) ....................................................................38

*Thomas J. Sibley, P.C. v. National Union Fire Ins. Co. of Pittsburgh, P.A.,*
921 F.Supp. 1526 (E.D. Tex. 1996) ........................................................41

*Town of Stratford v. International Federation of Professional and Technical Engineers,*
155 Conn. App. 246, 108 A.3d 280 (2015) .............................................36

*W. Employers Ins. v. Jefferies & Co.,*
958 F.2d 258 (9th Cir. 1992) ..................................................................37

*Zervos v. Freedman Properties Ltd.,*
223 N.J. Super. 599, 539 A.2d 336 (1987) .............................................37

**Statutes**

TEX. BUS. & COM. CODE § 17.50 (B)(1) ............................................................ 42

TEX. CIV. PRAC. & REM. CODE § 171.088(a)(3)(A) ......................................... 34

TEX. CIV. PRAC. & REM. CODE § 171.091(a)(2) .............................................. 34

TEX. CIV. PRAC. & REM. CODE § 41.001(11) .................................................. 42

TEX. CIV. PRAC. & REM. CODE § 41.001(7) .................................................... 43

**Other Authorities**

AAA Commercial Arbitration Rules and Procedures for Large, Complex
Commercial Disputes ................................................................................ passim

**Rules**

Tex. Rev. Civ. St. Ann. Art. 581-33(A)(2) .............................................................. 40

## STATEMENT OF THE CASE

*Nature of the underlying proceeding:*

Appellants filed suit in the District Court of Travis County in August 2013 against Appellee, an insurance carrier, seeking coverage (in the shoes of insureds, pursuant to a turnover order) for a prior judicially-endorsed "FINRA" Arbitration Award.[1] Appellants asserted causes of action for bad faith, specific performance under the insurance policy, and violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act.[2] The coverage dispute was sent to arbitration. This appeal arises out of the granting of an Order Confirming Arbitration Award and Denying Motion to Vacate, and the entry of a Final Judgment in favor of Appellee on May 15, 2015.[3]

*Course of the Proceedings:*

On November 8, 2013 the District Court of Travis County entered an Unopposed Order to Transfer to Arbitration.[4] The case proceeded in the American Arbitration Association (AAA) under Case No. 01-14-0000-1777. The parties and the panel of three arbitrators – Susan Perin, John Boyce and Raul A. Gonzalez (the "Arbitration Panel") – held a preliminary telephonic hearing on August 19, 2014 and agreed to conduct the arbitration proceeding in two parts, beginning with an initial summary judgment phase; the Arbitration Panel entered a scheduling order governing the initial summary judgment phase.[5] Both sides moved for summary judgment. A summary judgment hearing was conducted before the arbitration panel on December 17, 2014.[6] On February 6, 2015 the Arbitration

---

[1]   CR:   3-99 (Plaintiffs' Original Petition).
[2]   CR:   3-99 (Plaintiffs' Original Petition).
[3]   CR:   321 – 322 (Order Confirming Award); 323 – 324 (Notice of Appeal).
[4]   CR:   102-103 (Unopposed Order to Transfer to Arbitration).
[5]   CR:   310 (Case Management Order #1).
[6]   CR:   310 (Case Management Order #1); 251 – 253 (Final Summary Award).

Panel signed a "Final Summary Award" finding no insurance coverage and granting summary judgment in whole to Appellee.[7]

*Trial Court's Disposition of Case:*

Order Confirming Arbitration Award and Denying Motion to Vacate and Final Judgment, entered May 15, 2015.[8]

---

[7]  CR:  251 – 253 (Final Summary Award).

[8]  CR:  321 – 322 (Order Confirming Award).

## **REQUEST FOR ORAL ARGUMENT**

Appellants request the opportunity to present oral argument in this proceeding. Oral argument will assist with clarification of the legal arguments in this appeal, including the applicability of and distinctions of legal precedent cited to herein. Oral argument will also be helpful in the decisional process of the Court to the extent that arguments are unclear to the Court or are disputed between the parties. This appeal presents a novel question in this jurisdiction and oral argument will involve discussion of precedent in other jurisdictions, as well as public policy and due process considerations.

# ISSUE PRESENTED FOR RELIEF

Did the Arbitration Panel exceed the powers delegated to them at summary judgment by making fact-findings on disputed issues, where the parties had authorized the summary judgment proceeding as an *initial* stage of insurance coverage arbitration for determinations as a matter of law based on the applicable insurance policy and an underlying arbitration award, *after* which discovery specific to the coverage dispute and arbitration on the merits on remaining claims were to proceed, and did the trial court err in affirming the award and refusing to vacate or modify it based on Appellants' *excess of powers* argument?

## PRELIMINARY STATEMENT

Appellants Brian O'Grady, M.D. ("Dr. O'Grady") and his family partnership The O'Grady Family Limited Partnership, Ltd. ("OGFP") (collectively "Appellants" or "O'Grady") lost millions in three investment schemes promoted by two individuals, Brett Schulick and David Miller, in 2004 and 2007. At all pertinent times Mr. Schulick and Mr. Miller were registered representatives of Woodbury Financial Services, Inc. ("Woodbury"). At all pertinent times Woodbury also had a professional negligence policy in place which was designed to cover the "Wrongful Acts" of negligent Woodbury representatives in the rendering of professional services to clients, such as Dr. O'Grady.[9]

O'Grady filed suit in 2008 and claims against Miller, Schulick, River Oaks Capital Management, Inc. ("River Oaks"), and Woodbury were transferred to an arbitration proceeding before the Financial Industry Regulatory Authority (FINRA). Several days of trial testimony and evidence was presented to the FINRA panel, and in October 2012 they issued the "FINRA Award" in favor of O'Grady.[10] The FINRA Award found that Miller, Schulick and River Oaks were jointly and severally liable for gross negligence and for violations of the Texas Deceptive Trade Practices Act and the Texas Securities Act.[11]

---

[9] CR: 12 – 95 (Woodbury Insurance Policy).
[10] CR: 145 – 157 (FINRA Award).
[11] CR: 145 – 157, at 152 (FINRA Award).

12

The 98th Judicial District Court of Travis County, Texas approved of the FINRA Award and entered a Final Judgment for $3,279,351.49 plus interest against Miller, Schulick and River Oaks on February 28, 2013.[12] On June 28, 2013 Appellants obtained a Turnover Order from Judge Tim Sulak, whereby Appellants were deemed the owners of potential insurance-related causes of action, specifically including against Woodbury's Insurer National Union.[13]

Appellants' coverage dispute with Appellee National Union subsequently arose after unsuccessful demands for payment for the Judgment by O'Grady. Appellants filed the underlying lawsuit asserting bad faith, specific performance under the policy, and violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act.[14] The coverage dispute was submitted to a three-arbitrator panel under the AAA (the "Arbitration Panel").[15]

At the outset of the AAA arbitration proceedings the parties agreed to bifurcate the proceedings and to proceed with an initial summary judgment phase to determine certain claims as a matter of law. The parties agreed that no discovery specific to the coverage dispute would be conducted while the preliminary summary judgment stage was pending, in the interest of efficiency and in order to streamline future discovery to remaining coverage issues. As such, the

---

[12]   CR:   96 – 97 (Final Judgment).
[13]   CR:   98 – 99 (Turnover Order).
[14]   CR:   3-99 (Plaintiffs' Original Petition).
[15]   CR:   102 – 103 (Unopposed Order to Transfer to Arbitration); 310 (AAA Case Management Order #1).

parties agreed that the Arbitration Panel was to make summary judgment findings based on (a) the face of the FINRA Award and (b) the face of the Woodbury Insurance Policy, with a limited ability to look "behind" those documents to the record from the underlying FINRA proceeding solely for explanation of the FINRA Award. The parties did *not* agree to the Arbitration Panel's use of the underlying FINRA record to make their own factual findings not apparent from the face of the FINRA Award, nor to decide on the credibility of disputed facts; nor did they agree to forego the opportunity to conduct discovery on non-established or disputed issues of fact that would inform the coverage dispute issues. The Arbitration Panel, however, as more fully described herein, conducted itself in excess of their powers at the summary judgment stage of the proceeding, looked *behind* the FINRA Award (which was an unreasoned opinion and contained no findings of fact), made improper findings of fact, and summarily disposed of the dispute in the Insurer's favor.[16]

The underlying coverage dispute involved *three* investment products promoted by Miller and Schulick, and the Final Summary Award issued by the Arbitration Panel summarily denied coverage for them all.[17] While Appellants

---

[16]  CR:   251 - 253 (Final Summary Award).
[17]  CR:   251 - 253 (Final Summary Award).

believe that there were numerous problems with the Final Summary Award,[18] Appellants asked the lower court to vacate or modify the Final Summary Award *only* for its summary judgment denial of coverage for one of the investment schemes – the "Asset Protection Plan" or "APP".[19] Now Appellants further limit their argument and bring this Appeal on only one of three bases for vacatur that were urged to the lower court – "*excess of powers*." As such, a synopsis of the basic characteristics of, and known background on, the Asset Protection Plan is informative to this Brief and to why the Arbitration Panel exceeded the powers delegated to them by the parties at the agreed-upon summary judgment stage of the AAA arbitration proceedings.

After the agreement to bifurcate the arbitration proceeding, the parties each filed competing summary judgment motions to argue that certain claims or defenses could be summarily dealt with based upon the FINRA Award and the Insurance Policy at issue. The briefing of each side referred to parts of testimony and evidence that had been presented to the FINRA panel, and did so to provide background and also to demonstrate that disputed facts exist. As such, the Arbitration Panel heard prior testimony that the Asset Protection Plan was presented to Dr. O'Grady in 2004 as a Woodbury-endorsed investment scheme that

---

[18] Including improper fact-finding regarding all the investment vehicles, as well as taking such an insurer-friendly position as to violate public policy and gross mistake of law.

[19] CR: 115 – 280 (Motion to Vacate or Modify Arbitration Award).

15

would serve to protect the assets of Dr. O'Grady's medical practice from creditors. It heard that, under the Asset Protection Plan, Dr. O'Grady was sold creditor-protected Woodbury and Hartford products (Woodbury is a subsidiary of The Hartford), which he purchased using funds from a bank loan that was collateralized by the accounts receivables of his medical practice. They heard that the APP exclusively involved Woodbury/Hartford life insurance and annuities – products to which Miller and Schulick had access only by reason of their status as Woodbury representatives. They heard that the River Oaks office from which the APP was marketed to Dr. O'Grady displayed a Woodbury sign and license showing agency with Woodbury; that Miller and Schulick's direct supervisor at Woodbury was aware of the Asset Protection Plan; that Woodbury approved of the products it sold to Dr. O'Grady under the APP and Woodbury/Hartford were paid over $1 million in premiums for those products. They saw documentation on which Woodbury had listed Dr. O'Grady as a "client" who had generated significant production for Woodbury/Hartford. They learned that Miller and Schulick's sole commissions made under the APP were paid by Woodbury. They also learned that, despite assurances that the APP was a low-risk plan designed to insulate the assets of Dr. O'Grady's medical practice from creditors, the funds were put into high-risk, aggressive vehicles. Documentation demonstrated that Woodbury had notice that its products were being purchased with borrowed funds, based on the financial

statements submitted with the applications to purchase its products, and that Woodbury was aware the products Dr. O'Grady purchased were high-risk, aggressive vehicles. Woodbury profited from the sale of those products.

Appellants raise these preliminary points regarding Woodbury and the APP not in order to say that the Arbitration Panel should have ruled otherwise as to coverage of the APP, but instead to demonstrate the Arbitration Panel **made findings in excess of the powers delegated to it in the bifurcated proceeding**, although they were aware of the existence of disputed facts. This was **in contravention of the well-established procedural rules of summary judgment.** For example, there had been no prior adjudication on the question of Woodbury's "approval" of and "distribution" of the APP (for purposes of "Professional Services" coverage under the Policy), no such fact finding could be gleaned from the FINRA Award, and such issues were under <u>heavy</u> dispute. The FINRA Award contains <u>no</u> finding on those questions or other coverage-specific issues.[20]

By making findings of fact the Arbitration Panel exceeded the authority given to it by agreement of the parties, which was to make findings as <u>a matter of law</u> in the preliminary summary judgment stage. The Arbitration Panel's overreach has denied Appellants due process and has caused Appellants to lose their right (assured under the AAA Rules themselves) to put on evidence specific

---

[20]     CR:     145 – 157 (FINRA Award).

to the coverage dispute issues and to an arbitration proceeding on the merits of the coverage dispute.

## STATEMENT REGARDING THE RECORD

Contrary to Appellee's contention in the trial court, the lack of a transcript of the underlying arbitration proceeding is not fatal to the instant case.

First, no transcript exists, not due to any failure of the Appellants, but due to the Arbitration Panel's premature summary disposal of the arbitration, after a preliminary summary judgment hearing that did not even involve evidentiary rulings. No hearing on the merits ever took place, at which the parties' viable claims were tried, through live testimony and/or the submission of evidence. There was no "hearing on the merits" where all "proofs, allegations, arguments and authorities of the parties" were aired. *Brockman v. Tyson*, No. 01-03-01335-CV, 2005 WL 2850128 (Tex.App.—Houston [1st Dist.] Oct. 27, 2005). Thus a "complete record" by the traditional sense is not in existence, nor could it be.

Moreover, **no such record is required** in order to vacate or modify an arbitration award on the basis of *excess of powers*. *Leshin v. Oliva*, --- S.W.3d ---, 2015 WL4554333 (Tex.App.—San Antonio, July 29, 2015, no pet. h.). While some Texas appellate courts have held that there can be no appellate review of an arbitrator's decision without a complete record of the evidence presented at arbitration, such cases have dealt primarily with gross mistake of law, or other

18

bases for vacatur. "Excess of powers" as a basis for vacatur, on the other hand, is different than mistake of law, as the appropriate inquiry in determining if arbitrators acted in excess of their powers is *not* whether the arbitrators decided an issue *correctly*, but *whether* the arbitrator *had the authority to decide the issue at all*. *D.R. Horton-Texas, Ltd. v. Bernhard*, 423 S.W.3d 532, 534 (Tex.App.—Houston [14th Dist.] 2014, pet. filed). The authority of arbitrators is derived from the arbitration agreement and is limited to a decision of matters submitted either expressly or by necessary implication. *Centex/Vestal v. Friendship West Baptist Church*, 314 S.W.3d 677, 684 (Tex.App.—Dallas 2010, pet. denied). Such a determination can frequently be made from, for example, the face of the arbitration agreement, pleadings, and other documents and it is thus intuitive that a full record is not necessarily required. *Id.* at 685 (noting the application of the general rule that a record must be used to establish the basis for vacating an award does not foreclose on a consideration of whether the arbitrator exceeded his authority, the court decided on an excess of powers argument and did so without access to a complete record of arbitration proceeding).

Just this summer, on July 29, 2015 the San Antonio Court of Appeals reversed a trial court's affirmation of an arbitration award after concluding that the arbitrator had exceeded his powers – and did so without access to a complete record and with express affirmation that it could be done without a complete

record. *Leshin v. Oliva*, --- S.W.3d ---, 2015 WL4554333 (Tex.App.—San Antonio, July 29, 2015, no pet. h.). The appellate record consisted of the arbitration award, the pleadings on the request to vacate the award, and a copy of trust agreement that contained the arbitration agreement. "[B]ecause the scope of the arbitrator's powers is ultimately derived from these documents" the lack of an arbitration transcript did not preclude consideration of whether the arbitrator exceeded his powers. *Id.* at *4. The court reversed the confirmation of the award. *Id.* at *1.

In the instant case, the question of whether the Arbitration Panel acted in excess of the powers delegated to them for the summary judgment proceedings does not "turn on the evidence offered and considered by the arbitrator . . . ." *Centex/Vestal*, at 687. Rather, in order to determine "whether the arbitrator[s] had <u>authority</u> to decide the claims" they decided in the Final Summary Award, what is required is: (1) a legal practitioner's understanding of the procedural rules and purposes for summary judgments, whereby determinations are to be made based on the law and undisputed facts; and (2) certain documents that the parties had agreed were to inform the summary judgment - the Final Summary Award,[21] reviewed in light of the face of the FINRA Award[22] and the Woodbury Insurance Policy

---

[21]    CR:    251 – 253 (Final Summary Award).
[22]    CR:    145 – 147 (FINRA Award).

containing the arbitration clause invoking the AAA Commercial Arbitration Rules,[23] each of which are in the appellate record and are cited to herein.

As the Appellants will demonstrate herein, the FINRA Award contains no findings of fact, yet the Final Summary Award contained a "reasoning" and fact-finding that shows the Arbitration Panel acted in excess of their powers and overreached the issues submitted to them at the summary judgment stage of the proceeding,[24] and did so prior to any discovery or testimony specific to the coverage dispute.

## STATEMENT OF FACTS

Pursuant to the Unopposed Order to Transfer to Arbitration,[25] the determination of coverage of the FINRA Award under insurance policy No. 665-25-96 (the "Policy") was sent to arbitration.[26] After the Arbitration Panel was established – comprised of Susan Perin, John Boyce and Raul A. Gonzalez – a preliminary telephonic hearing was held, in conformity with the applicable AAA Commercial Arbitration Rules and Procedures for Large, Complex Commercial Disputes (the "AAA Commercial Arbitration Rules").[27] Each member of the

---

[23]     CR:    12 – 95, at 30 par. 19 (Woodbury Insurance Policy).
[24]     CR:    251 – 253 (Final Summary Award).
[25]     CR:    102 – 103 (Order to Arbitration).
[26]     CR:    12 – 95 (Woodbury Insurance Policy).
[27]     CR:    310 (Case Management Order #1); 12 – 95, arbitration provision at 30 par. 19 (Woodbury Insurance Policy) and App. Tab J – AAA Commercial Rules and Procedures for Large, Complex Commercial Disputes.

21

Arbitration Panel, counsel for the parties, and the AAA case manager Andrew Barton participated in that call on August 19, 2014.[28]

During the initial conference regarding the arbitration, the parties agreed to bifurcate the arbitration into an initial summary judgment portion prior to any discovery specific to the coverage dispute, to be followed by a second 'trial' portion with attendant discovery specific to the coverage dispute. The parties briefed competing summary judgment motions and both agreed that there was no need, at the summary judgment stage of the proceedings, to look past the face of (a) the FINRA Award and (b) the Insurance Policy. The parties agreed to a "limited" use of testimony and documentation from the underlying FINRA proceeding in order to provide background and explanation; not, however, for the Arbitration Panel to make fact-findings on disputed issues.

A summary judgment hearing was held on December 17, 2014, in keeping with the parties' agreement that the proceedings be bifurcated in an effort to narrow the issues. The summary judgment hearing lasted one day and did not involve live testimony, cross-examination or evidentiary disputes. Counsel for both sides reiterated at the summary judgment hearing their agreement that the Arbitration Panel need not look behind the face of (a) the Insurance Policy and (b) the FINRA Award in order to make certain coverage determinations as a matter of

---

[28]     CR:     310 (Case Management Order #1).

law.  The coverage dispute arbitrators executed their "Final Summary Award" on February 6, 2015 and issued it shortly thereafter on February 11, 2015.  The Final Summary Award found no coverage and summarily disposed of the dispute.[29]

**THE FACE OF THE WOODBURY INSURANCE POLICY**

The Policy at the center of this dispute covers the "Insured Agents" of Woodbury and is a professional liability insurance policy.  It provides for the payment of damages and defense costs <u>resulting</u> from a claim for a "Wrongful Act" (which means any actual or alleged negligent act, error, or omission) of an Insured Agent (it was never disputed that Miller and Schulick were Insured Agents), if the Wrongful Act occurs solely in the performance or failure to perform "Professional Services."   The Policy contains several definitions of Professional Services.  Endorsement #7 and Endorsement #8 provide the pertinent definitions in this case:

> **Endorsement #7** [(k)(3)]: Professional Services shall mean those services rendered or required to be rendered in the Insured Agent's profession as:
>> a licensed registered representative who services, sells or attempts to sell securities or other investment products including, but not limited to structured settlements approved by and distributed through . . . [Woodbury].
>
> **Endorsement #8** [(k)(7)]: Professional Services shall mean those services rendered or required to be rendered in the Insured Agent's profession as:

---

[29]    CR:    251 – 253 (Final Summary Award).

a financial planner, financial consultant, or investment advisor, acting on behalf of a customer or client and providing consultation, advice, administration and services, whether or not a separate fee is charged, but only with respect to:

> 1. Investment products which are currently APPROVED for sale by [Woodbury]. APPROVED for purposes of Endorsement #8 means "any investment product currently offered by [Woodbury] as available for sale through [Woodbury].

The Policy also contains certain exclusions, including:

**"The Dishonesty Exclusion"** at Section 3(a) of the Policy provides that the Policy does not cover damages or defense costs in connection with claims:

> arising out of, based upon or attributable to any actual or alleged criminal, dishonest, malicious, knowingly wrongful or fraudulent act committed by or at the direction of the Insured.

**"The Art Exclusion"** at Endorsement #12(x)(1) provides that the Policy does not cover claims based on the purchase or sale (or failure to purchase or sell) art.[30]

**"The Promissory Note Exclusion"** at Endorsement #12(aa)(1) provides that the Policy does not cover claims based on the purchase or sale (or failure to purchase or sell) promissory notes. Promissory notes are defined as:

> An investment whereby the maker agrees to pay to the payee a specific sum of money either on demand or at a fixed or determinable future date.[31]

---

[30] Appellants do not address the Art Exclusion herein because no party argued, nor was there any basis for, its potential applicability to the APP. It was discussed as to another investment product not at issue in this appeal. Appellants do point it out though, as it is contained in the Final Summary Award which – Appellants believe – reflects another improper fact finding in excess of powers.

[31] Appellants do not address the Promissory Note Exclusion herein because no party argued, nor was there any basis for, its potential applicability to the APP. It was discussed as to other investment products not at issue in this appeal. It was discussed as to another investment product not at issue in this appeal. Appellants do point it out

**THE FACE OF THE 2012 FINRA AWARD**

The FINRA Award provided for:

- Compensatory damages of $2,868,868.00
- Pre-award interest at 5% per annum from and including September 25, 2008
- Post-award interest at 5% per annum from and including the date of the FINRA Award
- $300,000.00 in punitive damages pursuant to the Texas Deceptive Trade Practices Act and gross negligence
- $819,314.50 in attorneys' fees pursuant to the Texas Securities Act and DTPA[32]

The FINRA Award was not a reasoned opinion and contained list of fact-findings. The FINRA Award did state in its Case Summary that Miller and Schulick had been "acting as agents of Woodbury and River Oaks."[33] It also stated that it did not adjudicate any claims against Woodbury because Woodbury had settled prior to the conclusion of the FINRA proceeding.[34] The FINRA Award stated that the fraud claims had been withdrawn.[35]

The FINRA Award was judicially approved and entered as a final judgment in Travis County for $2,118,921.30 (the compensatory damages less applicable settlement credits), pre-judgment interest of $41,115.69 from September 25, 2008,

---

though, as it is contained in the Final Summary Award which – Appellants believe – reflects another improper fact finding in excess of powers.

[32] CR: 145 – 157, at 150 (FINRA Award).
[33] CR: 145 – 157, at 150 (FINRA Award).
[34] CR: 145 – 157, at 151 (FINRA Award).
[35] CR: 145 – 157, at 151 (FINRA Award).

attorneys' fees of $819,314.50, $300,000 in punitive damages, for a total of $3,279,351.49.[36]

## THE FACE OF THE FINAL SUMMARY AWARD

In the section titled "Reasoning" of the Final Summary Award, the arbitrators found that each of the three investment products were not in the scope of "Professional Services" as defined by the Policy in Endorsement 7 and 8 because "**Woodbury neither approved nor distributed them**."[37] They also went on to find that three exclusions of the Policy defeated a finding of coverage: the so-called "Dishonesty Exclusion," "Art Exclusion," and "Promissory Note Exclusion."[38]

The Arbitration Panel stated its finding that "there is no genuine issue of material fact regarding the lack of coverage under the Policy for Claimants' Award . . . ."[39] However, as Appellants will demonstrate herein, there were genuine issues of material fact, and fact-finding itself is clear from a simple review of the Final Summary Award in comparison to the FINRA Award and the Insurance Policy.

---

[36] CR:   98 – 99 (Turnover Order).

[37] CR:   251 – 253, at 252 (Final Summary Award).

[38] Again Appellants do not address the Art or Promissory Note Exclusions herein because no party argued, nor was there any basis for, their potential applicability to the APP. Appellants believe that their inclusion in the Final Summary Award reflects additional improper fact finding in excess of powers, as the Arbitration Panel was well aware of a dispute between the parties as to whether certain other investment vehicles were for the purchase of art, or were promissory notes.

[39] CR:   251 – 253, at 252 (Final Summary Award).

## SUMMARY OF THE ARGUMENT

The Final Summary Award issued by the Arbitration Panel was in excess of the parties' agreed delegation of a limited decision-making function at the bifurcated summary judgment stage. Rather than make findings "as a matter of law" based on the FINRA Award and the Policy that were submitted to them, the Arbitration Panel made improper fact findings that had not been submitted to them. They did so in violation of the parties' agreement to conduct summary judgment as well as the clear tenets of summary judgment procedure against improper findings of fact. Such fact findings could not have been made based on the FINRA Award, had not been adjudicated elsewhere, and were clearly under dispute.

Specifically for this appeal, the Arbitration Panel acted beyond their granted authority granted to them by finding that Woodbury "neither approved of distributed" the APP, and when it found that the conduct of Woodbury's representatives' was "dishonest, malicious, or knowingly wrongful".[40]

The Final Summary Award also reflects violations of the AAA Commercial Arbitration Rules themselves, which ensure that parties may fairly and fully air their claims through evidence and testimony. The Arbitration Panel acted beyond the issues submitted to it and in the process unfairly deprived Appellants of their

---

[40]    CR:    251 – 253, at 252 (Final Summary Award).

due process in this coverage dispute. Appellants seek an evidentiary hearing on the merits of its claims for coverage on the APP.

The lower court erred by affirming the Final Summary Award.

## ARGUMENT

**ISSUE**: Did the Arbitration Panel exceed the powers delegated to them at summary judgment by making fact-findings on disputed issues, where the parties had authorized the summary judgment proceeding as an *initial* stage of insurance coverage arbitration for determinations as a matter of law based on the applicable insurance policy and an underlying arbitration award, *after* which discovery specific to the coverage dispute and arbitration on the merits on remaining claims were to proceed, and did the trial court err in affirming the award and refusing to vacate or modify it based on Appellants' *excess of powers* argument?

**ANSWER**: Yes.

In insurance coverage cases it is common that the "underlying case often does not resolve all factual issues relevant to coverage because the question of coverage can be irrelevant to the question of insured's liability." *National Union Fire Ins. Co. of Pittsburgh, P.A. v. Puget Plastics Corp.*, 532 F.3d 398, 404 (5th Cir. 2008). As such, and out of concerns of efficiency and narrowing the issues for future discovery specific to the coverage, the parties agreed to an initial proceeding to assess the viable coverage claims and defenses and to do so by the procedural device of summary judgment. The Arbitration Panel was authorized at the summary judgment stage only to assess coverage or a lack thereof from the eight corners of the Award and the Policy, and to look behind to the FINRA record

28

only for limited, explanatory purposes.[41] The Arbitration Panel acted beyond their delegated task to make findings as a matter of law at summary judgment, based on the face of the FINRA Award and the Policy. Instead they improperly made fact-findings on questions unique to the coverage dispute, and summarily disposed of the arbitration.

Summary judgment is a familiar procedural device with clear, well-established tenets and purposes. Its purpose includes the goal of prompt disposal of unmeritorious claims or untenable defenses, but with built-in rules to assure that litigants are not deprived of their right to try their case. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 n.5 (Tex. 1979); *Collins v. County of El Paso*, 954 S.W.2d 137, 145 (Tex.App.—El Paso 1997, pet. denied). Despite the parties' agreement to bifurcate into summary judgment for the sake of efficiency, and despite their agreement to hold off on coverage-specific discovery until after the summary judgment stage, the Arbitration Panel made several improper fact-findings at summary judgment, including that the Asset Protection Plan was "not [a Woodbury] product[] because <u>Woodbury neither approved nor distributed</u>" it and that hence, Woodbury's agents Miller and Schulick "did not perform 'professional services' as defined by the Policy . . . ."[42]  However, this certainly could be

---

[41] CR:   145 – 157 (FINRA Award).
[42] CR:   251 – 253, at 252 (Final Summary Award) [emphasis added.]

29

gleaned from the face of the FINRA Award. Woodbury settled during the FINRA proceeding and there was no FINRA finding as to Woodbury.

The Arbitration Panel also improperly made a fact-finding of "dishonest, malicious, [or] knowingly wrongful acts," by Woodbury's representatives, despite the fact that the FINRA Award contains <u>no such</u> factual finding.[43] As discussed more fully herein there is also no legal finding in the FINRA Award for which either dishonesty, maliciousness or knowing wrongfulness is a required element.

"Arbitrators exceed their powers when they decide matters not properly before them." *Ancor Holdings, LLC v. Peterson, Goldman & Villani, Inc.*, 294 S.W.3d 818, 829 (Tex.App.—Dallas 2009, no pet.); see also *Barsness v. Scott*, 126 S.W.3d 232, 241 (Tex.App.—San Antonio 2003, pet. denied) (finding the arbitration panel exceeded its authority in issuing its award). The Arbitration Panel acted in excess of the powers delegated by to them by the parties' agreement to bifurcate the proceeding. They did so **by making findings of fact in contravention of the well-established procedural rules of summary judgment, in contravention of the safeguards of the AAA Rules, and in contravention of the parties' agreement**. As a result, the parties did not obtain an opportunity to conduct discovery specific to the coverage dispute, and did not get to air all "proofs, allegations, arguments and authorities of the parties in a hearing on the

---

[43]    CR:    251 – 253, at 252 (Final Summary Award); 145 – 147 (FINRA Award).

merits." *Brockman v. Tyson*, No. 01-03-01335-CV, 2005 WL 2850128 (Tex.App.—Houston [1st Dist.] Oct. 27, 2005).

### Standard of Review

A trial court's decision to confirm or vacate an arbitration award is reviewed *de novo. Centex/Vestal v. Friendship West Baptist Church*, 314 S.W.3d 677, 684 (Tex.App.—Dallas 2010, pet. denied). This stems from strong public policy favoring arbitration of disputes, and because it has the effect of a judgment of a court of last resort, it is given deference. *CVN Grp. v. Delgado,* 95 S.W.3d 234, 238 (Tex.2002). In fact, absent specific common law or statutory grounds for vacating, modifying, or correcting an award, a reviewing court must confirm an arbitration award. *CVN Grp.,* 95 S.W.3d at 238. Statutory grounds for vacating, modifying, or correcting an award can be found in the Federal Arbitration Act as well as the Texas General Arbitration Act. 9 U.S.C. § 10(a); TEX. CIV. PRAC. & REM. CODE § 171.088(a)(3). Pursuant to these statutes, a trial court may vacate an arbitration award for any one of several enumerated reasons, including the contention that the arbitrator exceeded his powers. 9 U.S.C. § 10(a); TEX. CIV. PRAC. & REM. CODE § 171.087. The lower court's confirmation of the Final Summary Award may be vacated if there is a determination that the Arbitration Panel exceeded its powers. See *Leshin v. Oliva*, --- S.W.3d ---, 2015 WL4554333, *3 (Tex.App.—San Antonio, July 29, 2015, no pet. h.).

### The AAA Commercial Arbitration Rules Govern

The arbitration provision within the Woodbury Insurance Policy provides that disputes shall be submitted to the AAA and conducted in accordance with the "then-prevailing commercial arbitration rules."[44] AAA Commercial Arbitration Rule R-1(a) provides that the parties "shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the AAA under its Commercial Arbitration Rules . . . ."[45] Thus, the AAA Commercial Arbitration Rules attached hereto in the Appendix at Tab J govern and inform an analysis of the Arbitration Panel's conduct of the arbitration.

By its own Rules, the AAA acknowledges that its authority to administer an arbitration is through a "delegation of duties" and is obtained through parties' agreement and/or initiation of an arbitration under the Rules.[46] Rule R-21 provides for a preliminary hearing, at which the parties and arbitrators are to "discuss and establish a procedure for the conduct of the arbitration that is appropriate to achieve a fair, efficient, and economical resolution of the dispute." Rules P-1 and P-2 address the issues to be considered at the preliminary hearing and provide that the proceeding is to be organized "in a manner that will maximize efficiency and

---

[44]     CR:     12 – 95, at 30 par. 19 (Woodbury Insurance Policy).
[45]     App. Tab J, AAA Commercial Rules and Procedures for Large, Complex Commercial Disputes.
[46]     App. Tab J, p. 11, Rule R-2 "AAA and Delegation of Duties."

economy, and will provide each party a fair opportunity to present its case."[47]  The

preliminary hearing, pursuant to the AAA Commercial Arbitration Rules, provides

an opportunity to decide, among other things[48]:

- what procedural law applies (P-2(a)(v)(b));
- "whether there are any threshold or dispositive issues that can efficiently be decided without considering the entire case," (P-2(a)(vi)), including without limitation:
  - Bifurcation of the proceeding (P-2(a)(vi)(d));
  - "whether the parties will exchange documents, including electronically stored documents, on which they intend to rely in the arbitration, and/or make written requests for production of documents within defined parameters" (P-2(a)(vii));
  - "whether the parties intend to present evidence from expert witnesses, and if so, whether to establish a schedule for the parties to identify their experts and exchange expert reports" (P-2(a)(xi));
  - "whether, according to a schedule set by the arbitrator, the parties will:
    - "identify all witnesses, the subject matter of their anticipated testimonies, exchange written witness statements, and determine whether written witness statements will replace direct testimony at the hearing" (P-2(a)(xii)(a))

Rule P-2(b) provides that "arbitrator shall issue a written order

memorializing decisions made and agreements reached during or following the

preliminary hearing."[49]  Case Management Order #1 memorialized the August 19,

2014 preliminary telephonic hearing where the parties agreed to bifurcate the

proceeding and begin with summary judgment briefing and a summary judgment

---

[47]     App. Tab J, p. 32, Rule P-1(a).
[48]     App. Tab J, p. 32, Rule P-2(a).
[49]     App. Tab J, p. 32, Rule P-2(b).

hearing.[50] Tellingly, the Order discusses *only* the summary judgment motions, and nothing else regarding the way the remaining case will be put on. That is, the parties did not get into the exchange of documents (under P-2(a)(vii)), expert witnesses or reports (P-2(a)(xi)); identification of witnesses, anticipated subject matter, or the use of direct testimony or witness statements (under P-2(a)(xii)(a)). They did not do so because *it was never contemplated by the parties that*, by bifurcating the proceedings as allowed under Rule P-2(a)(vi)(d), that the initial summary judgment proceeding would serve as a replacement for a hearing on the merits.

The Rules also set forth certain procedural and fairness standards for AAA arbitration proceedings. AAA Commercial Rule R-32 on the "Conduct of Proceedings" provides for the presentation of evidence by both sides and for the opportunity for witnesses to be cross-examined as well as to take questions directly from the arbitrator.[51] The same rule provides that parties are to be "treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case."[52] The proceedings are to "afford a full opportunity for all parties to present any evidence that the arbitrator deems material and relevant to

---

[50] CR:    310 (Case Management Order #1).
[51] App. Tab J, p. 22, Rule R-32(a).
[52] App. Tab J, p. 22, Rule R-32(a).

the resolution of the dispute and, when involving witnesses, provide an opportunity for cross-examination."[53]

### *Excess of Powers as a Basis for Vacating or Modifying an Award*

Texas and Federal statutory law clearly provide for the vacatur or modification of an arbitration award for *excess of powers*. The Texas Arbitration Act lists specific grounds for vacating, modifying, or correcting an arbitration award and provides that, on application of a party to vacate an arbitration award, the court <u>shall</u> vacate an award if the arbitrators "exceeded their powers." TEX. CIV. PRAC. & REM. CODE § 171.088(a)(3)(A). A court also <u>shall</u> modify or correct an award if the arbitrators "have made an award with respect to a matter not submitted to them," and the award may be corrected without affecting the merits of the decision with respect to the issues that were submitted. TEX. CIV. PRAC. & REM. CODE § 171.091(a)(2). Section 10 of the FAA likewise provides for vacatur of an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C.A. § 10(a)(4).

Arbitration is a creature of agreement. In an arbitration conducted by agreement of the parties, "it is well established that [a]n arbitrator derives his power from the parties' agreement to submit to arbitration." *Nafta Traders, Inc. v.*

---

[53] App. Tab J, p. 22, Rule R-32(c).

*Quinn*, 339 S.W.3d 84, 90 (Tex. 2011) (quotation omitted); *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 130 S.Ct. 1758, 1773-1774 (2010). When enforcing an agreement to arbitrate, "courts and arbitrators **must give effect to the contractual rights and expectations of the parties**. In this endeavor, as with any other contract, the parties' intentions control. This is because an arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution." *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 130 S.Ct. 1758, 1773-1774 (2010) (emphasis added). An arbitrator exceeds his powers when he decides matters not properly before him by departing from the arbitration agreement, "and, in effect, dispenses with his own idea of justice that the award may be unenforceable." *Centex/Vestal v. Friendship Baptist Church*, 314 S.W.3d 677, 684 (Tex.App.—Dallas 2010) (citing *Major League Baseball Players Ass'n v. Garvey*, 523 U.S. 504, 509 (2001)). It is clear that the appropriate inquiry in determining if arbitrators acted in excess of their powers is not whether the arbitrators decided an issue *correctly*, but whether the arbitrator had the authority to decide the issue at all. *D.R. Horton-Texas, Ltd. v. Bernhard*, 423 S.W.3d 532, 534 (Tex.App.—Houston [14th Dist.] 2014, pet. filed).

*Excess of powers* as a basis for vacatur does not turn only on the scope of an arbitration agreement – the authority of arbitrators is **also derived from the matters *submitted* to them for determination when they were appointed**.

*Centex/Vestal v. Friendship West Baptist Church*, 314 S.W.3d 677 (Tex.App.—Dallas 2010); *Town of Stratford v. International Federation of Professional and Technical Engineers*, 155 Conn. App. 246, 108 A.3d 280 (2015) (the parties themselves, by terms of their submission, define the powers of the arbitrators). Indeed, Appellants' issue with the Final Summary Award is not that its findings fall outside the scope of the arbitration provision found in the Policy – ultimately the Arbitration Panel was empowered to make an award that would fully settle the dispute *both* as to law and fact. Rather, the Arbitration Panel went beyond their task because it ignored the parties' agreement to bifurcate into an initial summary judgment proceeding and treated a hearing on the motions as if it was a full arbitration proceeding in which they could make fact-findings – without telling the parties and without the parties' consent.

Procedural unfairness or incorrect implementation of procedures in the course of arbitration proceedings may be a basis for *excess of powers* vacatur. Courts across the country have scrutinized and endorsed procedural missteps, or conducting the arbitration contrary to the parties' agreement, as evidence of arbitrators' *excess of powers* sufficient to vacate an arbitration award. See, e.g: *Bonshire v. Thompson¸* 60 Cal. Rptr. 2d 716, 721 (Cal. App. 1997) (reversing confirmation of award where the arbitrator exceed his powers by violating the parties' agreement to prohibit the introduction of extrinsic evidence and limit the

37

arbitrator; arbitrator's remedy was unauthorized because it was arrived at through an unsubmitted issue that the arbitrator was prohibited from reviewing); citing *Advanced Micro Devices, Inc. v. Intel Corp.*, 885 P.2d 994 (1994) (where the California Supreme Court recognized that the parties may specifically agree to compel the arbitrator to follow legal rules). The Eleventh Circuit vacated an award in excess of powers because it was handed down by only two arbitrators when the arbitration agreement in question unambiguously required arbitration before "at least three arbitrators." *Szuts v. Dean Witter Reynolds, Inc.,* 931 F.2d 830, 830 - 32 (11th Cir.1991). The Ninth Circuit has also vacated an arbitration award that failed to provide 'findings of fact and conclusions of law' as was required under the arbitration agreement. *W. Employers Ins. v. Jefferies & Co.*, 958 F.2d 258, 260 (9th Cir. 1992).

Unfairness in the proceedings can also be a basis for excess of powers and vacatur. *McKinney Drilling Co. v. Mach I Limited Partnership*, 32 MD App 205, 359 A.2d 100 (176) (arbitrator could have exceeded his powers in permitting officer of nonparty to attend all sessions and testify even though witnesses were to be sequestered). For example, arbitrators' procedural delay in completing the proceedings and entering an award has been found to support a claim they exceeded their powers. *Zervos v. Freedman Properties Ltd.,* 223 N.J. Super. 599, 539 A.2d 336 (1987) (arbitrators, without the explicit consent of parties, delayed

the closing of hearings by almost two months after the submission of final briefs, and also delayed in entry of the award, and were found to be in excess of their authorized powers). Evidence of an arbitrator's failure to notify a party of the pendency of an arbitration hearing has also been held to demonstrate procedural conduct in excess of powers sufficient to vacate an award. *T&M Properties v. ZVFK Architects & Planners*, 661 P.2d 1040 (Wyo. 1983) (arbitrator sent only one of several relevant contracts and did not send the correct contract to a party who failed to appear and against whom award was entered).

By dismissing this case *in toto* on summary judgment before the parties had the opportunity to conduct coverage-specific discovery nor to have any evidentiary hearing, the arbitrators denied Appellants "rights to present their case in full and to test [Appellee's] case through cross-examination." See *Chem-Met Co. v. Metaland Intern., Inc.*, No. Civ. A. 96-02548, 1998 WL 3572368, *4 (D.D.C. filed Mar. 25, 1998) (vacating arbitration award pursuant to the FAA because the arbitrators exceeded their powers by deciding the case on summary judgment and without an evidentiary hearing). The court in *Chem-Met* went on that "Even recognizing the need for flexibility in arbitration, it is a bedrock principle that each party must be given a full opportunity to present its case at a hearing on the evidence. The AAA's Rules make it clear that deviation from that principle is only legitimate upon the joint, written agreement of the parties." *Id.* at *4.

*The Arbitration Panel Went Beyond their Authority in Finding Woodbury Did Not Approve or Distribute the Asset Protection Plan*

The Arbitration Panel was not permitted to assess at summary judgment whether <u>Woodbury approved or distributed</u> the Asset Protection Plan, and based thereon to determine that the APP was "not [a Woodbury] product[] it and that hence, Woodbury's agents Miller and Schulick "did not perform 'professional services' as defined by the Policy . . . ."[54] The FINRA Award stated nothing about Woodbury's approval or distribution, nor anything about Woodbury at all, as Woodbury settled during the FINRA proceeding and there was no FINRA finding as to Woodbury.

*The Arbitration Panel Went Beyond their Authority in Finding that the conduct of Woodbury's representatives was "dishonest, malicious or knowingly wrongful"*

The Arbitration Panel was not permitted to bar the APP from coverage under the Dishonesty Exclusion based on a fact-finding that Woodbury's representatives Miller and Schulick were "dishonest, malicious or knowingly wrongful." The FINRA Award made no finding of dishonesty or of fraud. The FINRA Award acknowledges on its face that the fraud allegations were in fact <u>withdrawn</u> before conclusion of the proceedings. The FINRA Award is based on violations of the Texas Securities Act, DTPA and gross negligence, none of which contain an element of intent, malice, knowing wrongfulness or dishonesty. Nonetheless the

---

[54] CR: 251 – 253, at 252 (Final Summary Award) [emphasis added.]

Arbitration Panel made a fact finding that Miller and Schulick had engaged in "dishonest, malicious, [or] knowingly wrongful acts."[55]

Section 33 of the Texas Securities Act provides a civil cause of action against any person who offers or sells, or offers or buys, a security by means of a material misrepresentation or omission. A violation under Section 33 has only two elements: (1) a misrepresentation or omission, (2) that is material. Tex. Rev. Civ. St. Ann. Art. 581-33(A)(2); *Duperier v. Texas State Bank*, 28 S.W.3d 740 (Tex. App. 2000). The plaintiff need not prove scienter. *See Busse v. Pacific Cattle Feedings Fund No. 1, Ltd.*, 896 S.W.2d 807, 815 (Tex. App. 1995); *Duperier*, 28 S.W.3d 740. Likewise, there is no scienter element under the DTPA. The elements of a successful Deceptive Trade Practices Act claim is: (1) the plaintiff is a consumer, (2) the defendant can be sued under the DTPA, (3) the defendant committed one or more wrongful acts under the DTPA, (4) the defendant's acts was a producing cause of plaintiff's damages. *Armstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996). A DTPA violation does not prove intentional dishonesty and an insured *can* be held liable for DTPA without any showing of dishonesty, fraud or malicious intent. Even a knowing violation is not necessarily intentional: "Knowing violations of the DTPA are not intentional torts." *National Union Fire Ins. Co. of Pittsburgh, P.A. v. Puget Plastics Corp.*, 532 F.3d 398 (5th

---

[55] CR: 251 – 251, at 252 (Final Summary Award).

Cir. 2008), citing *Pope v. Rollins Protective Serv. Co.*, 703 F.2d 197, 201 (5th Cir. 1983) (noting one of the primary reasons for the DTPA's enactment was "to provide consumers with a remedy for deceptive trade practices without the burdens of proof and numerous defenses encountered in a common law fraud or breach of warranty action"); *Thomas J. Sibley, P.C. v. National Union Fire Ins. Co. of Pittsburgh, P.A.*, 921 F.Supp. 1526 (E.D. Tex. 1996) (noting that it is possible to violate deceptive trade practices law without showing any dishonesty or fraud). In *St. Paul*, the Texas Supreme Court found that there was evidence of negligence and violations of the DTPA, but no evidence of the actual awareness that the actions were false, deceptive or unfair, or that the insurer was "more than consciously indifferent" to the rights and welfare of the person affected. *St. Paul Surplus Lines Ins. Co., Inc. v. Dal-Worth Tank Co., Inc.,* 974 W.S.2d 51, 54 (Tex. 1998). "All that we can definitively conclude" from a finding of a knowing violation of the DTPA is that the actions were deliberately taken. *Puget Plastics Corp.*, 532 F.3d at 402. There is simply no inherent element of intent to harm, awareness of the wrongfulness or maliciousness in DTPA violations.

Lastly, conduct that is dishonest, malicious or knowingly wrongful *cannot* be deduced from the FINRA Award's award of punitive damages. The FINRA panel awarded punitive damages based on gross negligence and for DTPA

violations, neither of which require contain elements that would trigger the Dishonesty Exclusion.[56]

First, as already stated, "Knowing violations of the DTPA are not intentional torts." *Puget,* 532 F.3d 398. Punitive damages awarded under the DTPA are higher when the conduct is deemed intentional. TEX. BUS. & COM. CODE § 17.50 (B)(1) (punitives for intentional violation can be as high as 3x the economic damages and the mental anguish damages). The punitive damages awarded by the FINRA panel were very low in comparison to the overall compensatory damages ($300,000 as compared to almost $3 million).[57] If the conduct was deemed intentional, the punitives would have been higher. Here the award was at 10%, not close to the 300% that would have been allowed if intentional.

Secondly, gross negligence, for punitive damages purposes, is defined in the Texas Civil Practice and Remedies Code as:

> an act or omission, which when viewed objectively from the standpoint of defendant(s) at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) of which the defendants have actual subjective, awareness of the risk involved, but nevertheless proceed with conscious indifference to the rights, safety or welfare of others.

TEX. CIV. PRAC. & REM. CODE § 41.001(11).

---

[56] CR: 145 – 157 (FINRA Award).
[57] CR: 145 – 157 (FINRA Award).

The standard is thus actual awareness of the risk, rather than knowing wrongfulness. This is distinct from "malice," which the FINRA panel did *not* find, and which does include "a specific intent" "to cause substantial injury or harm." TEX. CIV. PRAC. & REM. CODE § 41.001(7). The Texas Supreme Court has noted that the terms "gross negligence," "knowingly" "willful" and "intentional" are not to be equated, and that those "terms lie on a continuum with gross negligence being the lowest mental state and intentional being the highest." *St. Paul Surplus Lines,* 974 S.W.2d at 54 (quoting *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115, 118 (Tex. 1984).

The Policy covers negligent Wrongful Acts (i.e., professional negligence), and that is what the FINRA Award, on its face, found.[58] In the current coverage dispute the Claimants had the right to obtain discovery on such questions such as intent or dishonesty and any dispositive finding that the so-called Dishonesty Exclusion bars coverage was wholly premature at summary judgment stage of the coverage dispute. The Arbitration Panel's improper fact-finding at a summary judgment hearing was in clearly excess their delegated authority to determine summary judgment motions, and prior to discovery.

---

[58] CR: 12 - 95 (Woodury Insurance Policy); 145 – 157 (FINRA Award).

44

*Conclusion*

The Final Summary Award *itself* states on its face that the case concerns the "**enforcement**" of an underlying FINRA Award against the Policy.[59] The FINRA Award was self-explanatory and should have been viewed in a light most favorable to the prevailing parties – Dr. O'Grady and OFP. Instead, the coverage arbitrators did not pay due deference to the FINRA Award, and went beyond the scope of their authority to make factual findings not contained in the FINRA Award, and upon which no discovery had yet taken place, at a summary judgment hearing. They did this with the awareness of the existence of a significant amount of dispute over certain matters. In this coverage dispute, the Arbitration Panel was to determine coverage of the FINRA Award they were tasked to "enforce." They were to determine if there was coverage for its findings, i.e., violations of the DTPA, the Texas Securities Act, and gross negligence (NOT fraud, the claims of which were withdrawn and not adjudicated, and NOT malice). See, e.g., *Myers v. Hall Columbus Lender LLC*, 437 S.W.3d 632, 637 (Tex.App.—Dallas 2014) (noting the "well-settled law of insurance that a liability insurer's . . . **duty to indemnify is triggered** (or not) **by the <u>outcome of the case against the insured</u>**"). The coverage arbitrators' denial of coverage in its entirety, and refusal to permit those portions of the dispute that were still subject to disputed fact issues

---

[59] CR: 251 - 253 (Final Summary Award).

to survive summary judgment, was in excess of their powers. The outcome wrongfully denied Appellants of discovery, evidentiary hearings and due process generally, and unfairly launched Appellants from a position of *favorable* presumption (as the insured and as the prevailing party at FINRA) and into their current *unfavorable* position of challenging an arbitration award.

The Arbitration Panel was procedurally restricted by agreement or the parties and they overstepped procedural bounds by making their own assessments on disputed factual matters that had not yet been arrived at, fully aired and or submitted to a hearing on the merits. Even *with* such a procedural restriction, Appellants could theoretically result in a total summary disposition at the initial phase, under certain circumstances. However in the instant case and under the instant circumstances, *this* Arbitration Panel, bound to review the FINRA Award and the Policy, could not make a summary disposition at the junction that they did, and it was beyond the scope of their delegated authority to do so.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellants pray that this Court find that the Arbitration Panel acted in excess of its powers when it found that there was no coverage under the Policy for the Asset Protection Plan and to vacate or modify that portion of the Final Summary Award, and remand to arbitration so that coverage of the Asset Protection Plan under the Policy may be assessed after a

full evidentiary hearing on the merits. Appellants further prays for such other relief, whether at law or in equity to which this Court deems they are justly entitled.

Respectfully submitted,

RICHIE & GUERINGER, P.C.


BY: ___/s/ *Sheldon E. Richie*_____
     SHELDON E. RICHIE
     State Bar of Texas No. 16877000
     Email: srichie@rg-austin.com
     EMILY J. SEIKEL
     State Bar of Texas No. 24072331
     Email: eseikel@rg-austin.com
     100 Congress Avenue, Suite 1750
     Austin, Texas 78701
     512-236-9220 telephone
     512-236-9230 facsimile

     ATTORNEYS FOR APPELLANTS

# CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rules of Appellate Procedure 9.4, the undersigned certifies Appellant's Brief complies with 9.4.

1. Exclusive of the exempted portions in Texas Rules of Appellate Procedure 9.4(i)(1), Appellants' Brief contains 8,504 words.

2. Appellant's Brief has been prepared in proportionally spaced typeface using Microsoft Word Version 2007 in Times New Roman 14 point.

3. The undersigned has provided an electronic version of Appellants' Brief.

4. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of Texas Rules of Appellate Procedure 9.4, may result in the Court's striking Appellants' Brief.

*/s/ Emily J. Seikel*
Sheldon E. Richie/Emily J. Seikel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was served upon the following parties via electronic mail by the Court's CM-ECF system on this the 19th day of August 2015, as follows:

Robert S. Harrell
Jon C. Rice
Andrea L. Fair
Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, Texas  77010

*Counsel for Appellee*

*/s/ Emily J. Seikel*
Sheldon E. Richie/Emily J. Seikel

NO. 13-15-00312-CV

IN THE COURT OF APPEALS
FOR THE THIRTEENTH JUDICIAL DISTRICT OF TEXAS
AT CORPUS CHRISTI

BRIAN O'GRADY, M.D. AND
THE O'GRADY FAMILY PARTNERSHIP, LTD.
*Appellants*,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
P.A.,
*Appellee.*

Appealed from the 53rd District Court of Travis County, Texas

APPENDIX TO
RECORD EXHIBITS ACCOMPANYING
APPELLANTS' BRIEF

NO. 13-15-00312-CV

IN THE COURT OF APPEALS
FOR THE THIRTEENTH JUDICIAL DISTRICT OF TEXAS
AT CORPUS CHRISTI

BRIAN O'GRADY, M.D. AND
THE O'GRADY FAMILY PARTNERSHIP, LTD.
*Appellants*,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
P.A.,
*Appellee.*

Appealed from the 53rd District Court of Travis County, Texas

TABLE OF CONTENTS
TO RECORD EXHIBITS ACCOMPANYING
APPELLANTS' BRIEF

The Appellants, Brian O'Grady, M.D. and The O'Grady Family Partnership, Ltd.,

submits the following exhibits in support of the Appellants' Brief.

**TAB**  **DESCRIPTION**

A  Order Confirming Award and Denying Motion to Vacate [C.R. 321-322]

B  Final Summary Award [C.R. 251-253]

C  FINRA Award [C.R. 145-148]

D  Plaintiffs' Original Petition [C.R. 3-99]

    a.  Woodbury Insurance Policy [C.R. 12-95]

    b.  Final Judgment Entering FINRA Award [C.R. 96-97]

    c.  Turnover Order [C.R. 98-99]

**TAB** **DESCRIPTION**

E     American Arbitration Association Case Management Order No. 1
[C.R. 310-311]

F     TEX. CIV. PRAC. & REM. CODE § 171.088

G     TEX. CIV. PRAC. & REM. CODE § 171.091

H     9 U.S.C.A. § 10

I     TEX. CIV. PRAC. & REM. CODE § 41.001 - 41.003

J     AAA Commercial Arbitration Rules

K     *Leshin v. Oliva*, --- S.W.3d ---, 2015 WL4554333 (Tex.App.—San Antonio,
July 29, 2015, no pet. h.)

# APPENDIX

# TAB A

# ORDER CONFIRMING AWARD AND DENYING MOTION TO VACATE
## (C.R. 321-322)

CAUSE NO. D-1-GN-13-002748

| | | |
|---|---|---|
| BRIAN O'GRADY, M.D. and | § | IN THE DISTRICT COURT OF |
| THE O'GRADY FAMILY | § | |
| PARTNERSHIP, LTD., as owners of | § | |
| the claim of David Miller, Brett | § | |
| Schulick, and River Oaks Capital, Inc. | § | |
| per the June 28, 2013 Turnover Order | § | |
| of Judge Tim Sulak | § | |
| Plaintiffs, | § | TRAVIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| NATIONAL UNION FIRE INSURANCE | § | |
| COMPANY OF PITTSBURGH, PA., | § | |
| | § | |
| | § | |
| Defendant. | § | 53rd JUDICIAL DISTRICT |

## ORDER CONFIRMING ARBITRATION AWARD AND DENYING MOTION TO VACATE AND FINAL JUDGMENT

Pending before the Court is Defendant National Union Fire Insurance Company of Pittsburgh, Pa.'s ("National Union") Motion to Confirm Arbitration Award ("Motion to Confirm") and the Motion to Vacate or Modify Arbitration Award ("Motion to Vacate") filed by Plaintiffs Brian O'Grady, M.D. and The O'Grady Family Partnership, Ltd. ("Plaintiffs"). In American Arbitration Association ("AAA") Case No. 01-14-0000-1777 panel members Hon. Raul A. Gonzalez, Susan G. Perin, and John K. Boyce, III (the "Panel") found no genuine issue of material fact regarding the lack of coverage under Insurance Agents Professional Liability Insurance Policy No. 665-25-96 (the "Policy") for a FINRA arbitration award entered against David Miller, Brett Schulick, and River Oaks Capital Management, Inc. ("Miller and Schulick"). The Panel found that National Union and American International Group, Inc. ("AIG") are entitled to an award as a matter of law. The Panel held:

- that Miller and Schulick did not perform "professional services" as defined by the Policy in Endorsements 7 and 8, and that the Policy therefore provides no coverage.



004033056

321

- that the FINRA award's finding of "punitive damages pursuant to the Texas Deceptive Trade Practices Act ("DTPA"), and gross negligence" constitutes "dishonest, malicious, [or] knowingly wrongful" acts, and coverage under the Policy is excluded.

- that coverage for the Art Purchase Agreement and Team 02 is excluded under Endorsement 12 of the Policy.

- that AIG is neither an insurer under the Policy nor a party to the Policy.

After considering the motions, the responses, replies, and argument of counsel, the Court finds the Motion to Confirm should be GRANTED and the Motion to Vacate should be DENIED.

IT IS THEREFORE ORDERED that the Final Summary Award dated February 6, 2015, issued in AAA Case No. 01-14-0000-1777 by the Panel is CONFIRMED.

IT IS FURTHER ORDERED that the Motion to Vacate is DENIED.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiffs Brian O'Grady, M.D. and The O'Grady Family Partnership, Ltd., as owners of the claim of David Miller, Brett Schulick, and River Oaks Capital, Inc., TAKE NOTHING on their claims against National Union and AIG.

All relief requested in this case and not expressly granted is denied.

Signed this 15TH day of ___MAY___, 2015.

_____
JUDGE PRESIDING

TIM SULAK

Approved as to form:

_____
on behalf of Plaintiffs

_____
on behalf of Defendant

- 2 -

**APPENDIX**

**TAB B**

**FINAL SUMMARY AWARD**
**(C.R. 251-253)**

BRIAN O'GRADY, M.D. AND THE O'GRADY FAMILY PARTNERSHIP, LTD.

Claimants,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, AND AMERICAN INTERNATIONAL GROUP, INC.

Respondents

## FINAL SUMMARY AWARD

**WE, THE UNDERSIGNED ARBITRATORS,** having been duly appointed pursuant to ¶19 "Arbitration" contained in the National Union professional liability insurance policy effective August 1, 2008 ("Policy"), the subject of this suit; having been sworn, and having heard the allegations, arguments of the Parties, and having considered all furnished briefs, exhibits, documents, and affidavits; and having reviewed the exhibits and documents presented at the summary judgment hearing, the Panel enters its AWARD, as follows:

### Introduction

1.      A summary judgment hearing was conducted on December 17, 2014, at the Four Seasons Hotel, Austin, Texas. Both sides moved for summary judgment. Sheldon E. (Don) Richie and Emily J. Seikel of Richie & Gueringer, P.C. appeared on behalf of Claimants, Brian O'Grady, M.D. and the O'Grady Family Partnership, Ltd. ("Claimant"). Robert S. Harrell, Jon Rice and Katie McNeanney of Norton Rose Fulbright appeared on behalf of Respondents, National Union Fire Insurance Company of Pittsburgh, PA. ("National Union") and American International Group ("AIG"). Additional briefs were filed after the hearing.

2.      This case concerns the enforcement of an underlying Financial Industries Regulatory Authority ("FINRA") arbitration award- turned-judgment ("Award") against the subject Policy.

EXHIBIT D
TO MOTION TO VACATE
OR MODIFY ARBITRATION AWARD

<u>Award</u>

The Panel finds that there is no genuine issue of material fact regarding the lack of coverage under the Policy for Claimants' Award, and those Respondents are entitled to an award as a matter of law. ACCORDINGLY, Respondents' motion for summary judgment be and is hereby GRANTED.

<u>Reasoning</u>

1. The three Products/Transactions, the Asset Protection Plan, the Art Purchase Agreement, and Team 02, subjects of this arbitration, were <u>not</u> Woodbury Financial Services, Inc.'s ("Woodbury") products because Woodbury neither approved nor distributed them. Hence, Woodbury's agents, Miller and Schulick, ("Agents") did not perform "professional services" as defined by the Policy in Endorsements 7 and 8, and the Policy does not cover the Award;

2. The FINRA Award's finding #4 of "punitive damages pursuant to the Texas Deceptive Trade Practices Act ("DTPA"), and gross negligence" constitutes "dishonest, malicious, [or] knowingly wrongful" acts, and coverage under the Policy is excluded under its Endorsement 3(a); and

3. Coverage for the Agents' Art Purchase Agreement and Team 02 is excluded under Endorsement 12 of the Policy.

4. AIG is neither an insurer under the Policy nor a party to the Policy, nor is there any arbitrable contract between AIG and Claimants.

<u>Fees and Expenses</u>

The administrative fees and expenses of the American Arbitration Association totaling $8200.00 and the compensation and expenses of the arbitrators totaling $67,094.73 shall be borne by borne by the party incurring same.

This AWARD is in full settlement of all claims and counterclaims submitted in this arbitration. All claims for relief not expressly granted herein, including all claims set forth by the Parties in their pleadings, in their pre- and post-summary judgment hearing briefs, or orally at the hearing, are hereby DENIED.

This award may be executed in multiple copies.

2-6-15
Date

_Raul A. Gonzalez_
Hon. Raul A. Gonzalez, Chair

February 6, 2015
Date

_Susan G. Perin_
Susan G. Perin, Arbitrator

February 6, 2015
Date

_John K. Boyce, III_
John K. Boyce, III, Arbitrator

**APPENDIX**

**TAB C**

**FINRA AWARD**
**(C.R. 145-147)**

**FINRA Dispute Resolution**
**Midwest Processing Center**
**55 West Monroe Street**
**Suite 2600**
**Chicago, IL 60603**
**E-mail:midwestprocessingcenter@finra.org**
**Phone: 312-899-4440**
**Fax: 312-236-9239**



Number of Pages including the Cover Sheet: _____

Date: 10/04/2012

Case Number:10-04965

Case Name:   Brian O'Grady and The O'Grady Family Partnership, Ltd. vs. Woodbury Financial Services, Inc., David Mi ler, et al.

To:       Andrew Leib )witz  Phone:   214-915-9841  Fax: 214-752-8250
          Sheldon E. Ri :hie   Phone:   512-236-9220  Fax: 512-236-9230

From:     Elizabeth Mul( oon
          Case Administ :ator

Message:

This facsimile transmission is int :nded only for the addressee(s) shown above. It may contain information that is privileged, confidential, or otherwise protected from disclosure. Any review, dissemination or use of this transmission or its contents by persons other than addressee is s rictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at the above number.

EXHIBIT A
TO MOTION TO VACATE
OR MODIFY ARBITRATION AWARD



**FINRA**

Financial Industry Regulatory Authority

October 4, 2012

Sheldon E. Richie, Esq.
Richie & Gueringer, P.C.
100 Congress Ave.
1750
Austin, TX 78701

Subject:    FINRA Dispute Resolution Arbitration Number 10-04965
            Brian O'Gracy and The O'Grady Family Partnership, Ltd. vs. Woodbury Financial
            Services, Inc., David Miller, et al.

Dear Mr. Richie:

Enclosed please find the decision reached by the arbitrators in the above-referenced matter.

### Responsibility to Pay Monetary Award

FINRA rules provide that all monetary awards shall be paid within 30 days of receipt unless a
motion to vacate has been filed with a court of competent jurisdiction. An award shall bear
interest from the date of the award:

- If not paid within 30 days of receipt;
- If the award is the subject of a motion to vacate which is denied; or
- As specified by the panel in the award.

Interest shall be assessed at the legal rate, if any, then prevailing in the state where the award
was rendered, or at a rate set by the arbitrators.

### Expedited Suspension Proceedings for Non-Payment of Awards

Article VI, Section 3 of the FINRA By-Laws and FINRA Rule 9554 permit FINRA to suspend or
cancel the registration of any firm or associated person that fails to comply with a FINRA
arbitration award.

Firms are required to notify FINRA in writing within 30 days of receipt of an award that they or
their associated persons have paid or otherwise complied with the award, or to identify a valid
basis for non-payment. We also request that prevailing claimants notify us in writing when their
awards have not been paid within 30 days of receipt of the award.

Written notification concerning award compliance or lack thereof should be directed to:

Investor protection. Market integrity.       Dispute Resolution      55 West Monroe Street    t  312 899 4440
                                             Midwest Regional Office  Suite 2600              f  312 236 9239
                                                                      Chicago, IL             www.finra.org
                                                                      60603-5104

David Carey
FINRA Dispute Resolution
One Liberty Plaza, 165 Broadway, 52nd Floor
New York, NY 10006
212-858-4333 (tel) | 301-527-4706 (fax) | david.carey@finra.org (email)

## Right to File Motion to Vacate Award

FINRA rules provide that, unless the applicable law directs otherwise, all awards rendered are final and are not subject to review or appeal. Accordingly, FINRA has no authority to vacate this award. Any party wishing to challenge the award must make a motion to vacate the award in a federal or state court of appropriate jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, or applicable state statute. There are limited grounds for vacating an arbitration award, and a party must bring a motion to vacate within the time period specified by the applicable statute. If you are not represented by counsel and wish to challenge the award, we urge you to seek legal advice regarding any rights or remedies available to you.

## Forum Fees

You will receive under separate cover an invoice that reflects the fees assessed and any outstanding balance or refund due. Fees are due and payable to FINRA Dispute Resolution upon receipt of the invoice and should be sent to the address specified on the invoice. Any applicable refunds will also be sent under separate cover approximately 45 days after the case closes. All questions regarding payment of fees and refunds should be directed to FINRA Finance at (240) 386-5910.

## Arbitrator Evaluation

FINRA encourages parties to complete Arbitrator Evaluation Forms at the conclusion of every case. We will utilize your comments in our ongoing efforts to evaluate and improve the services our forum provides. You can complete the Arbitrator Evaluation Form on our website at www.finra.org/arbevaluation.

## Party Submissions to Arbitrators After a Case Closes

FINRA rules provide that parties may not submit documents to arbitrators in cases that have been closed except under the following limited circumstances: 1) as ordered by a court; 2) at the request of any party within 10 days of service of an award, for typographical or computational errors, or mistakes in the description of any person or property referred to in the award; or 3) if all parties agree and submit documents within 10 days of service of an award. Any documents, if submitted, must be sent through FINRA.

## Questions Concerning Award

Should you have any questions, please contact me at the phone number or email address provided below. Parties should not directly contact arbitrators under any circumstances.

Very truly yours,

Elizabeth A. Muldoon, Esq.
Case Administrator
Phone:  312-899-4440
Fax:       301-527-4856
Elizabeth.Muldoon@finra.org

EAW:aas:LC09A
idr: 08/29/2012

RECIPIENTS:
Andrew Leibowitz, Esq., River Oaks Capital Management, Inc.
The Berry Firm PLLC, 1412 Main Street, Suite 2300, Dallas, TX 75202

Andrew Leibowitz, Esq., Brett Stephen Schulick
The Berry Firm PLLC, 1412 Main Street, Suite 2300, Dallas, TX 75202

Andrew Leibowitz, Esq., David Charles Miller
The Berry Firm PLLC, 1412 Main Street, Suite 2300, Dallas, TX 75202

Sheldon E. Richie, Esq., The O'Grady Family Partnership, Ltd.
Richie & Gueringer, P.C., 100 Congress Ave., 1750, Austin, TX 78701

Sheldon E. Richie, Esq., Brian O'Grady, M.D.
Richie & Gueringer, P.C., 100 Congress Ave., 1750, Austin, TX 78701

**APPENDIX**

**TAB D**

**PLAINTIFFS' ORIGINAL PETITION**
**(C.R. 3-99)**

Filed
13 August 9 P3:27
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-13-002748

CAUSE NO. _____

| | | |
|---|---|---|
| BRIAN O'GRADY, M.D. and | § | IN THE DISTRICT COURT OF |
| THE O'GRADY FAMILY | § | |
| PARTNERSHIP, LTD., as owners of | § | |
| the claim of David Miller, Brett | § | |
| Schulick, and River Oaks Capital, | § | |
| Inc. per the June 28, 2013 Turnover | § | |
| Order of Judge Tim Sulak | § | TRAVIS COUNTY, TEXAS |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| NATIONAL UNION FIRE INSURANCE | § | |
| COMPANY OF PITTSBURGH, PA. | § | |
| Defendant. | § | _____ JUDICIAL DISTRICT |

## ORIGINAL PETITION

Plaintiffs, BRIAN O'GRADY, M.D. and THE O'GRADY FAMILY PARTNERSHIP, LTD., as owners of claims of David Miller, Brett Schulick, and River Oaks Capital Management, Inc. (collectively "Plaintiffs") file this Original Petition against NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA ("Defendant" or "National Union").

## INTRODUCTION

1.      Plaintiffs seek a judicial declaration that the Judgment awarded them against Defendant's Insureds is covered by the Policy which is the subject of this lawsuit.

2.      Plaintiffs seek damages against Defendant for bad faith, breach of contract, breach of the common law duty of good faith and fair dealing, violations of the Texas Insurance Code, and unfair and deceptive trade practices.

## DISCOVERY LEVEL 3

3.      Discovery in this matter will be conducted pursuant to Rule 190.4 (Level 3) of the Texas Rules of Civil Procedure.

**PARTIES**

4.      Plaintiff Brian O'Grady, M.D. ("O'Grady") is an individual.

5.      Plaintiff The O'Grady Family Partnership, Ltd. ("OFP") is a duly-registered Texas Limited Partnership authorized to do business in the State of Texas.

6.      Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("Defendant" or "National Union") is a foreign for profit corporation conducting business in the State of Texas and may be served through its registered agent, Corporation Service Company at 211 East 7th Street, Suite 620, Austin Texas 78701-3218, or wherever else National Union may be found.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over Defendant pursuant to section 37.003 of the Texas Civil Practice & Remedies Code.

8.      Pursuant to Section 15.002(1) of the Texas Civil Practice and Remedies Code, jurisdiction and venue are appropriate in the District Court of Travis County, Texas because all or a substantial part of the events and/or omissions on which this lawsuit is based occurred in Travis County. More specifically, the final judgment of the underlying action for which National Union is liable for was entered in Travis County, Texas. Additionally, the turnover order by which Plaintiffs recovered the rights of Defendant's Insureds and Plaintiffs was entered in Travis County, Texas.

9.      The amount in controversy is over $1,000,000.00 and is within the jurisdictional limits of this court.

**BACKGROUND FACTS**

10.      National Union issued a policy, Policy Number 00-665-25-96 (the "Policy"), insuring Woodbury Financial Services, Inc. ("Woodbury"), River Oaks Capital Management,

2

Inc. ("ROC Management"), David Miller ("Miller"), and Brett Schulick ("Schulick"), collectively "Insureds." A true and correct copy of the Policy is attached hereto as **Exhibit A.**

11.    On September 25, 2008, during the coverage period, Plaintiffs sued the Insureds for various wrongful acts covered under the Policy. The Insureds timely notified National Union of their claim and Plaintiffs' law suit (hereinafter the "Underlying Action"). National Union tendered a defense for ROC Management, Miller and Schulick in the Underlying Action.

12.    With the sole exception of Woodbury, who agreed to a settlement with Plaintiffs, Plaintiffs prevailed against the remaining Insureds (ROC Management, Miller, and Schulick) at the arbitration of the Underlying Action.

13.    A final judgment awarding Plaintiffs the principal amount of $3,279,351.49, plus interest, was entered in the 98th Judicial District Court of Travis County, Texas against Defendant's Insureds - ROC Management, Miller, and Schulick, on February 28, 2013. A true and correct copy of the Judgment is attached hereto as **Exhibit B.**

14.    Despite the Judgment against its Insureds, National Union has refused and continues to refuse to pay Plaintiffs the amounts of the Judgment covered by the Policy claiming lack of coverage.

15.    Defendant's Insureds, ROC Management, Miller, and Schulick have failed to satisfy the Judgment awarded to Plaintiffs, forcing Plaintiffs to obtain a Turnover Order granting ownership in the Insureds' rights under the Policy to Plaintiffs. A true and correct copy of Plaintiffs' Turnover Order is attached hereto as **Exhibit C.**

## DECLARATORY JUDGMENT

16.    Plaintiffs incorporate paragraphs 1 through 15 as if fully set forth verbatim herein.

3

17.     The Texas Declaratory Judgment Act ("TDJA") expressly authorizes this Court to declare the rights and other legal relations of any interested party seeking such declaration. TEX. CIV. PRAC. & REM. CODE § 37.003(a). Thus, Plaintiffs request that this Court declare coverage under the Policy giving rise to this proceeding. That is, Plaintiffs seek a judicial declaration from the Court ruling that Plaintiffs' monetary judgment against ROC Management, Miller, and Schulick is enforceable against Defendant because Plaintiffs' damages award qualifies as a covered claim under the Policy.

18.     Plaintiffs also request the Court to award costs and reasonable and necessary attorneys' fees as "are equitable and just."

## BREACH OF CONTRACT

19.     Plaintiffs incorporate paragraphs 1 through 18 as if fully set forth verbatim herein.

20.     In the Underlying Action, Plaintiffs prevailed on their claims against Defendant's Insureds, ROC Management, Miller, and Schulick. Said claims were covered under the Policy issued by Defendant. In breach of its contractual obligations to its Insureds and now Plaintiffs National Union has refused to tender amounts in satisfaction of the judgment awarded to Plaintiffs. As a result of such breach, Defendant's Insureds and Plaintiffs have been damaged in an amount in excess of $3,279,351.49, plus interest.

21.     As a result of Defendant's breach of contract, Plaintiffs, as owners of the claims held by Defendant's Insureds are entitled to recover damages and reasonable and necessary attorneys fees incurred in this lawsuit.

## BAD FAITH

22.     Plaintiffs incorporate paragraphs 1 through 21 as if fully set forth verbatim herein.

4

23.     ROC Management, Miller, and Schulick and now Plaintiffs, qualify as Insureds under the Policy issued by National Union, which gives rise to a duty of good faith and fair dealing.

24.     Defendant owes its Insureds ROC Management, Miller, Schulick, and now Plaintiffs, the duty to deal fairly and in good faith in processing and paying their claims, including the judgment awarded to Plaintiffs against Defendant's Insureds.

25.     Defendant breached its duty to its Insureds ROC Management, Miller, Schulick and now Plaintiffs, by wrongfully denying payment of a valid, covered claim when Defendant knew its liability under the Policy was reasonably clear.

26.     Defendant's Insureds and Plaintiffs suffered injury proximately caused by Defendant's breach.

27.     As owners of the claims and rights of Defendant's Insureds, ROC Management, Miller, and Schulick under the Policy, Plaintiffs are entitled to recover damages against Defendant for Defendant's bad faith. Plaintiffs are also entitled to costs and attorney's fees for the pursuit of this action pursuant to the Texas Civil Practice & Remedies Code § 38.001 and Article 21.55 of the Texas Insurance Code.

28.     Defendant is liable for punitive damages because Defendant's breach of the duty of good faith and fair dealing was accomplished by intentional, fraudulent, or grossly negligent conduct.

## VIOLATION OF THE TEXAS INSURANCE CODE

29.     Plaintiffs incorporate paragraphs 1 through 28 as if fully set forth verbatim herein.

30.     The actions of Defendant as described above constitute violations of the Texas Insurance Code.

5

31.    Defendant violated Section 541.060 of the Texas Insurance Code by refusing and failing to tender payment to Plaintiffs in satisfaction of the Judgment, which is a claim covered by the Policy.

32.    As owners of the claims and rights retained by ROC Management, Miller, and Schulick against Defendant, Plaintiffs are entitled to any and all damages owed by Defendant to ROC Management, Miller, and Schulick.  Further, Plaintiffs are entitled to an award of up to three times the amount of their actual damages because of Defendant's knowing violations of the Texas Insurance Code.

33.    Pursuant to Chapter 541 of the Texas Insurance Code, Plaintiffs are entitled to a statutory penalty of 18% per annum plus reasonable and necessary attorney's fees.

## UNFAIR AND DECEPTIVE TRADE PRACTICES

34.    Plaintiffs incorporate paragraphs 1 through 33 as if fully set forth verbatim herein.

35.    As Defendant's Insureds and Plaintiffs, ROC Management, Miller, Schulick and now Plaintiffs, qualify as consumers under the DTPA.  The actions of Defendant as described above constitute violations of the Texas Deceptive Trade Practices Act ("DTPA").

36.    Defendant's wrongful acts were a producing cause of damages to ROC Management, Miller, Schulick and Plaintiffs.

37.    To that end and as owners of the claims and rights retained by ROC Management, Miller, and Schulick against Defendant, Plaintiffs are entitled to any and all damages owed by Defendant to ROC Management, Miller, and Schulick.

## SPECIFIC PERFORMANCE

38.    Plaintiffs incorporate paragraphs 1 through 37 as if fully set forth verbatim herein.

39.    Plaintiffs are entitled to specific performance of the terms, conditions, and provisions of the insurance policy issued by Defendant. Accordingly, Defendant should be

6

ordered by the Court to specifically perform its obligations under the policy and pay Plaintiffs the entire Judgment award obtained by them in the Underlying Action, plus any related interest, fees, and costs.

## EXEMPLARY DAMAGES

40.     Plaintiffs incorporate paragraphs 1 through 39 as if fully set forth verbatim herein.

41.     Plaintiffs are entitled to damages resulting from injuries caused by Defendant's wrongful conduct.  Defendant's wrongful conduct includes acts amounting to gross negligence, malice, or actual fraud, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code §41.003(a).

## COSTS AND ATTORNEYS' FEES

42.     Plaintiffs incorporate paragraphs 1 through 41 as if fully set forth verbatim herein.

43.     As a result of Defendant's wrongful conduct, Plaintiffs had to engage the services of the law firm of Richie & Gueringer, P.C., licensed attorneys, to represent them in this action, and have agreed to pay said attorneys a reasonable fee for their services.  Plaintiffs request these attorneys' fees and costs incurred in connection herewith pursuant to all applicable laws, including but not limited to, Chapter 37.009 of the Texas Civil Practice and Remedies Code, Chapter 38.001 of the Texas Civil Practice and Remedies Code, Article 21.55 of the Texas Insurance Code, Chapter 541 of the Texas Insurance Code as well as the Texas Deceptive Trade Practices Act.

## CONDITIONS PRECEDENT

44.     All conditions precedent to Plaintiffs' claims for relief have been performed or have occurred.  National Union received timely notice and demand of the Insureds' coverage claim.  In fact, National Union had representative counsel appear on its behalf at the arbitration of the Underlying Action.

7

## MOTION TO REFER TO ARBITRATION

45.     Plaintiffs' claims are subject to an arbitration agreement.  Said arbitration agreement is included in the insurance policy attached as **Exhibit A**.  Upon hearing, Plaintiffs would request that this case be abated and referred to arbitration.

## PRAYER

WHEREFORE, based on the foregoing, Plaintiffs respectfully pray that Defendant be summoned to appear and answer, and that upon the allegations hereof, Plaintiffs be granted the following:

a)     An abatement and referral to arbitration of this case;

b)     Declaration that Defendant is liable to Plaintiffs for all amounts provided by the Final Judgment of the Underlying Action;

c)     Declaration and Judgment against Defendant for actual damages, exemplary damages, and applicable statutory damages and/or specific performance;

d)     Attorney's fees incurred by Plaintiffs;

e)     Costs of suit;

f)     Pre-judgment and post-judgment interest;

g)     Such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

8

Respectfully submitted,

RICHIE & GUERINGER, P.C.

BY: _____

SHELDON E. RICHIE
State Bar No. 16877000
WARREN C. WILLS
State Bar No. 24037716
JEANINE O. NAVARRO
State Bar No. 24052894
100 Congress Avenue, Suite 1750
Austin, Texas 78701
512-236-9220 telephone
512-236-9230 facsimile

ATTORNEYS FOR PLAINTIFF

9

National Union Fire Insurance Company of Pittsburgh, Pa.
*175 Water Street*
*New York, NY 10038*

*212-770-7000*

A member company of
American International Group, Inc.

---

**NOTICE OF SUBJECT TO INFORMATION**

*September 18, 2008*

*SETH COLE*
*ALLIANT INSURANCE SERVICES, INC.*
*600 MONTGOMERY ST*
*FL 9TH*
*SAN FRANCISCO, CA 94111-2711*

RE: **WOODBURY FINANCIAL SERVICES, INC.**
**THROUGH THE FINANCIAL SALES**
**PROFESSIONALS RISK PURCHASING GROUP**

Policy Number: 00- 665- 25- 96

*Dear SETH*

As you are aware, this account was bound subject to the receipt, review and acceptance of various additional information or documentation. Unfortunately, as of the present date, the following information and/or documentation which is required to permanently bind the above-reference account, pursuant to our temporary and conditional binder, is still outstanding:

- *Confirmation that the appropriate RPG is still in place*
- *Completed, signed and dated application (no warranty questions).*
- *Schedule of Insured Agents to be covered under the policy, due to the Insurer no later than forty-five (45) days from policy inception (due 9/15/2008) and quarterly enrollment updates*

This information and/or documentation was to have been received, reviewed and given written underwriting approval by this office by *August 8, 2008*          .

As a matter of courtesy, we enclose your client's policy. However, please note that by accepting the policy, you acknowledge that by issuing the policy, we do not waive our right to receive, review and approve the additional information or documentation noted above.

Also, be advised that we have added exclusionary endorsement(s) to the policy pursuant to our rights set forth in our binder for the policy. Upon receipt and review of this outstanding information and/or documentation and written underwriting approval by this office, we may remove these exclusionary endorsements.

If you have already sent the information requested above, please accept my sincerest apologies and call me at *212-458-2863*          .

Very truly yours,

*Marshall Rothstein*

Enc.

360000925

*BROKER*
*Archive Copy*



**EXHIBIT**

A

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aigproducercompensation.com or by calling AIG at 1-800-706-3102.

91222 (7/06)*Archive Copy*



# AIG EXECUTIVE LIABILITY <sup>SM</sup>

Insurance provided by the following member of American International Group, Inc.

## National Union Fire Insurance Company of Pittsburgh, Pa.

A capital stock company

POLICY NUMBER: 00-665-25-96        REPLACEMENT OF POLICY NUMBER: 00-664-90-85

**INSURANCE COMPANY SUPERVISORY & VICARIOUS LIABILITY AND
INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY**

NOTICE: THIS IS A CLAIMS-MADE FORM. EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE DEDUCTIBLE.

### DECLARATIONS

Item 1.   NAMED INSURED:   **WOODBURY FINANCIAL SERVICES, INC.
THROUGH THE FINANCIAL SALES
PROFESSIONALS RISK PURCHASING GROUP**

MAILING ADDRESS:   **500 BIELENBERG DRIVE
WOODBURY, MN 55125**

Item 2.   POLICY PERIOD: From: **AUGUST 1, 2008**      To: **DECEMBER 1, 2009**
(12:01 A.M. standard time at the address stated in Item 1.)

Item 3.   LIMIT OF LIABILITY: **$75,000,000**      aggregate for Coverages A, B and C combined (including Defense Costs).

The limit of the Insurer's liability for all amounts payable hereunder in settlement or satisfaction of Claims covered under this policy shall be subject to one of the following Sub-Limits of Liability:

a.   **See End't #1** for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts resulting in a Claim(s) made against:
(i)      one Insured Agent; or
(ii)     the Named Insured; or
(iii)    both one Insured Agent and the Named Insured.

68909 10/97 *Archive Copy*                    1
© American International Group, Inc. All rights reserved.

b.  **$3,000,000**  for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts resulting in a Claim(s) made against:
(i)   more than one Insured Agent; or
(ii)  both more then one Insured Agent and the Named Insured.

c.  **N/A**  for Damages and Defense Costs arising from a Class Action Suit (certified or non-certified) alleging a Wrongful Act or Interrelated Wrongful Acts resulting in a Claim(s) made against:
(i)   the Named Insured; or
(ii)  both the Named Insured and more than one Insured Agent.

The Sub-Limits of Liability shall not increase the aggregate Limit of Liability.

Item 4,   DEDUCTIBLE:

a.  Named Insured Non-Class Action Deductible:

**N/A**  for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts. The Named Insured Deductible shall apply to all Insureds under this policy when a Claim(s) is suited and made against:
(i)   the Named Insured; or
(ii)  both the Named Insured and one or more Insured Agents.

b.  Named Insured Class Action Deductible (Shall only apply if Coverage C is elected):

**N/A**  for Damages and Defense Costs arising from a Class Action suit (certified or non-certified) alleging a Wrongful Act or Interrelated Wrongful Acts. The Named Insured Class Action Deductible shall apply under this policy when a Claim(s) is suited and made against:
(i)   the Named Insured; or
(ii)  both the Named Insured and one or more Insured Agents.

In the event a Class Action is not certified prior to final disposition of the suit, the deductible in Item 4a shall apply and the Insurer shall reimburse the Named Insured for all Damages and Defense Costs in excess of the deductible stated in 4a above, subject to the Limit of Liability stated In Item 3b on the Declarations page.

© American International Group, Inc. All rights reserved.

15

c.  Insured Agent Deductible:

**See End't #2** for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts. The Insured Agent Deductible shall apply severally to each Insured Agent when a Claim(s) is:
(i)   suited and made against one or more Insured Agents and not against the Named Insured; or
(ii)  not suited.

In no event shall the total amount of Insured Agent Deductibles applied to the same Wrongful Act or Interrelated Wrongful Acts exceed in the aggregate the Named Insured Deductible amount stated above.

Item 5.   PREMIUM:                (subject to upward adjustment)

Item 6.   COVERAGES:  Only those of the Coverages designated as "covered" by the corresponding letter for the coverage (for example the letter A(a) in the column under the heading "COVERED" next to where they are listed below) are afforded coverage by this policy. Absence of an entry means not covered.

|  | COVERED | NOT COVERED |
|---|:---:|:---:|
| COVERAGE A(a): |  | X |
| COVERAGE A(b): |  | X |
| COVERAGE B: | X |  |
| COVERAGE C: |  | X |

ITEM 7.   NAME AND ADDRESS OF Insurance Company ("Company"):
(This policy is issued only by the insurance company indicated below.)

**National Union Fire Insurance Company of Pittsburgh, Pa.**
**175 Water Street**
**New York, NY 10038**

*Archive Copy*
© American International Group, Inc. All rights reserved.

**IN WITNESS WHEREOF**, the Insurer has caused this policy to be signed on the Declarations by its President, a Secretary and its duly authorized representative.

_(signature)_
**PRESIDENT**

_Elizabeth M. Tuck_
**SECRETARY**

_(signature)_
**AUTHORIZED REPRESENTATIVE**

| COUNTERSIGNATURE | DATE | COUNTERSIGNED AT |
|---|---|---|
| | | |

ALLIANT INSURANCE SERVICES, INC.
600 MONTGOMERY ST
FL 9TH
SAN FRANCISCO, CA 94111-2711

360000925

® American International Group, Inc. All rights reserved.

# AIG AIG EXECUTIVE LIABILITY[SM]

Insurance provided by the following member of American International Group, Inc.

## National Union Fire Insurance Company of Pittsburgh, Pa.®

A capital stock company

## INSURANCE COMPANY SUPERVISORY & VICARIOUS LIABILITY AND INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY

NOTICE: THIS IS A CLAIMS-MADE FORM. EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE DEDUCTIBLE.

In consideration of the payment of the premium, and in reliance upon the statements in the Application attached and made a part of this policy, and subject to the terms and conditions of this policy, the insurance company designated in Item 6 of the Declarations, herein called the "Insurer", agrees as follows:

## 1. INSURING AGREEMENTS

### COVERAGE A: INSURANCE COMPANY SUPERVISORY & VICARIOUS LIABILITY INSURANCE

This policy shall pay the Damages and Defense Costs of the Named Insured arising from any Claim or Claims first made against the Named Insured, with or without any Claim or Claims made against an Insured Agent, during the Policy Period or any Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged:

    (a) Wrongful Act of the Named Insured arising out of, based upon or attributable to the General Supervision of an Insured Agent, or

    (b) Vicarious Liability of the Named Insured

arising solely out of the Wrongful Act of an Insured Agent in the performance of or failure to perform Professional Services.

Coverage A of this policy shall apply only if the underlying Wrongful Act of the Insured Agent is otherwise covered under the terms and conditions of this policy.

The Insurer has the right but not the duty to defend the Named Insured for Claim(s) which would be covered under Coverage A. The Named Insured shall defend and contest any Claim(s) made hereunder. However, the Insurer shall reimburse, at the written request of the Named Insured, Defense Costs prior to the final disposition of any Claim(s), subject to Clause 9, Defense Costs, Settlements, Judgments (Including Advancement of Defense Costs).

### COVERAGE B: INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE

(1) This policy shall pay the Damages and Defense Costs of the Named Insured arising from any Claim or Claims first made against any Insured Agent during the Policy Period or any Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for a Wrongful Act of an Insured Agent or that of any other person for whom the Insured Agent is legally responsible, but only if such Wrongful Act occurs solely in the performance of or failure to perform Professional Services, and only if the Named Insured

has assumed the defense of the Insured Agent pursuant to the following paragraph.

The Named Insured has the right but not the duty to assume the defense of any Claim(s) made against an Insured Agent. In the event the Named Insured assumes the defense of an Insured Agent, the Insurer shall reimburse, at the written request of the Named Insured, Defense Costs prior to the final disposition of any Claim(s), subject to Clause 9, Defense Costs, Settlements, Judgments (Including Advancement of Defense Costs).

(2) In the event the Named Insured does not assume the defense of any Claim(s) made against an Insured Agent pursuant to Coverage B(1) or Coverage C below, this policy shall pay on behalf of the Insured Agent Damages and Defense Costs resulting from any Claim or Claims first made against the Insured Agent during the Policy Period or any Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any Wrongful Act of the Insured Agent, but only if such Wrongful Act occurs solely in the performance of or failure to perform Professional Services. The Insurer will defend any such Claim(s) against the Insured Agent, even if the allegations in any such Claim(s) are groundless, false or fraudulent, subject to Clause 9, Defense Costs, Settlements, Judgments (Including Advancement of Defense Costs), but only when the Insured Agent is not being defended by the Named Insured pursuant to Coverage B(1) above.

## COVERAGE C: CLASS ACTION COVERAGE FOR NAMED INSURED AND INSURED AGENTS

Coverage C may only be elected if the Named Insured has elected Coverage A(a) and/or A(b) of the policy. Upon election of Coverage C, as indicated in Item. 6 of the Declarations, this policy shall pay the Damages and Defense Costs arising from a Class Action suit (whether certified or non-certified) first made against the Named Insured with or without any Class Action suit or suits made against an Insured Agent during the Policy Period (if applicable) and reported to the Insurer pursuant to this policy for any actual or alleged Wrongful Act or Interrelated Wrongful Act arising solely out of the Wrongful Act of an Insured Agent in the performance of or failure to perform Professional Services.

Coverage C of this policy shall apply only if the underlying Wrongful Act of the Insured Agent is otherwise covered under the terms and conditions of this policy.

In the event the Named Insured does not elect Coverage C, this policy shall pay on behalf of the Insured Agent(s) Damages and Defense Costs resulting from any Class Action suit (certified or non-certified) first made against the Insured Agent during the Policy Period or any Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any Wrongful Act of the Insured Agent, but only if such Wrongful Act occurs solely in the performance of or failure to perform Professional Services. In all cases described herein the Insured Agent Deductible stated in Item 4c shall apply. The Named Insured retains the right but not the duty to assume the defense of any Class Action suit made against an Insured Agent. However, if the Named Insured does not assume the defense of any Class Action suit made against the Insured Agent this policy will respond as stated in Coverage B(2) above.

## 2. DEFINITIONS

(a) "Claim/Class Action" means:

(1) any demand for monetary relief; or

(2) a civil, criminal, administrative or arbitration proceeding for monetary relief which is commenced by:

(i) service of a complaint or similar proceeding; or
(ii) return of an indictment (in the case of a criminal proceeding); or
(iii) receipt or filing of a notice of charges.

A Claim or Class Action suit is "suited" when a lawsuit, civil, criminal, administrative or arbitration proceeding is formally commenced, pursuant to (i), (ii) or (iii) above or the requirements, laws, rules and regulations of the jurisdiction where the Claim or Class Action suit is asserted.

19

(b) "Continuity Date" means:

(1) with respect to the Named Insured, the effective date of the Named Insured's first Insurance Company Supervisory & Vicarious Liability and Insurance Agents Professional Liability Insurance policy issued by the Insurer or any member company of American International Group, Inc. and continuously renewed and maintained in effect thereafter with the Insurer or any member company of American International Group, Inc. to the inception date of this policy.

(2) with respect to any Insured Agent, the earlier of:

(i) the effective date of the Insured Agent's first Insurance Agents Professional Liability Insurance policy issued to the Insured Agent; or

(ii) the effective date the Insured Agent first became scheduled under an Insurance Company Supervisory & Vicarious Liability and Insurance Agents Professional Liability Insurance policy,

issued by the Insurer or any member company of the American International Group, Inc. and continuously renewed and maintained in effect thereafter with the Insurer or any member company of the American International Group, Inc. to the inception date of this policy.

(c) "Damages" means all sums which an Insured is legally obligated to pay for any Claim(s) or Class Action suit to which this insurance applies. Damages shall not include any amount for which an Insured is not financially liable or which are without legal recourse to an Insured, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. Damages shall include any taxes, fines and penalties incurred by a third party, other than an Insured, and which are included in such third party's Claim against an Insured.

(d) "Defense Costs" shall mean reasonable and necessary fees, costs and expenses resulting solely from the investigation, adjustment, defense or appeal of any Claim or Class Action suit to which this insurance applies. Defense Costs shall not include the cost of investigation and adjustment of any Claim(s) or Class Action suit by salaried employees of the Insurer or the Insured, but shall include the fees of any attorney hired to defend an Insured. Defense Costs are only those fees, costs and expenses incurred by the Named Insured with the Insurer's consent, or incurred by the Insurer or at the Insurer's direction when the Insurer is defending an Insured.

(e) "General Supervision" means the Named Insured's selection of an Insured Agent and its oversight and direction of the performance of an Insured Agent in the rendering of or failure to render Professional Services.

(f) "Insured(s)" means:

(1) any Insured Agent(s); and/or

(2) the Named Insured, but only as respects coverage under Insuring Agreement, Coverage A, Insurance Company Supervisory & Vicarious Liability Insurance.

(g) "Insured Agent(s)" means:

(1) any natural person who is a licensed life or accident and health insurance agent or general agent under contract with the Named Insured and is scheduled by the Insurer, which schedule is considered to be attached to and made part of this policy;

(2) any corporation, partnership, or other business entity engaging in Professional Services which is either owned or controlled by a natural person in (1) above or in which a natural person in (1) above is an employee and then only with respect to those operations of the corporation, partnership or other business entity directly related to the Professional Services provided by the natural person in (1) above. Furthermore, this extension shall not afford coverage for any actual or alleged Wrongful Act of the corporation, partnership, or other business entity, but shall only apply to Claim(s) or Class Action suit arising out of

any actual or alleged Wrongful Act(s) of a natural person in (1) above;

(3) any natural person who was or is a partner, officer, director or employee of (1) or (2) above solely while acting within the scope of his/her duties as such and provided such natural person is not at the time of the alleged Wrongful Act a party to an agent, general agent, insurance broker or registered representative contract with any corporation, partnership, or other business entity engaging in Professional Services.

In all events, coverage as is afforded under this policy with respect to an Insured Agent shall only apply to a Claim(s) or a Class Action suit made against an Insured Agent after the Continuity Date of the Insured Agent pursuant to Definition 2(b)(2) above and for any Wrongful Act(s) committed or allegedly committed prior to the time such Insured Agent ceases to be an Insured Agent.

(h) "Interrelated Wrongful Acts" means Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision. For the purposes of this definition, "causally connected" Wrongful Acts shall include, but are not limited to, all Wrongful Acts arising out of, based upon, or attributable to: (1) a related method of sale, marketing or illustration of a particular product; (2) an incident which affects more than one investor or customer in one or more policies, obligations or securities issued, sponsored or distributed by an entity or its subsidiaries or affiliates; or (3) any single occurrence or event.

(i) "Named Insured" means the insurance company designated in Item 1 of the Declarations and any Subsidiary thereof.

(j) "Policy Period" means the period from the inception date of this policy shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

(k) "Professional Services" shall mean those services rendered or required to be rendered in the Insured Agent's profession as:

(1) a licensed life or accident and health insurance agent or general agent who is placing business with the Named Insured;

(2) a licensed life or accident and health insurance agent or general agent who is placing business with insurance companies other than the Named Insured;

(3) a licensed registered representative who services, sells, or attempts to sell securities approved by and distributed through the Named Insured's National Association of Securities Dealers ("NASD") licensed broker/dealer;

(4) a licensed registered representative who services, sells, or attempts to sell mutual funds or variable products through any NASD licensed broker/dealer;

(5) a notary public, but solely with respect to the performance of Professional Services described in paragraphs (1) through (4) above.

(6) a general agent of the Named Insured, but solely while acting within the scope of his duties on behalf of the Named Insured, including but not limited to the recruitment, training and supervision of Insured Agents.

(l) "Subsidiary" means:

(1) a corporation of which the insurance company designated in Item 1 of the Declarations owns, on the inception date of the Policy Period, more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries;

(2) a corporation which becomes a Subsidiary during the Policy Period but only upon the condition that within 90 days of its becoming a Subsidiary, the insurance company designated in Item 1 of the Declarations shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or

68910 (10/97) **BROKER Archive Copy** 4

21

amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary.

A corporation becomes a Subsidiary when the insurance company designated in Item 1 of the Declarations owns more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries. A corporation ceases to be a Subsidiary when the insurance company designated in Item 1 of the Declarations ceases to own more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to a Claim made against a Subsidiary shall only apply for any Wrongful Act(s) committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceases to be a Subsidiary.

(m) "Vicarious Liability" means liability of the Named Insured arising out of, based upon or attributable to the Wrongful Act(s) of an Insured Agent. Vicarious Liability shall not include liability for any Wrongful Act(s) of the Named Insured.

(n) "Wrongful Act" means any actual or alleged:

(1) negligent act, error, or omission; or

(2) false arrest, detention or imprisonment; or

(3) the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; or

(4) wrongful entry or eviction or other invasion of the right of private occupancy.

## 3. EXCLUSIONS

This Insurer shall not be liable to make any payment for Damages and Defense Costs in connection with a Claim or Class Action suit made against:

(a) (1) an Insured arising out of, based upon or attributable to any actual or alleged criminal, dishonest, malicious, knowingly wrongful or fraudulent act committed by or at the direction of the Insured; or

(2) an Insured arising out of, based upon or attributable to any actual or alleged violation of the Racketeer Influenced and Corrupt Organizations Act (as amended), 18 USC Sections 1961 et seq., or any rules or regulations promulgated thereunder;

however, if such allegations are not subsequently proven by a final judgment or other adjudication adverse to the Insured and are not admitted to by the Insured, then the Insured shall be entitled to all reasonable Defense Costs which would have been collectible under this policy;

(b) an Insured for physical injury, sickness or disease sustained by a person, including death resulting from any of these at any time, emotional distress, damage to or destruction of any property, including the loss of use thereof;

(c) an Insured alleging, arising out of, based upon or attributable to the facts alleged, or to the same Wrongful Act or Interrelated Wrongful Acts alleged or contained, in any Claim or Class Action suit which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(d) an Insured alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date, or alleging or derived from the same or substantially the same facts as alleged in such pending or prior litigation;

(e) an Insured arising out of, based upon or attributable to any actual or alleged Wrongful Act or Interrelated Wrongful Acts occurring prior to the Continuity Date, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act or

Interrelated Wrongful Acts could be the basis of a Claim or Class Action suit;

(f) an Insured arising out of, based upon or attributable to the Insured's activities as an actuary, lawyer, accountant, real estate agent, real estate broker, or third party claims administrator;

(g) an Insured arising out of, based upon or attributable to the insolvency, receivership, bankruptcy, liquidation or inability to pay, of any entity in which the Insured has placed funds or obtained coverage or invested funds for a client, including, but not limited to, the Named Insured, or any bank, banking firm, insurance company, benefit plan, broker/dealer, trust or investment vehicle;

(h) an Insured arising out of, based upon or attributable to any commingling of funds or accounts;

(i) the Named Insured alleging, arising out of, based upon or attributable to any one or more of the following:

(1) any failure or refusal to pay, or delay in the payment of, benefits due or alleged to have been due under any insurance contract or from any pension plan, welfare plan or other benefit plan;

(2) any lack of good faith or fair dealing in the handling of any claim or obligation arising out of or under any insurance contract or from any pension plan, welfare plan or other benefit plan;

(j) an Insured arising out of, based upon or attributable to any pension plan, welfare plan or other benefit plan sponsored by any Insured or by any firm in which:

(1) any Insured has a financial interest;

(2) any Insured is a participant, named fiduciary, designated fiduciary, administrator or trustee as those terms are used in the Employee Retirement Income Security Act of 1974 as amended;

(k) an Insured which is brought by or on behalf of any Insured under this policy;

(l) an Insured for taxes, fines or penalties, or the multiplied portion of multiplied damages imposed against an Insured unless such taxes, fines or penalties are incurred by a third party, other than an Insured, and which are included in such third party's Claim against an Insured; furthermore, only where permitted by law, this policy shall cover, subject to all the terms, conditions and exclusions contained herein, up to $5,000 punitive, exemplary or multiplied damages, as part of and not in addition to the Limits of Liability otherwise afforded by this policy;

(m)an Insured arising out of, based upon or attributable to the Insured making or stating any promises or guarantees as to interest rates or market values;

(n) an Insured alleging, arising out of, based upon or attributable to:

(1) any business interference with client lists;

(2) any fees, commissions, brokerage monies or other charges for any Professional Services; provided, however, this exclusion shall not apply to Claims made against an Insured Agent by a client of the Insured Agent;

(3) any contract dispute between any Insureds, or between the Insureds and any other entities insurance companies or securities broker/dealers;

(o) an Insured which is brought by any governmental authority or any self-regulatory or regulatory authority regardless of the capacity in which it is brought, or brought by the successors or assigns of any of the aforementioned; however, this exclusion shall not apply to a Claim brought by any of the aforementioned to enforce its rights as a direct client of the Insured in the ordinary course of business;

23

(p) an Insured arising out of, based upon or attributable to any Wrongful Act committed or alleged to be committed directly or indirectly in connection with the sale or recommendation of any instrument issued by any limited partnership, master limited partnership, real estate investment trust or any affiliated organization of any of the foregoing;

(q) an Insured arising out of, based upon or attributable to any solicitation, placement or referral of property and/or casualty insurance;

(r) an Insured alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

(1) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or

(2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants,

including but not limited to a Claim alleging damage to the Named Insured or its securities holders;

Pollutants include, but is not limited to, any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned or reclaimed;

(s) an Insured arising out of, based upon or attributable to any obligation for which the Insured or any carrier as his insurer may be held liable under any workers compensation, unemployment compensation or disability benefits law or under any similar law;

(t) an Insured arising out of, based upon or attributable to payment of employee benefits, wages, salaries or commissions;

(u) an Insured for any publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy made by or at the direction of any Insured with the knowledge of the falsity thereof.

*NOTE: The Wrongful Act of any Insured Agent under Coverage B of this policy shall not be imputed to any other Insured Agent under Coverage B for the purpose of determining the applicability of the exclusions within the policy.*

## 4. LIMIT OF LIABILITY - (INCLUDING DEFENSE COSTS)

The aggregate Limit of Liability stated in Item 3 of the Declarations is the maximum limit of the Insurer's liability for all Damages and Defense Costs arising out of all Claims or Class Action suits covered under this policy. The aggregate Limit of Liability applies regardless of the number of Insureds, Claims or Class Action suits or Wrongful Acts.

The limit of the Insurer's liability for all amounts payable hereunder in settlement or satisfaction of all Claim(s) or Class Action suit(s) (including Defense Costs) covered under this policy shall be subject to one of the following Sub-Limits of Liability provided in paragraphs (A), (B) or (C) below. The applicable Sub-Limits of Liability shall apply to all Claims or Class Action suits alleging the same Wrongful Act or Interrelated Wrongful Acts and is dependent upon the number of Insureds against whom Claim(s) is made.

The Sub-Limits of Liability shall be reduced by Defense Costs as incurred and Damages shall be paid in the order that the Insurer, in its absolute discretion, deems appropriate. The Sub-Limits of Liability shall not, under any circumstances, serve to increase the aggregate Limit of Liability stated in Item 3 of the Declarations. The Sub-Limits of Liability are subject to the aggregate Limit of Liability and accordingly, may not be available in whole or in part depending on the amount of reduction of the aggregate Limit of Liability. The Insurer shall not be obligated to defend any Claim(s) or reimburse any Insured after the applicable Sub-Limit of Liability or aggregate Limit of Liability stated in Item 3 of the Declarations has

been exhausted, whichever occurs first.

**A. FOR DAMAGES AND DEFENSE COSTS ARISING FROM A WRONGFUL ACT OR INTERRELATED WRONGFUL ACTS RESULTING IN CLAIM(S) MADE AGAINST: (i) ONE INSURED AGENT; OR (ii) THE NAMED INSURED; OR (iii) BOTH ONE INSURED AGENT AND THE NAMED INSURED.**

The Sub-Limit of Liability stated in Item 3a of the Declarations is the limit of the Insurer's liability for Damages and Defense Costs payable hereunder arising from a Wrongful Act or Interrelated Wrongful Acts regardless of the number of Claims or Class Action suits, Insureds or claimants involved. This Sub-Limit of Liability shall apply to all Insureds under this policy when a Claim(s) or Class Action suit is made against:

    (i) one Insured Agent; or
    (ii) the Named Insured; or
    (iii) both one Insured Agent and the Named Insured.

If additional Claims are subsequently made against the Insured Agent and/or the Named Insured which arise out of the same Wrongful Act or Interrelated Wrongful Acts as Claims already made and reported to the Insurer, all such Claims, whenever made, shall be considered first made within the Policy Period or any Discovery Period (if applicable) in which the earliest Claim arising out of such Wrongful Act or Interrelated Wrongful Acts was first made and reported to the Insurer. Such additional Claims, along with all other previously made Claims, shall be subject to a single Sub-Limit of Liability as stated in Item 3a of the Declarations.

However, if additional Claims are subsequently made against the Insured Agent and/or the Named Insured, as well as against any other Insured Agents, which arise out of the same Wrongful Act or Interrelated Wrongful Acts as Claims already made and reported to the Insurer, all such Claims, whenever made, shall be considered first made within the Policy Period or any Discovery Period (if applicable) in which the earliest Claim arising out of such Wrongful Act or Interrelated Wrongful Acts was first made and reported to the Insurer. Such additional Claims, along with all other previously made Claims, shall thereafter be subject to a single Sub-Limit of Liability as stated in Item 3b of the Declarations (more fully described below).

**B. FOR DAMAGES AND DEFENSE COSTS ARISING FROM A WRONGFUL ACT OR INTERRELATED WRONGFUL ACTS RESULTING IN CLAIM(S) MADE AGAINST: (i) MORE THAN ONE INSURED AGENT; OR (ii) BOTH MORE THAN ONE INSURED AGENT AND THE NAMED INSURED.**

The Sub-Limit of Liability stated in Item 3b of the Declarations is the limit of the Insurer's liability for Damages and Defense Costs payable hereunder arising from a Wrongful Act or Interrelated Wrongful Acts regardless of the number of Claims, Insureds or claimants involved. This Sub-Limit of Liability shall apply to all Insureds under this policy when a Claim(s) is made against:

    (i) more than one Insured Agent; or
    (ii) both more than one Insured Agent and the Named Insured.

If additional Claims are subsequently made against the Insureds which arise out of the same Wrongful Act or Interrelated Wrongful Acts as Claims already made and reported to the Insurer, all such Claims, whenever made, shall be considered first made within the Policy Period or any Discovery Period (if applicable) in which the earliest Claim arising out of such Wrongful Act or Interrelated Wrongful Acts was first made and reported to the Insurer. Such additional Claims, along with all other previously made Claims, shall be subject to a single Sub-Limit of Liability as stated in Item 3b of the Declarations.

This Sub-Limit of Liability shall apply and be in effect throughout the settlement and/or satisfaction of all such Claims regardless of whether an Insured Agent is later dismissed from a Claim which would otherwise cause the Sub-Limit of Liability stated in Item 3a of the Declarations to be applicable.

**C. FOR DAMAGES AND DEFENSE COSTS ARISING FROM ALL CLASS ACTION SUITS (CERTIFIED OR NON-CERTIFIED) ALLEGING A WRONGFUL ACT OR INTERRELATED WRONGFUL ACTS RESULTING IN CLAIM(S) MADE AGAINST: (i) THE NAMED INSURED; OR (ii) BOTH THE NAMED INSURED AND MORE THAN ONE INSURED AGENT.**

The Sub-Limit of Liability stated in Item 3c of the Declarations is the limit of the Insurer's liability for Damages and Defense Costs payable hereunder arising from a Class Action suit (certified or non-certified) alleging a Wrongful Act or Interrelated Wrongful Acts regardless of the number of Claims, Insureds or claimants involved. This Sub-Limit of Liability shall apply to all Insureds under this policy when a Class Action suit is made against:

    (i)  the Named Insured; or
    (ii)  both the Named Insured and more than one Insured Agent.

This Sub-Limit of Liability shall apply and be in effect throughout the settlement and/or satisfaction of all such Claims regardless of whether an Insured Agent is later dismissed from a Claim which would otherwise cause the Sub-Limit of Liability stated in Item 3a of the Declarations to be applicable.

**5. DEDUCTIBLE**

The Insurer shall only be liable for those amounts payable hereunder in settlement and/or satisfaction of Claim(s) or Class Action suit (including Defense Costs) which are in excess of the applicable Deductible stated in Item 4 of the Declarations.

The Deductible stated in Item 4a of the Declarations, Named Insured Non-Class Action Deductible, shall apply to Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts. The Named Insured Deductible shall apply to all Insureds under this policy when a Claim(s) is suited and made against:

    (i)  the Named Insured; or
    (ii)  both the Named Insured and one or more Insured Agents.

The Deductible stated in Item 4b of the Declarations, Named Insured Class Action Deductible, shall apply to Damages and Defense Costs arising from a class action suit (certified or non-certified) alleging a Wrongful Act or Interrelated Wrongful Acts. The Named Insured Class Action Deductible shall apply under this policy when a Class Action is made against:

    (i)  the Named Insured; or
    (ii)  both the Named Insured or one or more Insured Agents.

In the event a class action is not certified prior to final disposition of the suit, the deductible in Item 4a on the Declarations page shall apply and the Insurer shall reimburse the Named Insured for all Damages and Defense Costs in excess of the deductible stated in 4a of the Declarations page subject to the Limit of Liability stated in Item 3b on the Declarations page.

The Deductible stated in Item 4c of the Declarations, Insured Agent Deductible, shall apply to each Insured Agent for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts. The Insured Agent Deductible shall apply severally to each Insured Agent when a Claim(s) is:

    (i)  suited and made against one or more Insured Agents and not against the Named Insured; or
    (ii)  not suited.

In no event shall the total amount of Insured Agent Deductibles applied to the same Wrongful Act or Interrelated Wrongful Acts exceed in the aggregate the Named Insured Deductible amount stated in Item 4a of the Declarations.

**6. DISCOVERY PERIOD**

**A. OPTIONAL POLICY DISCOVERY PERIOD**

26

If the Insurer or the Named Insured shall cancel or refuse to renew this policy, the Named Insured shall have the right, upon payment of an additional premium of 75% of the total annual premium, to purchase a period of twelve (12) months following the effective date of such cancellation or non-renewal in which to give written notice to the Insurer of Claim(s) first made during the Optional Policy Discovery Period for Wrongful Acts occurring prior to the effective date of such cancellation or non-renewal and otherwise covered by this policy.

The rights contained in this clause shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within sixty (60) days of the effective date of cancellation or non-renewal. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

### B. TERMINATED AGENT DISCOVERY PERIOD

Upon termination of his status as an Insured Agent during the Policy Period, the terminated Insured Agent shall have an automatic one (1) year Terminated Agent Discovery Period, effective as of his termination date, to report Claim(s) under this policy but only for Wrongful Acts which occurred prior to his/her termination date.

### C. RETIRED/DISABLED AGENT DISCOVERY PERIOD

Upon retirement, death or disability of an Insured Agent during the Policy Period, the retired, deceased (or the estate of the deceased Insured Agent on his/her behalf; or the Named Insured on the deceased Insured Agent's behalf) or disabled Insured Agent shall have an unlimited Retired/Disabled Agent Discovery Period, effective as of his retirement, death or disability to report Claim(s) under this policy but only for Wrongful Acts which occurred prior to the date of his/her retirement, death or disability.

The provisions of any Discovery Period shall be part of and not in addition to the applicable Sub-Limit of Liability and the aggregate Limit of Liability for the Policy Period.

### 7. TERRITORY

This policy applies to Wrongful Acts committed anywhere in the world provided that a Claim is made or a suit is brought against the Insured in the United States of America, its territories or possessions or Canada.

### 8. NOTICE/CLAIM REPORTING PROVISIONS

**Notice hereunder shall be given in writing to the Insurer named on the Declarations at the address indicated in Item 6 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

(a) The Named Insured or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim or Class Action suit made against an Insured as soon as possible and either:

(1) anytime during the Policy Period or during any Discovery Period (if applicable); or

(2) within 30 days after the end of the Policy Period or any Discovery Period (if applicable), as long as such Claim or Class Action suit is reported no later than 30 days after the date such Claim or Class Action suit was first made against an Insured.

(b) If written notice of a Claim or Class Action suit has been given to the Insurer pursuant to Clause 8(a) above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act or Interrelated Wrongful Acts alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

(c) If during the Policy Period or during any Discovery Period (if applicable) the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim or Class Action suit being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act or Interrelated Wrongful Acts alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

## 9. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING ADVANCEMENT OF DEFENSE COSTS)

**The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Damages and Defense Costs under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim or Class Action suit.**

The Insurer may make any settlement of any Claim or Class Action suit it deems expedient with respect to any Insured subject to such Insured's written consent. If any Insured withholds consent to such settlement which is agreeable to the claimant, the Insurer's liability for all Damages and Defense Costs on account of such Claim or Class Action suits shall not exceed the amount for which the Insurer could have settled such Claim or Class Action suit plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer.

The Insurer shall have the right to effectively associate with the Insureds in the defense of any Claim, including but not limited to negotiating a settlement. The Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

Under Coverage A,B(1) and C of this policy, the Insurer has the right but not the duty to defend any Claim(s) or Class Action suits. The Named Insured shall defend and contest any Claim(s) made thereunder. Except as hereinafter stated, the Insurer shall reimburse, at the written request of the Named Insured, Defense Costs prior to the final disposition of any Claim(s) or Class Action suit. Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds, severally according to their respective interests, in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of Defense Costs.

Under Coverage B(2) of this policy, the Insurer shall have the right and duty to defend any suit, with counsel of its selection, against an Insured Agent for any alleged Wrongful Act even if such Claim(s) or Class Action suit(s) are groundless, false or fraudulent.

The Insurer shall not be obligated to defend any Claim(s) or Class Action suits or reimburse any Insured after the applicable Sub-Limit of Liability or aggregate Limit of Liability stated in Item 3 of the Declarations has been exhausted, whichever occurs first.

## 10. ALLOCATION OF UNINSURED ALLEGATIONS AGAINST THE NAMED INSURED

With respect to (i) Defense Costs jointly incurred by, (ii) any joint settlement made by, and/or (iii) any adjudicated judgment of joint and several liability against the Named Insured and any Insured Agent(s), in connection with any Claim(s) or Class Action suit other than a covered Claim under Coverage A, the Named Insured and the Insured Agent(s) and the Insurer agree to use their best efforts to determine a fair and proper allocation of the amounts as between the Named Insured, the Insured Agent(s) and the Insurer, taking into account the relative legal and financial exposures of and the relative benefits obtained by the Insured Agent(s) and the Named Insured.

68910 (10/97) *BROKER Archive Copy* 11

## 11. ASSISTANCE AND COOPERATION OF THE INSURED

The Insured shall cooperate with the Insurer and, upon the Insurer's request, assist in making settlements, in the conduct of suits or proceedings and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured. The Insured shall attend hearings, trials and depositions and shall assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not admit any liability, voluntarily make any payment, assume any obligation, or incur any expense without the prior written consent of the Insurer. Any such undertaking by the Insured without the written consent of the Insurer shall be made at the Insured's own cost.

## 12. ACTION AGAINST INSURER

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy, nor until the full amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Insurer. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insured to determine the Insured's liability nor shall the Insurer be impleaded by the Insured or his legal representative.

## 13. SUBROGATION

If any person or organization to or for whom the Insurer makes payment under this policy has rights to recover damages from another, those rights are transferred to the Insurer. That person or organization must do everything necessary to secure those rights of the Insurer and must do nothing to impair or prejudice such rights.

## 14. OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided under this policy shall apply only as excess over any other valid and collectible insurance. This policy applies to the amount of Damages and Defense Costs which is more than the limits of insurance of the other insurance and the total of all deductibles and self-insured amounts under such other insurance. This policy shall not pay more than the applicable Sub-Limit of Liability or the aggregate Limit of Liability stated in Item 3 of the Declarations.

If any Claim under this policy is also covered by one or more other policies issued by the Insurer, or by any other member company of the American International Group, Inc. to the persons or entities insured under this policy or to any person who controls, is controlled by, or is affiliated by common control with, said persons or entities, then with respect to any such Claim(s) or Class Action suits:

(a) the Insurer shall not be liable under this policy for a greater proportion of the loss than the applicable Sub-Limit of Liability or aggregate Limit of Liability under this policy bears to the total limits of liability of all such policies, and

(b) the maximum amount payable under all such policies shall not exceed the limit of liability of that policy referred to above which has the highest applicable limit of liability.

## 15. CANCELLATION

This policy may be canceled by the Named Insured by surrender of this policy to the Insurer or by giving written notice to the Insurer stating when thereafter such cancellation shall be effective. This policy may also be canceled by the Insurer mailing to the Named Insured by registered, certified or other first class mail, at the Named Insured's address shown in Item 1 of the Declarations, written notice stating when, not less than sixty (60) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this policy shall terminate at the date and hour specified in such notice.

If this policy shall be canceled by the Named Insured, the Insurer shall retain the customary short rate proportion of the premium herein.

If this policy shall be canceled by the Insurer, the Insurer shall retain the pro rata proportion of the premium herein.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

### 16. ASSIGNMENT

Assignment of interest under this policy shall not bind the Insurer until its consent is endorsed hereon; however, subject otherwise to the terms hereof, this policy shall cover the estate, heirs, legal representative or assigns of the Insured in the event of the Insured's death, bankruptcy, insolvency or being adjudged incompetent.

### 17. BANKRUPTCY

Bankruptcy or insolvency of the Insured or the Insured's estate shall not relieve the Insurer of any obligation hereunder.

### 18. NOTICE TO AGENT AND CHANGES

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the Insurer from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by written endorsement issued to form a part of this policy and signed by an authorized representative of the Insurer.

### 19. ARBITRATION

All disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of damages, shall be submitted to the American Arbitration Association under and in accordance with its then prevailing commercial arbitration rules. The arbitrators shall be chosen in the manner and within the time frames provided by such rules. If permitted by such rules, the arbitrators shall be three disinterested individuals having knowledge of the insurance issues relevant to the matters in dispute.

### 20. DUTIES OF NAMED INSURED

The Named Insured shall be the sole agent of all Insureds hereunder for the purpose of effecting or accepting any amendments to or cancellation of this policy, for the payment of premium and the receipt of any return premiums that may become due under this policy, and the exercising or declining to exercise any right to an extended reporting period.

### 21. REPRESENTATIONS

By accepting this policy, the Insureds agree that:

(a) The statements in the Declarations and Applications made part of this policy are accurate and complete;
(b) Those statements are based on representations the Insured made to the Insurer; and
(c) The Insurer has issued this policy in reliance upon the Insured's representations.

### 22. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

_____
AUTHORIZED REPRESENTATIVE

68910 (10/97) *BROKER* ive Copy          13

30

This endorsement, effective *12:01 AM    August 1, 2008*          forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

**AMEND DECLARATIONS PAGE - ITEM 3(a)**

In consideration of the premium charged, it is hereby understood and agreed that Item 3(a), of the Declarations Page is deleted in its entirety and replaced by the following:

The limit of the Insurer's liability for all amounts payable hereunder in settlement or satisfaction of Claims covered under this policy shall be subject to either of one of the following Sub-Limits of Liability:

**A1.**  *$1,250,000*    for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts resulting in a Claim(s) made against:

(i)       one Insured Agent; or
(ii)      the Named Insured; or
(iii)     both one Insured Agent and the Named Insured.

**A2.**  *$2,000,000*    for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts resulting in a Claim(s) made against:

(i)       one Insured Agent; or
(ii)      the Named Insured; or
(iii)     both one Insured Agent and the Named Insured.

**A3.**  *$2,000,000*    for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts resulting in a Claim(s) made against:

(i)       one Insured Agent; or
(ii)      the Named Insured; or
(iii)     both one Insured Agent and the Named Insured.

**A4.**  *$3,000,000*    for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts resulting in a Claim(s) made against:

(i)       one Insured Agent; or
(ii)      the Named Insured; or
(iii)     both one Insured Agent and the Named Insured.

*BROKER* *Archive Copy* *END 1*

This endorsement, effective *12:01 AM       August 1, 2008*          forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

The applicable Sub-Limit of Liability, either A1 or A2 or A3 above, shall be dependent on the option which was elected by the Insured Agent named in the Claim. Such election being reflected on the schedule of Insured Agents maintained by Driver Alliant Insurance Services, Inc. and provided quarterly to the Insurer for review, which schedule is considered to be attached to and made part of this policy.

In the event that a Claim(s) is made against more than one Insured Agent, the applicable Sub-Limit of Liability is that shown on Item 3(b) of the Declarations Page.

It is further agreed that the Sub-Limits of Liability, as shown in A1 or A2 or A3 above, shall not increase the aggregate Limit of Liability of $75,000,000 as shown on Item 3 of the Declarations Page, nor shall it increase the Sub-Limits of Liability as shown under Items 3(b) or 3(c) of the Declarations Page.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy*
American International Group, Inc. All rights reserved.
*BROKER          END 1*

<u>ENDORSEMENT#</u> *2*

This endorsement, effective *12:01 AM*     *August 1, 2008*     forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
         *THROUGH THE FINANCIAL SALES*
         *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

**AMEND INSURED AGENT DEDUCTIBLE**

The policy is hereby amended as follows: Item 4(c) of Declarations Page, "Insured Agent Deductible", is amended to read as follows:

c.      1. Insured Agent Deductible:

     I) $500        for Damages arising from a Wrongful Act or interrelated Wrongful Acts in connection with the following:

         1)      Proprietary Woodbury/Fortis/Hartford Mutual Funds and Annuities
         2)      Woodbury/Fortis/Hartford Life Insurance Company Products
         3)      All other mutual funds sold through Woodbury Financial Services, Inc.

     II) $1,000      for Damages arising from a Wrongful Act or interrelated Wrongful Acts in connection with the following:

         1)      All other securities and products sold through Woodbury Financial Services, Inc. not stated in paragraph I) above. (e.g., Series 7 - general securities).

     III) $2,500      for Damages arising from a Wrongful Act or Interrelated Wrongful Acts in connection with any other covered "outside" business (life, accident & health or disability insurance sold through any Non-Woodbury insurer; mutual funds or variable products sold through any broker/dealer other than Woodbury Financial Services, Inc.)

c)      2. Insured Agent Deductible: for Option A(3)

     A)      $2,500
         for Damages and Defense Costs arising from a Wrongful Act or Interrelated Wrongful Acts in connection with the following:

         (1)      Proprietary Woodbury/Fortis/Hartford Mutual Funds and Annuities
         (2)      Woodbury/Fortis/Hartford Life Insurance products
         (3)      All other mutual funds sold through Woodbury Financial Services, Inc.

*BRO**Archive** Copy**END 2***

33

This endorsement, effective *12:01 AM*     *August 1, 2008*     forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

B)     $2,500
       for Damages and Defense Costs arising from a Wrongful Act or
       Interrelated Wrongful Acts in connection with the following:

       1)     All other securities and products sold through Woodbury
              Financial Services, inc. not stated in paragraph A above, (i.e.
              Series 7 - general securities)

C)     $2,500
       for Damages and Defense Costs arising from a Wrongful Act or
       Interrelated Wrongful Acts in connection with any other covered
       "outside" business:

       (life, accident and health or disability insurance sold through any
       non-Woodbury insurer; mutual funds or variable products sold through
       any broker/dealer other than Woodbury Financial Services, Inc.)

       IN EITHER CASE:

       The Insured Agent Deductible shall apply severally to each Insured
       Agent when a Claim(s) is:

       (i)     suited and made against one or more Insured Agents and NOT
               against the Named Insured; or

       (ii)    not suited.

In no event shall the total amount of the Insured Agent Deductibles applied to the
same Wrongful Act or Interrelated Wrongful Acts exceed in the aggregate the
Named Insured Deductible amount stated above. (If no Named Insured Deductible
applies, in no event shall the total amount of the Insured Agent Deductibles applied
to the same Wrongful Act or Interrelated Wrongful Acts exceed $25,000.)

BROKER Archive Copy END 2

34

This endorsement, effective *12:01 AM* *August 1, 2008* forms a part of policy number *00-665-25-96*
issued to *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by *National Union Fire Insurance Company of Pittsburgh, Pa.*

It is further understood and agreed that Section 5. of the policy, Deductible, 5th paragraph is deleted in its entirety and replaced with the following:

The deductible stated in Item 4c of the Declarations, Insured Agent Deductible, shall apply to each Insured Agent for Damages arising from a Wrongful Act or Interrelated Wrongful Acts. The Insured Agent Deductible shall apply severally to each Insured Agent when a Claim(s) is:

(i) suited and made against one or more Insured Agents and not against the Named Insured; or

(ii) not suited.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.
*BROKER* *END 2*

<u>ENDORSEMENT# 3</u>

This endorsement, effective  *12:01 AM      August 1, 2008*        forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AMEND DEFINITION (g)

It is hereby agreed that Definition (g), "Insured Agent", is deleted in its entirety and replaced with the following:

(g)      "Insured Agent(s)" means:

   (1)      any natural person who is a licensed registered representative under contract with the Named Insured (Woodbury Financial Services, Inc.) and is scheduled by the Insurer, which schedule is considered to be attached to and made a part of this policy;

   (2)      any corporation, partnership or other business entity engaging in Professional Services which is either owned or controlled by a natural person in (1) above or in which a natural person in (1) above is an employee and then only with respect to those operations of the corporation, partnership or other business entity directly related to the Professional Services provided by the natural person in (1) above. Furthermore, this extension shall not afford coverage for any actual or alleged Wrongful Act of the corporation, partnership, or other business entity, but shall only apply to Claim(s) arising out of any actual or alleged Wrongful Act(s) of a natural person in (1) above;

   (3)      any natural person who was or is a partner, officer, director, employee or licensed support staff of (1) or (2) above, solely while acting within the scope of his/her duties as such and provided such natural person is not at the time of the alleged Wrongful Act a party to an agent, general agent, insurance broker or registered representative contract with any corporation, partnership, or other business entity for the purpose of providing Professional Services offered by the Insured in (1) or (2) above. Furthermore, coverage shall not apply to any licensed support staff of (1) or (2) above that is earning income on a commission basis.

   Coverage provided pursuant to this endorsement shall be subject to all of the terms, conditions and exclusions of the policy to which it attaches.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.
*BROKER*            *END 3*

36

## ENDORSEMENT# *4*

This endorsement, effective *12:01 AM     August 1, 2008*          forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AMEND DEFINITION (i) & DEFINTION (l)

This policy is hereby amended as follows: Definition (i), "Named Insured", is deleted in its entirety and replaced by the following:

(i)     "Named Insured" means the company designated in Item 1 of the Declarations and any Subsidiary thereof.

It is further agreed that the policy is amended as follows: Definition (l), "Subsidiary", is deleted in its entirety and replaced by the following:

(l)     "Subsidiary" means:

(1)     a corporation of which the Named Insured designated in Item 1 of the Declarations owns, on the inception date of the Policy Period, more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries;

(2)     a corporation which becomes a Subsidiary during the Policy Period but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Insured designated in Item 1 of the Declarations shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary.

A corporation becomes a Subsidiary when the Named Insured designated in Item 1 of the Declarations owns more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries. A corporation ceases to be a Subsidiary when the Named Insured designated in Item 1 of the Declarations ceases to own more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to a Claim made against a Subsidiary shall only apply for any Wrongful Act(s) committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceases to be a Subsidiary.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.
*BROKER          END 4*

<u>ENDORSEMENT# 5</u>

This endorsement, effective *12:01 AM*    *August 1, 2008*          forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
              *THROUGH THE FINANCIAL SALES*
              *PROFESSIONALS RISK PURCHASING GROUP*
by          *National Union Fire Insurance Company of Pittsburgh, Pa.*

**AMEND EXCLUSION (j)**

It is hereby agreed that Exclusion (j) is deleted in its entirety and replaced with the following:

(j)      an Insured arising out of, based upon or attributable to any pension plan, welfare plan or other benefit plan sponsored by any Insured or by any firm in which:

   (1)    any Insured has a financial interest;

   (2)    any Insured is a participant, named fiduciary, designated fiduciary, administrator or trustee as those terms are used in the Employee Retirement Income Security Act of 1974, as amended;

Provided, however, Exclusion (j) (i) shall not be applicable in the event an Insured Agent is either (i) deemed to be a Fiduciary Advisor under the Pension Act of 2006 or any amendments thereto or (ii) is a fiduciary by recommending securities, as described in Section 3(21)(A)(ii)of ERISA

Specifically, "named fiduciary" is defined in Section 402(a) (2) as:

   "a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary;

      (i)    by a person who is an employer or employee organization with respect to the plan; or

      (ii)   by such an employer and such an employee organization acting jointly."

Coverage provided pursuant to this endorsement shall be subject to all of the terms, conditions and exclusions of the policy to which it attaches.


ALL OTHER TERMS & CONDITIONS OF THE POLICY REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.
*BROKER*          *END 5*

38

## ENDORSEMENT# *6*

This endorsement, effective *12:01 AM      August 1, 2008*          forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AMEND DEFINITION (k)

It is hereby agreed that Definition (k), "Professional Services", is amended to include the following:

> The sale and/or servicing (including any advice and consultation in connection with such) of employee benefit plans (other than multiple employer welfare arrangements) including group or individual pension and/or profit sharing plans, life, accident & health and/or disability plans, provided however, that such plans must use either an insurance product, investment grade bonds, listed and over-the-counter stocks or mutual funds as a funding vehicle in order for coverage to be triggered under this endorsement.

The following exclusions shall apply with regard to this definition, and the policy shall not afford coverage for:

1. Any Claim arising out of activities of the Insured in regard to any employee benefit plan sponsored, as an employer, by the Insured or any firm or other entity which the Insured owns or controls, or in regard to any plan in which the Insured is a participant;

2. Any Claim arising out of activities of the Insured as an accountant, lawyer, actuary, third-party administrator, or real estate agent or broker, whether or not licensed as such;

3. Any Claim arising out of the Insured's activities or Professional Services as a named fiduciary as that term is defined in the Employee Retirement Income Security Act of 1974 (and any amendments thereto) or to the extent that the Insured exercises any discretionary authority or control concerning the management or disposition of plan assets;

4. Any Claim arising out of tax advice provided by the Insured, except as an incidental part of Professional Services rendered by the Insured;

5. Any Claim arising from or contributed to by the placement of coverage with Multiple Employer Welfare Arrangements as defined in the Employee Retirement Income Security Act of 1974, as amended.

Coverage provided pursuant to this endorsement shall be subject to all of the terms, conditions and exclusions of the policy to which it attaches.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.

*BROKER          END 6*

## ENDORSEMENT# *7*

This endorsement, effective *12:01 AM        August 1, 2008*        forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AMEND DEFINITION (k)(3)

It is hereby agreed that Definition (k)(3), "Professional Services", is deleted in its entirety and replaced with the following:

(k)    "Professional Services" shall mean those services rendered or required to be rendered in the Insured Agent's profession as:

(3)    a licensed registered representative who services, sells or attempts to sell securities or other investment products including, but not limited to structured settlements approved by and distributed through the Named Insured's National Association of Securities Dealers ("NASD") licensed broker/dealer (Woodbury Financial Services, Inc.);

Furthermore, the policy is hereby amended as follows: Exclusion (p) is deleted in its entirety and replaced by the following:

This Insurer shall not be liable to make any payment for Damages and Defense Costs in connection with a Claim made against:

(p)    an Insured arising out of, based upon or attributable to any Wrongful Act committed or alleged to be committed directly or indirectly in connection with the sale or recommendation of any instrument issued by any limited partnership, master limited partnership, real estate investment trust or any affiliated organization of any of the foregoing not offered and sold through the Named Insured's NASD licensed broker/dealer (Woodbury Financial Services, Inc.);

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.
*BROKER          END 7*

<u>ENDORSEMENT# *8*</u>

This endorsement, effective *12:01 AM      August 1, 2008*          forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

**AMEND DEFINITION (k) FINANCIAL PLANNER/FINANCIAL CONSULTANT EXTENSION**

It is hereby understood and agreed that the policy is amended as follows:   Definition (k),
"Professional Services", is amended by addition of the following:

(k)      "Professional Services" shall mean those services rendered  or required to be
         rendered in the Insured Agent's profession as:

         (7)      a financial planner, financial consultant, or investment advisor, acting on
                  behalf of a customer or client and providing consultation, advice,
                  administration and services, whether or not a separate fee is charged, but
                  only with respect to:

                  1.      investment products which are currently APPROVED for sale  by the
                          Named Insured's NASD licensed broker/dealer.

                          For the purposes of coverage provided  by virtue of this endorsement,
                          APPROVED shall mean:

                          (i)      any investment product currently offered by the Named
                                   Insured's NASD licensed broker/dealer as available for sale
                                   through the broker/dealer;

                  2.      Mutual funds and/or variable annuities which are approved by and
                          offered for sale through any NASD licensed broker/dealer.

         Any Insured Agent covered by virtue of this  endorsement must be in
         compliance with any  certification and/or licensing requirements as respects
         to financial planner,  financial consultant or investment advisor activities, in
         those jurisdictions in which the  Insured Agent is providing such Professional
         Services.

         Any Insured Agent providing  Professional Services with regards  to an
         investment product pursuant to (k)(7)1 (ii) of this endorsement, must keep
         written evidence of the approval from the  Named Insured's broker/dealer for
         review by the Insurer.

*BROKER Archive Copy END 8*

41

This endorsement, effective *12:01 AM*     *August 1, 2008*          forms a part of policy number  *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

Furthermore, it is agreed that the following is hereby added to the Clause 3., "Exclusions" of this policy:

> This insurer shall not be liable to make any payment for Damages and Defense Costs in connection with a Claim made against:

> v.     an Insured Agent arising out of tax advice provided by the Insured Agent, except as an incidental part of professional services rendered by the Insured Agent.

Nothing contained in this endorsement shall serve to alter or increase the Limit of Liability as stated in Item 3 of the Declarations.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy*, American International Group, Inc. All rights reserved.
*BROKER           END 8*

<u>ENDORSEMENT# *9*</u>

This endorsement, effective  *12:01 AM      August 1, 2008*          forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PROPERTY & CASUALTY EXTENSION

In consideration of an additional premium charged of $100/agent, it is understood and agreed that an Insured Agent(s) who is also a licensed property and/or casualty insurance agent(s) or general agent(s) shall have coverage extended as provided by this endorsement.

Solely with respect to such Insured Agents described above, the policy shall be amended as follows:

I.     Clause 2. DEFINITIONS is amended by addition of the following:

   (k)     (2)(a) a licensed property and/or casualty insurance agent or general agent who is placing property or casualty insurance with insurance companies other than the Named Insured;

   (o)     "Retroactive Date" means the effective date of the Insured Agent's first Property/Casualty Insurance Agents Professional Liability policy or any insurance agents errors and omissions policy (providing similar coverage) issued to the Insured Agent by any insurance carrier and continuously thereafter renewed and/or maintained in effect, without interruption, to the inception date of this policy.

II.    Clause 3. EXCLUSIONS (q) is deleted in its entirety.

III.   In no event shall this policy or this endorsement be construed to provide coverage for a Named Insured for any Claim(s) alleging, arising out of, based upon or attributable to the Insured Agent's performance of or failure to perform Professional Services as a licensed property and/or casualty insurance agent or general agent or for any Claim(s) arising out of, based upon or attributable to any solicitation, placement or referral of property and/or casualty insurance.

ALL OTHER TERMS & CONDITIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.

*BROKER            END 9*

43

**ENDORSEMENT# *10***

This endorsement, effective *12:01 AM      August 1, 2008*      forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AMEND EXCLUSION (b)

This policy is hereby amended as follows: Exclusion (b) is deleted in its entirety and replaced by the following:

This Insurer shall not be liable to make any payment for Damages in connection with a Claim made against:

(b)      an Insured for physical injury, sickness or disease sustained by a person, including death resulting from any of these at any time, or damage to or destruction of any property, including the loss of use thereof;

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.

***BROKER***      ***END 10***

44

## ENDORSEMENT# *11*

This endorsement, effective *12:01 AM    August 1, 2008*          forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by          *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AMEND EXCLUSION (g)

In consideration of the premium charged, it is understood and agreed that Exclusion (g) is deleted in its entirety and replaced by the following:

> an Insured arising out of, based upon or attributable to the insolvency, receivership, bankruptcy, liquidation or inability to pay, of any entity in which the Insured has placed funds or obtained coverage or invested funds for a client, including, but not limited to, any bank, banking firm, insurance company, benefit plan, broker/dealer, trust or investment vehicle.

Solely with respect to insurance coverage placed with the Named Insured this exclusion shall not apply, provided that at the time the policy of insurance was placed, the Named Insured had a Best's Rating of A- or higher.

ALL OTHER TERMS & CONDITIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.
*BROKER          END 11*

45

<u>ENDORSEMENT#</u> *12*

This endorsement, effective  *12:01 AM*      *August 1, 2008*          forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

**AMEND CLAUSE 3., EXCLUSIONS**

It is hereby understood and agreed that the policy's Clause 3., "Exclusions" is amended by adding the following:

> This Insurer shall not be liable to make any payment for Damages and Defense Costs in connection with a Claim or Class Action suit made against:

(w)    an Insured alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-load investment company or variable annuities in which there is no initial or contingent sales charge or commission;

(x)    an Insured alleging, arising out of, based upon or attributable to the purchase or sale of (or failure to purchase or sell) any of the following, or any advice in connection therewith:

1)    any collectible, including but not limited to stamps, art, cards, jewelry, antiques or other tangible personal property; or

2)    any equity security priced under $5.00 at the time that the Wrongful Act triggering such Claim arose; however, this exclusion shall not apply if the security is:

i)    registered, or approved for registration upon notice of issuance, on a national securities exchange; or

ii)    authorized, or approved for authorization upon notice of issuance, for quotation in the NASDAQ National Market System or the NASDAQ Small Cap Market; or

iii)    issued by an investment company registered under the Investment Company Act or 1940 (as amended); or

3)    any security in any market outside of the United States of America and its territories and possessions or Canada; or

BROKER Archive Copy END 12

This endorsement, effective *12:01 AM    August 1, 2008*           forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

4)    any commodities, futures contracts, forwards contracts or any type of option or futures contract, or any similar investment or investment product; however this exclusion shall not apply to "Covered Call Options", which for the purposes of this section shall be defined as: exchange-traded and/or NASDAQ traded short call options on stock actually owned by the Insured's client throughout the option's life.

(y)   an Insured alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in whole or in part, of any limited partnership or general partnership, including but not limited to Claims arising out of an Insured acting as a general partner or any limited partnership and/or managing general partner or any general partnership;

(z)   an Insured alleging, arising out of, based upon or attributable to, in whole or in part, any investment banking activity by an Insured, including but not limited to any disclosure requirements in connection with the foregoing; however, this exclusion shall not apply to Claims arising out of the sale by an Insured to a particular client or customer of an open-ended investment company or variable annuity which alleges that a client or customer was unsuitable for and wrongfully placed into such investment company or variable annuity.

For the purposes of this section, "investment banking activity" shall mean the underwriting or syndicating of any security or partnership interest in connection with any of the following: any actual, alleged or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, reorganization (voluntary or involuntary), capital restructuring, recapitalization, spin-offs, primary or secondary offerings of securities (regardless of whether the offering is a public offering or private placement), dissolution or sale of all or substantially all of the assets or stock of a business entity, or effort to raise or furnish capital or financing for any enterprise or entity, or any activity by an Insured as a specialist or market maker (including the failure to make a market) for any securities, or any disclosure requirements in connection with any of

*BROKER* *Archive Copy* END 12

This endorsement, effective *12:01 AM*      *August 1, 2008*          forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
          *THROUGH THE FINANCIAL SALES*
          *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

the foregoing.  Investment banking activity also includes the rendering of advice or recommendations or rendering of a written opinion in connection with any of the foregoing, however it does not include advice in connection with or sale of bank owned life insurance or corporate owned life insurance products.

(aa)    an insured alleging, arising out of, based upon, or attributable to the purchase or sale (or failure to purchase or sell) any of the following, or any advice in connection therewith:

(1)    promissory notes, i.e. an investment whereby the maker agrees to pay to the payee a specific sum of money either on demand or at fixed or determinable future date;

(2)    viatical products including viatical settlement and viatical contracts; or

(3)    callable certificates of deposit.

(4)    leases (including but not limited to ETS Pay Phones).

Coverage provided pursuant to this endorsement shall be subject to all of the terms, conditions and exclusions of the policy to which it attaches.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy*
American International Group, Inc. All rights reserved.
**BROKER          END 12**

48

<u>ENDORSEMENT#</u> *13*

This endorsement, effective *12:01 AM*    *August 1, 2008*    forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
    *THROUGH THE FINANCIAL SALES*
    *PROFESSIONALS RISK PURCHASING GROUP*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**MOLD EXCLUSION**

In consideration for the premium charged it is hereby understood and agreed that the following amendments to the policy shall apply:

The EXCLUSIONS section of the policy is amended by adding the following paragraph to the end thereof:

This policy does not apply:

to any claim for or alleging bodily injury, sickness, disease, or death of any person, or damage to or destruction of any property (including the loss of use thereof), personal and advertising injury, or any other damage, loss, cost or expense, including, but not limited to damages, losses, costs or expenses related to, arising from or associated with clean-up, remediation, containment, removal or abatement, caused directly or indirectly, in whole or in part, by:

a.    Any Fungus(i), Molds(s), mildew or yeast, or

b.    Any Spore(s) or toxins created or produced by or emanating from such Fungus(i), Mold(s), mildew or yeast, or

c.    Any substance, vapor, gas, or other emission or organic or inorganic body or substance produced by or arising out of any Fungus(i) , Mold(s), mildew or yeast, or

d.    Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any Fungus(i), Mold(s), mildew, yeast, or Spore(s) or toxins emanating therefrom,

regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that bodily injury, property damage, personal and advertising injury, loss, cost or expense.

*BROKER Archive Copy END 13*

49

This endorsement, effective  *12:01 AM*      *August 1, 2008*          forms a part of
policy number    *00-665-25-96*
Issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

The DEFINITIONS section of the policy is amended by adding the following to the end thereof:

Fungus(i) includes, but is not limited to, any of the plants or organisms belonging to the major group Fungi, lacking chlorophyll, and including Molds, rusts, mildews, smuts, and mushrooms.

Mold(s) includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and Fungi that produce Molds.

Spore(s) means any dormant or reproductive body produced by or arising or emanating out of any Fungus(i), Mold(s), mildew, plants, organisms or microorganisms.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy*
American International Group, Inc. All rights reserved.
*BROKER          END 13*

This endorsement, effective *12:01 AM*      *August 1, 2008*        forms a part of
policy number    *00-665-25-96*
issued to      *WOODBURY FINANCIAL SERVICES, INC.*
              *THROUGH THE FINANCIAL SALES*
              *PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

**AMEND SECTION 6(A) DISCOVERY PERIOD**

It is hereby agreed that the policy is amended as follows: Section 6, "Discovery Period", is deleted in its entirety and replaced with the following:

6.     DISCOVERY PERIOD

   A(1). AUTOMATIC POLICY DISCOVERY PERIOD

      If the Insurer or the Named Insured shall cancel or refuse to renew this policy, the Named Insured shall have an automatic ninety (90) day period following the effective date of such cancellation or non-renewal in which to give written notice to the Insurer of Claim(s) first made during the Automatic Policy Discovery Period for Wrongful Acts occurring prior to the effective date of such cancellation or non-renewal and otherwise covered by this policy.

      However, in the event that the Insured(s) is issued another professional liability policy upon the cancellation or nonrenewal of this policy, whether by this Insurer or any other insurance company, then the Insured(s) shall not be entitled to this Automatic Policy Discovery Period.

   A(2). OPTIONAL POLICY DISCOVERY PERIOD

      If the Insurer or the Named Insured shall cancel or refuse to renew this policy, the Named Insured shall have the right, upon payment of an additional premium of 150% of the total annual premium, to purchase a period of twelve (12) months following the effective date of such cancellation or non-renewal in which to give written notice to the Insurer of Claim(s) first made during the Optional Policy Discovery Period for Wrongful Acts occurring prior to the effective date of such cancellation or non-renewal and otherwise covered by this policy.

      The rights contained in this clause shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within sixty (60) days of the effective date of cancellation or non-renewal. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

      The first ninety (90) days of the Optional Policy Discovery Period, if it becomes effective, shall run concurrently with the Automatic Policy Discovery Period.

*BROKER* *Archive Copy* *END 14*

This endorsement, effective *12:01 AM*        *August 1, 2008*              forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

B.    TERMINATED AGENT DISCOVERY PERIOD

Upon termination of his status as an Insured Agent during the Policy Period, the terminated Insured Agent shall have an automatic one (1) year Terminated Agent Discovery Period, effective as of his termination date, to report Claim(s) under this policy but only for Wrongful Acts which occurred prior to his/her termination date.

The rights contained in this clause shall terminate in the event that the terminated Insured Agent has replaced coverage or is insured under any other professional liability insurance policy.

Furthermore, this clause and the rights contained herein shall not apply if the Named Insured has terminated its relationship with the terminated Insured Agent for disciplinary reasons.

C.    RETIRED/DISABLED AGENT DISCOVERY PERIOD

Upon retirement, death or disability of an Insured Agent during the Policy Period, the retired, deceased (or the estate of the deceased Insured Agent on his/her behalf; or the Named Insured on the deceased Insured Agent's behalf) or disabled Insured Agent shall have an unlimited Retired/Disabled Agent Discovery Period, effective as of his retirement, death or disability to report Claim(s) under this policy but only for Wrongful Acts which occurred prior to the date of his/her retirement, death or disability. Furthermore, the rights contained in this clause shall terminate in the event that the retired/disabled/deceased Insured Agent has replaced coverage or is insured under any other professional liability insurance policy.

The provisions of any Discovery Period shall be part of and not in addition to the applicable Sub-Limit of Liability and the aggregate Limit of Liability for the Policy Period.

Coverage provided pursuant to this endorsement shall be subject to all of the terms, conditions and exclusions of the policy to which it attaches.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy*
American International Group, Inc. All rights reserved.
*BROKER*            *END 14*

This endorsement, effective *12:01 AM      August 1, 2008*          forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

**IMPROPER MUTUAL FUND AND VARIABLE ANNUITY PRACTICES ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not make any payment for loss based solely upon allegations that any Insured intentionally permitted, or aided or abetted others in using, was aware of others using, or was a participant or connected in any way in the use of: 1) Late Trading; 2) Market Timing; 3) Soft-dollar Activity; 4) Front Running; or 5) Revenue Sharing related to a mutual fund or variable annuity.

Solely for the purpose of this endorsement, "Late Trading" means: 1) any transaction involving mutual fund shares made after the determination of the mutual fund's Current Net Asset Value (as defined in Rule 2a-4 of the Investment Company Act of 1940), including but not limited to, the placement or confirmation of orders for, or the purchase or redemption of mutual fund shares, but made at a price based on the fund's previously determined Current Net Asset Value calculated that same day, in contravention of Rule 22c-1 of the Investment Company Act of 1940; or, 2) any transaction defined as late trading by any state or federal statute or regulation, or any prospectus, policy, limitation, agreement or procedure of the mutual fund.

Solely for the purpose of this endorsement, "Market Timing" means the making of short-term purchases or sales of mutual fund shares or variable annuities, contrary to or in violation of any mutual fund prospectus, variable annuity contract, policy, limitation, agreement or procedure, or contrary to or in violation of any state or federal statute or regulation, and the conduct associated therewith, including, but not be limited to:

(1)    the waiver of redemption fees associated with Short-Term Trading contrary to the mutual fund's prospectus, variable annuity contract, policies, limitations, agreements or procedures;

(2)    the failure to abide by written representations regarding the permissibility of Short-Term Trading, or written representations regarding the mutual fund's or variable annuity's efforts to monitor or prevent Short-Term Trading;

(3)    the receipt of fees or other compensation from certain investors in exchange for providing such investors with Short-Term Trading privileges not available to other investors;

(4)    the failure to monitor, detect, identify or remediate Short-Term Trading.

This endorsement, effective _12:01 AM_      _August 1, 2008_        forms a part of
policy number   _00-665-25-96_
issued to   _WOODBURY FINANCIAL SERVICES, INC._
            _THROUGH THE FINANCIAL SALES_
            _PROFESSIONALS RISK PURCHASING GROUP_
by        _National Union Fire Insurance Company of Pittsburgh, Pa._

Solely for the purpose of this endorsement, "Short-Term Trading" means the redemption of shares of a mutual fund, or sale of a variable annuity contract, in a time period less than that provided in a mutual fund prospectus, or a variable annuity contract, or the policies, limitations, agreements or procedures of a mutual fund or variable annuity, or at law, including without limitation any so-called "in and out" trading of mutual fund shares or variable annuity contracts or any other trade of mutual fund shares or variable annuity contracts designed to take advantage of inefficiencies in the method the mutual fund uses to price its shares or the variable annuity uses to price its contracts.

Solely for the purpose of this endorsement, "Soft Dollar Activities" means paying or providing, or receiving or accepting, fees, commissions, bonuses, gratuities, services or any other form of compensation in exchange for the preferential treatment of a particular mutual fund, particular class of mutual fund share or particular variable annuity.

Solely for the purpose of this endorsement, "Front Running" means the trading by brokers of mutual fund shares or variable annuities based on information received internally, before clients of the broker have been given the information.

Solely for the purpose of this endorsement, "Revenue Sharing" means any undisclosed compensation to the Insured(s) by a sponsoring company for the purchase or sale of their mutual fund or variable annuity

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

_Archive Copy_ International Group, Inc. All rights reserved.
**_BROKER_**          **_END 15_**

<u>ENDORSEMENT#</u> *16*

This endorsement, effective *12:01 AM*  *August 1, 2008*  forms a part of policy number  *00-665-25-96*
issued to  *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

**AIG NON-STACKING LIMITS ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that if any Claim under this policy is also covered by one or more other policies issued by the Insurer, or by any other member of American International Group, Inc. to the person or entity named in Item 1 of the Declarations or to any person who controls, is controlled by or is under common control with, said person or entity, then with respect to such Claim:

1) the Insurer shall not be liable under this policy for a greater proportion of the Loss than the applicable limit of liability under this policy bears to the total applicable limits of liability of all such policies; and

2) the maximum amount payable under all such policies shall not exceed the limit of liability of that policy referred to above which has the highest applicable limit of liability.

Nothing contained in this endorsement shall be construed to increase the limit of liability of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy*
, American International Group, Inc. All rights reserved.
**BROKER**          **END 16**

55

<u>ENDORSEMENT#</u> *17*

This endorsement, effective *12:01 AM     August 1, 2008*     forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## FEE ARRANGEMENT EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for loss and/or defense costs in connection with any claim made against any Insured alleging, arising out of, based upon or attributable to any allegations that any Insured intentionally or negligently permitted, or aided or abetted others in using, was aware of others using, or was a participant or connected in any way in the use of an illegal or improper agreement or other arrangement between an insurance broker and an insurance carrier involving the payment of increased fees, commissions or other compensation based on the volume or type of business referred to the insurance carrier.

It is the intent of the parties that this policy shall exclude such loss regardless of the form, style, or denomination of any such claim, regardless of whether the claim is criminal, administrative or civil, and shall specifically apply but not be limited to claims alleging conflict of interest, breach of contract, failure to supervise, negligent supervision or negligence of any contract, controlling person liability, breach of fiduciary duty, personal profiting, improper or unlawful fees or charges of any kind, criminal activity, market manipulation, violation of any law related to the insurance industry, misrepresentation, estoppel or repudiation of any commitment and any other theory of liability.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy* American International Group, Inc. All rights reserved.
*BROKER            END 17*

56

This endorsement, effective *12:01 AM*     *August 1, 2008*          forms a part of
policy number     *00-665-25-96*
issued to     *WOODBURY FINANCIAL SERVICES, INC.*
                   *THROUGH THE FINANCIAL SALES*
                   *PROFESSIONALS RISK PURCHASING GROUP*
by          *National Union Fire Insurance Company of Pittsburgh, Pa.*

**NEW YORK AMENDATORY**

I.    **GENERAL TERMS AND CONDITIONS**

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to any Insureds that are domiciled or have a primary place of business in New York, the Policy is amended as follows:

A.    Clause 9, ("Defense and Settlements"), first paragraph, is deleted and replaced with the following:

With respect to any **Claim** for which insurance is afforded by this policy under Insuring Agreement 1 above, the Company shall, as part of and subject to the Limits of Liability, pay on behalf of the **Insured Defense Costs**. The Company shall at all times have the right and duty to assume the defense of all **Claims** against any **Insured**.

1.    The Company shall have the right to appoint counsel and to make such investigation and defense of a **Claim** as it deems necessary. The **Insured** or **Insureds**, as applicable, shall:

a.    have the right to consent to the Company's choice of defense attorney, which consent shall not be unreasonably withheld; and

b.    participate in and assist in the direction of the defense of any **Claim**.

Subject to Paragraph II. below, the Company's obligation to defend any **Claim** or pay any **Damages** or **Defense Costs**, shall be completely fulfilled and extinguished if the applicable Limit of Liability has been exhausted by payment of **Damages** or **Defense Costs**.

2.    If the Company concludes that any Limit of Liability applicable to a **Claim** may become exhausted prior to the conclusion of a **Claim**, the Company will notify the **Insured** or **Insureds**, in writing, to that effect.

This endorsement, effective *12:01 AM*     *August 1, 2008*     forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
          *THROUGH THE FINANCIAL SALES*
          *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

When any Limit of Liability applicable to a **Claim** has actually been exhausted prior to the conclusion of a **Claim**, the Company will notify the **Insured** or **Insureds**, in writing, as soon as practicable, that such Limit of Liability has been exhausted and that the Company's duty to defend such **Claim** has ended.

The Company will initiate, and cooperate in, the transfer of control to the **Insured** or **Insureds**, of any **Claims** which were subject to that Limit of Liability and which were reported to the Company prior to the exhaustion of such Limit. The **Insured** or **Insureds** must cooperate in the transfer of control of such **Claims**.

The Company agrees to take the necessary steps as the Company deems appropriate to avoid a default in, or continue the defense of, such **Claims** until such transfer has been completed, provided that **Insured** or **Insureds** are cooperating in completing such transfer.

The **Insured** or **Insureds** shall reimburse the Company for expenses the Company incurs in taking those steps the Company deems appropriate to avoid a default in, or continuing the defense of, any such **Claims**.

The Company will not take any action with respect to any **Claim** that would have been subject to such Limit of Liability, had it not been exhausted, if the **Claim** is reported to the Company after that applicable Limit of Liability has been exhausted.

The exhaustion of any Limit of Liability by payment of any **Claim**, and the resulting end of the Company's duty to defend, will not be affected by the Company's failure to comply with any of the terms and conditions of this provision.

B.    Item 3 of the Policy's Declarations ("total policy aggregate for Coverages A, B & C") is deleted.

*BROKER* *Archive Copy* *END 18*

This endorsement, effective *12:01 AM    August 1, 2008*        forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

C.    Clause 4 of the Policy is deleted and replaced with the following:

The per **Claim** Limit of Liability stated in Item 3 of the Declarations is the maximum limit of the Company's liability for **Damages** and **Defense Costs** incurred in a **Claim** which is covered under this policy excess of the applicable Retention indicated in Item 4 of the Declarations. The per **Claim** Limit of Liability applies regardless of the number of **Insureds, Wrongful Acts, Interrelated Wrongful Acts** or claimants implicated, named or referenced in a **Claim.** If an **Insured/Broker Dealer, Named Insured** and/or two or more **Insured Agents** are implicated in a **Claim,** then a single per **Claim** Limit of Liability applies, whichever is the largest.

The **Insured Agent** aggregate Limit of Liability stated in Item 3 of the Declarations is the maximum limit of the Company's liability for all **Damages** and **Defense Costs** arising out of all **Claims** against an **Insured Agent** covered under this policy. The aggregate Limit of Liability applies regardless of the number of **Claims** against or **Wrongful Acts** or **Interrelated Wrongful Acts** by an **Insured Agent.**

The limit of the Company's liability for all amounts payable hereunder in settlement or satisfaction of all **Claim(s)** (including **Defense Costs)** covered under this policy shall be subject to the Limits of Liability stated in Item 3 of the Declarations. The Company shall not be obligated to defend any claim(s) or reimburse any **Insured** after the applicable Limit of Liability or aggregate Limit of Liability stated in Item 3 of the Declaration as applicable to such **Insured** has been exhausted; provided however that should the settlement, satisfaction or defense of **Claims(s)** exhaust the aggregate **Insured Agent** Limited of Liability, other **Insureds** shall remain covered up to the aggregate Limits of Liability afforded to such **Insureds.**

If additional **Claims** are subsequently made against an **Insured** that arise out of the same **Wrongful Act** or **Interrelated Wrongful Acts** as **Claims** already made and reported to the Company, all such **Claims,** whenever made, shall be considered first made within the **Policy Period** in which the earliest **Claim** arising out of such **Wrongful Act** or **Interrelated Wrongful Acts** was first made and reported to the Company. Such additional **Claims,** along with all other previously made **Claims,** shall be subject to a single per **Claim** Limit of Liability as stated in Item 3 of the Declarations.

**BROᴀ𝒓𝒄ʜ𝒊𝒗𝒆 Copy ᴇɴᴅ 18**

This endorsement, effective *12:01 AM*     *August 1, 2008*        forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

D.      Clause 8 ("Notice/Claim Reporting Provisions"), Subsection (a) is deleted and replaced with the following:

The **Insureds** shall, as a condition precedent to the obligations of the Company under this policy, give written notice to the Company of a **Claim** made against an **Insured** as soon as practicable during the **Policy Period**, any subsequent renewal of the Policy, or an Extended Reporting Period, if applicable.

E.      The Policy is amended to include the following provision:

1)      In consideration of the coverage provided by this Policy, the **Named Insured** hereby covenants that it will not:

   i.      mandate that any **Insured Agent** or **Insured Broker/Dealer** purchase or accept coverage under this Policy; or

   ii.     impose any penalty upon any **Insured Agent** or **Insured Broker/Dealer** that does not purchase or accept coverage under this Policy,

provided, however, that the **Named Insured** may require such **Insured Agent** or **Insured Broker/Dealer** to either purchase or accept coverage under this Policy or otherwise obtain comparable coverage.

2)      In consideration of the coverage provided by this Policy, the **Named Insured**, each **Insured Agent**, and each **Insured Broker/Dealer** hereby covenant that the **Named Insured** shall be the sole agent of each **Insured Agent** and **Insured Broker/Dealer** for accepting any return premium, notice of cancellation or non-renewal of coverage or any extended reporting period offer under this Policy with respect to any **Insured Agent** or **Insured Broker/Dealer**. Upon receipt of a cancellation or non-renewal notice or extended reporting period offer from the Company, the **Named Insured** shall send timely notice of such cancellation or non-renewal to the applicable **Insured Agent** or **Insured Broker/Dealer** in accordance with the provisions provided herein.

*BROKER* *Archive Copy* *END 18*

60

This endorsement, effective *12:01 AM*     *August 1, 2008*         forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

3).    It is understood and agreed that nothing stated in this endorsement shall be deemed to affect in any way Definition (h) of this Policy, " **Interrelated Wrongful Acts**" or the application of such definition pursuant to any provision in the Policy or any endorsements thereto, including but not limited to any applicable per **Claim** Limit of Liability, **RETENTION**, or **NOTICE/CLAIM REPORTING PROVISIONS.**

E.    The Policy is amended to include the following provision:

NONRENEWAL/CONDITIONAL RENEWAL OF THE POLICY

1.    If the Company elects not to renew this Policy, the Company shall send notice as provided in paragraph F (3) below along with the reason for nonrenewal.

2.    If the Company conditions renewal of this Policy upon:

A.    change of Limits of Liability;

B.    change in type of coverage;

C.    reduction of coverage;

D.    increased Retention;

E.    addition of exclusion; or

F.    increased premiums in excess of 10%, exclusive of any premium increased due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit; the Company shall send notice as provided in paragraph F(3) below.

3.    Notice of nonrenewal and conditional renewal will be provided as follows:

If the Company decides not to renew this Policy or to conditionally renew this Policy as provided in Paragraphs F (1) and F (2) above, the Company shall mail or deliver written notice to the **Named Insureds** at least sixty (60), but not more than one hundred twenty (120) days before the expiration date of the Policy.

*BROKER Archive Copy END 18*

This endorsement, effective *12:01 AM    August 1, 2008*        forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

4.    Notice will be mailed or delivered to the **Named Insured,** at the address in Item 6 of the Declarations, and to its authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

5.    The Company will not send the **Named Insured** notice of non-renewal or conditional renewal if any of the **Named Insured,** its authorized agent or broker, or another insurer of the **Named Insured** mails or delivers notice to the Company that this Policy has been replaced or is no longer desired.

G.    The Policy is amended to include the following provision:

CANCELLATION/NONRENEWAL/CONDITIONAL RENEWAL OF INSURED AGENT CERTIFICATE OF INSURANCE

I.    Cancellation of Certificate of Insurance

1.    An **Insured Agent** has the right to cancel his or her **Certificate of Insurance** and enrollment for coverage under the Policy at any time by giving notice to the Company stating when thereafter the cancellation shall be effective. If the Certificate of Insurance is so cancelled, earned premium shall be computed on a short rate basis

2.    If an **Insured Agent's Certificate of Insurance** and enrollment for coverage under the Policy has been in effect for sixty (60) days or less, the **Certificate of Insurance** and enrollment may be cancelled by the Company, in the manner provided by in General Condition E. 2. of this endorsement, by mailing or delivering to the **Insured Agent** written notice stating the reason for cancellation at the mailing address shown on the **Certificate of Insurance,** and to the **Insured Agent's** authorized agent or broker at least:

(i)    Twenty (20) days before the effective date of cancellation if the Certificate of Insurance is canceled for any reason not included in paragraph (ii) below.

This endorsement, effective *12:01 AM    August 1, 2008*         forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

(ii)    Fifteen (15) days before the effective date of cancellation if the **Certificate of Insurance** is canceled for any of the following reasons:

A.    nonpayment of premium;

B.    conviction of a crime;

C.    discovery of fraud or material misrepresentation in the obtaining of the **Certificate of Insurance** or in the presentation of a **Claim**;

D.    after issuance of the **Certificate of Insurance** or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current **Policy Period**;

E.    material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the **Certificate of Insurance**, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the **Certificate of Insurance** was issued or last renewed;

F.    required pursuant to a determination of the New York State Superintendent of Insurance that continuation of the Company's present premium volume would jeopardize the Company's solvency or would be hazardous to the interest of the Company's policyholders, creditors or the public;

G.    a determination by such Superintendent that the continuation of the **Certificate of Insurance** would violate, or would place the Company in violation of, any provision of the New York Insurance Code; or

*BROKER**Archive** Copy* END 18

This endorsement, effective *12:01 AM*      *August 1, 2008*        forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

        H.     revocation or suspension of the **Insured Agent's** license to provide **Professional Services**.

3.     If an **Insured Agent's Certificate of Insurance** and enrollment for coverage under the Policy has been in effect for more than sixty (60) days, or if the **Certificate of Insurance** is a renewal or continuation of a **Certificate of Insurance** issued by the Company, the **Certificate of Insurance** and enrollment may be cancelled by the Company, in the manner provided by General Condition E. 2. of this endorsement, only for any of the reasons listed in paragraph I.2. (ii) above, provided that written notice is mailed or delivered to the **Insured Agent** at the address shown in the **Certificate of Insurance**, and to his or her authorized agent or broker at least fifteen (15) days before the effective date of cancellation stating the reason for cancellation.

4.     Notice of cancellation will state the effective date of cancellation. The **Insured Agent's** enrollment for coverage under the Policy will end on this date. If notice is mailed, proof of mailing will be sufficient proof of notice. The notice of cancellation for nonpayment of premium will include the amount of premium due.

5.     If an **Insured Agent** cancels his or her **Certificate of Insurance** and enrollment for coverage under the Policy, earned premium will be computed on a short rate basis. If the Company cancels a Certificate(s) of Insurance, earned premium shall be computed on a pro rata basis based upon the amount paid towards the Policy premium by such **Insured Agent**. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

6.     If one of the reasons for cancellation set forth in Paragraph I.2. (ii) exists, the Company may cancel an **Insured Agent's** entire **Certificate of Insurance** and enrollment for coverage under the policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of a **Certificate of Insurance**.

*BROKER Archive Copy* END 18

This endorsement, effective *12:01 AM*    *August 1, 2008*    forms a part of policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
         *THROUGH THE FINANCIAL SALES*
         *PROFESSIONALS RISK PURCHASING GROUP*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

II.    Nonrenewal of Certificate of Insurance

1.    If the Company elects not to renew an **Insured Agent's Certificate of Insurance** and enrollment for coverage under the policy, the Company shall send notice as provided in paragraph G (II)(2)(i) below along with the reason for nonrenewal.

2.    Notice of nonrenewable and conditional renewal will be provided as follows:

(i)    If the Company decides not to renew an **Insured Agent's Certificate of Insurance** and enrollment for coverage under the Policy as provided in paragraph G (II)(1) above, the Company shall mail or deliver, in the manner provided in General Condition E.2. written notice to the **Named Insured** at least seventy (70) but not more than one hundred twenty (120) days before:

A.    the expiration date; or

B.    the anniversary date of the **Insured Agent's** continuous **Certificate of Insurance**.

(ii)    Notice will be mailed or delivered to the **Insured Agent** by the Company, in the manner provided by General Condition E. 2. of this endorsement, at the address shown in the **Certificate of Insurance** and his or her authorized agent or broker. If notice is mailed, proof or mailing will sufficient proof of notice.

(iii)    The Company will not send the **Named Insured** notice of non-renewal of the **Insured Agent's Certificate Of Insurance** if the **Insured Agent** or its authorized agent or broker or another insurer of the **Insured Agent** mails or delivers notice that his or her coverage has been replaced or no longer desired.

*BROKER* *Archive Copy* END 18

This endorsement, effective *12:01 AM*    *August 1, 2008*    forms a part of policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

III.    INCOMPLETE/LATE CONDITIONAL RENEWAL NOTICE OR LATE NONRENEWAL NOTICE

If any **Insured** does not receive timely or proper nonrenewal notice under applicable New York law:

1.    and the **Policy Period** has not expired, then coverage will remain in effect at the same terms and conditions of this **Policy Period** at the lower or the notice is mail or delivered, unless the **Insured**, during this sixty (60) day period, has replaced coverage or elects to cancel.

2.    and the **Policy Period** has ended, then coverage will remain in effect at the same terms and conditions of this **Policy Period** for another **Policy Period** at the lower of the current rates or the prior **Policy Period's** rates, unless the **Insured**, during the **Policy Period**, has replaced the coverage or elects to cancel.

H.    The Policy is amended to include the following provision:

BANKRUPTCY

Bankruptcy or insolvency of an **Insured** or of an **Insured's** estate will not relieve the Company of its obligations under this Policy.

I.    The Policy's Exclusions are amended as follows:

Exclusion (o) is deleted in its entirety and replaced with the following:

to any **Claim** brought by any governmental authority or any self-regulatory or regulatory authority (including, but not limited to, the Securities Investor Protection Corporation or National Association of Securities Dealers, Inc.), regardless of the capacity in which it is brought, or brought by the successors or assigns of any of the aforementioned;

In addition, the following Exclusion is added:

(v)    to any **Claim** that is certified as, or which is seeking certification as, a class action.

This endorsement, effective *12:01 AM* *August 1, 2008* forms a part of policy number *00-665-25-96*
issued to *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by *National Union Fire Insurance Company of Pittsburgh, Pa.*

## II. INSURED AGENT

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to any **Insured Agents** that are domiciled or have a primary place of business in New York, the Policy is amended as follows:

A. Definition (g) of **Insured Agent** is amended by addition of the following:

It is understood and agreed that a condition precedent to coverage for any **Insured Agent** is that the **Named Insured** issued such **Insured Agent** a **Certificate of Insurance**.

B. The Policy is amended to include the following Definition:

**Certificate of Insurance** means the document issued to an **Insured Agent** which evidences in accordance with applicable law his or her enrollment for coverage under the Policy, pursuant to all of its terms, provisions, exclusions, limitations and conditions.

C. The Policy is amended to include the following:

EXTENDED REPORTING PERIODS

I. AUTOMATIC EXTENDED REPORTING PERIOD

1. In the event of termination of an **Insured Agent's Certificate of Insurance** because of cancellation or nonrenewal of the Policy or of **Certificate(s) of Insurance**; or due to a decrease in limits, reduction in coverage, new exclusion or any other change in coverage less favorable to an **Insured Agent** than that contained in the preceding Policy, a sixty (60) day Automatic Extended Reporting Period will be granted to the **Insured Agent** at no charge, solely with respect to such coverage restriction or decrease in limits.

A. Pursuant to this Extended Reporting Period, an **Insured Agent** shall automatically have an additional sixty (60) days, commencing on the date of termination and ending sixty (60) days thereafter, during which to report **Claims** under this Policy solely with respect to the coverage so extended. **Claims** reported during the

*BRO**Archive Copy**END 18*

This endorsement, effective *12:01 AM*     *August 1, 2008*          forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
              *THROUGH THE FINANCIAL SALES*
              *PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

Automatic Extended Reporting Period must have been first made against the **Insured Agent** during the **Policy Period** for a **Wrongful Act** occurring prior to the end of the **Policy Period.**

B.    The Limits of Liability for such Automatic Extended Reporting Period shall be the applicable amount remaining on the Policy's aggregate Limit of Liability with respect to such **Insured Agent.**

C.    **Claims** reported during the Automatic Extended Reported Period must otherwise be covered pursuant to the terms, provisions, exclusions and other conditions contained in the Policy.

2.    Within thirty (30) days after termination of the Policy, the Company, in the manner provided by General Condition E. 2. of this endorsement, will notify each affected **Insured Agent,** in writing, of the Automatic Extended Reporting Period provided for by paragraph 1(A) above.

II.   ADDITIONAL EXTENDED REPORTING PERIOD

1.    Within thirty (30) days after termination of the Policy or **Certificate of Insurance,** the Company will notify the Named **Insured** of the availability of, the premium for, and the importance of purchasing an Additional Extended Reporting Period. It is understood and agreed that, in the manner provided by General Condition E.2 of this endorsement, the **Named Insured** will notify each affected **Insured Agent** regarding same.

2.    The Additional Extended Reporting Period shall be for 1 year commencing on the date of termination and ending 12 months thereafter, inclusive of the sixty (60) day Automatic Reporting Period specified in Section I above, during which to report any **Claims** under the Policy. **Claims** reported during the Additional Extended Reporting Period must have been first made against the **Insured Agent** during the **Policy Period** or the Additional Extended Reporting Period for a **Wrongful Act** occurring prior to the end of the **Policy Period.**

This endorsement, effective *12:01 AM*    *August 1, 2008*    forms a part of policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

A.    **Claims** reported during the Additional Extended Reported Period must otherwise be covered pursuant to the terms, provisions, exclusions and other conditions contained in the Policy.

B.    The premium for the Additional Extended Reporting Period shall be computed in accordance with the rates in effect when the Policy was last issued or renewed. The premium for the Additional Extended Reporting Period shall be based upon the rates for such coverage in effect on the date this Policy was issued or last renewed and shall be for 1) years at 150% of such premium.

3.    An **Insured Agent** shall have the greater of sixty (60) days from the effective date of termination of this Policy or thirty (30) days from the date of mailing or delivery of the advice of the availability to purchase an Additional Extended Reporting Period, to submit written acceptance of the Additional Extended Reporting Period. The premium for such Additional Extended Reporting Period must be paid promptly when due. The premium shall be fully earned at the inception of this endorsement.

4.    Upon termination of this Policy:

A.    any return premium due the **Insured Agent** shall be credited toward the premium for an Additional Extended Reporting Period if the **Insured Agent** elects such coverage.

B.    where premium is due to the Company for coverage under this Policy or any preceding policy, any monies received by the Company from the **Insured Agent** as payment for an Additional Extended Reporting Period coverage shall first be applied to such premium owing for this Policy or any preceding policy.

*BROKER* Archive Copy END 18

This endorsement, effective *12:01 AM .   August 1, 2008*                forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

5.   As a condition precedent to the right to purchase an Additional Extended Reporting Period, the total premium for this Policy must have been paid. The right to purchase an Additional Extended Reporting Period shall end unless the Company receives written notice and full payment of the premium for such period within sixty (60) days after the end of the **Policy Period** or thirty (30) days from the date of mailing or delivery of the advice of the availability to purchase an Additional Extended Reporting Period.

6.   If an Additional Extended Reporting Period is purchased, the entire premium shall be deemed earned at its commencement without any obligation by the Company to return any portion thereof.

7.   Limits of Liability for such additional extended reporting period shall be the applicable amount remaining on the Policy's aggregate Limit of Liability with respect to such **Insured Agent.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THE POLICY SHALL REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy*American International Group, Inc. All rights reserved.
*BROKER*          *END 18*

This endorsement, effective *12:01 AM* *August 1, 2008* forms a part of policy number *00-665-25-96*
issued to *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by *National Union Fire Insurance Company of Pittsburgh, Pa.*

The Aggregate Limit of CIP Insurance set forth in Item 7 of the Declarations and each and every Sublimit of Insurance described in Item 8 of the Declarations shall be part of, and not in addition to, the Aggregate Limit of Liability set forth in Item 3 of the Declarations of the policy.

II.

Clause 1. INSURING AGREEMENTS is amended by adding the following to the end thereof:

### D. Personal Identity Liability

This policy shall pay on behalf of the Insured, those amounts in excess of any applicable Deductible, the Insured is legally obligated to pay as Damages resulting from a Claim arising from a Personal Identity Event first discovered by an Insured during the Policy Period and reported to the Insurer within the Notice Period.

### E. Administrative Action

This policy shall pay the Insured for all reasonable Administrative Expenses, in excess of any applicable Deductible and Coinsurance, resulting from an Administrative Action arising from a Personal Identity Event first discovered by an Insured during the Policy Period and reported to the Insurer within the Notice Period.

### F. Identity Event Services

This policy shall pay the Named Insured for all reasonable Notification Costs, Crisis Expenses and Post Event Services, in excess of any applicable Deductible and Coinsurance, resulting from a Personal Identity Event first discovered by an Insured during the Policy Period and reported to the Insurer within the Notice Period.

*BROArchive CopyEND 19*

This endorsement, effective *12:01 AM*      *August 1, 2008*          forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

### III.

Solely with respect to the coverage provided by this endorsement,  Clause 2. DEFINITIONS
is amended by adding the following to the end thereof:

CIP(a)   "Administrative Action" means and is limited to:
    1.   an investigation of the Insured after written notice is sent to the Insured by,
    2.   negotiation of a consent order against the Insured with, or
    3.   formal adversarial administrative proceeding against the Insured instituted by, a United States or Canadian federal, state, provincial or territorial regulatory agency, arising solely out of a Personal Identity Event first discovered by an Insured during the Policy Period and reported to the Insurer within the Notice Period.

CIP(b)   "Administrative Expenses" means reasonable attorneys' fees and expenses for legal services incurred by the Insured with the Insurer's prior written consent, in the defense and investigation of an Administrative Action, provided that these services are not performed by employees of the Named Insured.  All Administrative Expenses incurred with respect to appeals and proceedings, or a series of continuous or interrelated appeals and proceedings arising out of an Administrative Action shall be considered as part of the original Administrative Action.  Administrative Expenses shall not include ongoing monitoring or the costs of implementing any changes required or consented to for regulatory compliance.

CIP(c)   "Class Action Claim" means any Claim arising out of a Personal Identity Event:
    1.   brought on behalf of a class or putative class of plaintiffs (whether or not certified as such); or
    2.   otherwise brought on a representative basis.

CIP(d)   "Crisis Expenses" means the reasonable and necessary charges and fees incurred by a Named Insured within six (6) months following discovery of a Personal Identity Event covered under this policy, for the services of a public relations firm, crisis management firm, or law firm hired or appointed by the Insurer, or by the Named Insured with the Insurer's prior written consent, retained solely for the purpose of restoring the confidence of the Named Insured's customers and investors.

*BROKER*Archive Copy *END 19*

This endorsement, effective *12:01 AM     August 1, 2008*          forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

CIP(e)   "Information Holder" means a third party that the Insured has provided Personal Identification to and with whom an Insured has entered into a contract that requires such party to protect such Personal Identification.

CIP(f)   "Notification Costs" means and is limited to the reasonable and necessary costs incurred by a Named Insured with the Insurer's prior written consent, within one (1) year following discovery of a Personal Identity Event covered under this policy, for:

1.   newspaper or other printed media, radio and television advertisements, or correspondence intended to inform or educate the general public, that cite a Personal Identity Event and advise any individual whose Personal Identification is the subject of such Personal Identity Event of any available remedy; and

2.   correspondence or any other communication directed to any individual whose Personal Identification is the subject of a Personal Identity Event for purposes of notifying them of the Personal Identity Event and any available remedy.

CIP(g)   "Notice Period means the sixty (60) day period of time the Insured shall have to notify the Insurer that a Personal Identity Event has occurred. The Notice Period shall commence immediately upon first discovery of the Personal Identity Event by an Insured.

CIP(h)   "Personal Identification" means any information from which an individual may be uniquely and reliably identified, including without limitation, an individual's name, address, telephone number, social security number, account relationships, account numbers, account balances, account histories and passwords.

CIP(i)   "Personal Identity Event" means any event involving a Named Insured that has or could reasonably result in the fraudulent use of Personal Identification, that is or was in the care, custody or control of an Insured or Information Holder. All Claims, Administrative Actions, Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses and Post Event Services resulting from the same, continuous, related or repeated event or which arise from the same, related or common nexus of facts will be deemed to arise out of one Personal Identity Event.

BROKER Archive Copy END 19

This endorsement, effective *12:01 AM* *August 1, 2008* forms a part of
policy number *00-665-25-96*
issued to *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by *National Union Fire Insurance Company of Pittsburgh, Pa.*

CIP(j) "Pollutants" means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, asbestos, acids, alkalis, chemicals and Waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

CIP(k) "Post Event Services" means reasonable fees and expenses incurred by a Named Insured with the Insurer's prior written consent, for any service specifically approved by the Insurer in writing, including without limitation, identity theft education and assistance and credit file monitoring. Such Post Event Services must be provided by or on behalf of a Named Insured within one (1) year following discovery of a Personal Identity Event covered under this policy to any individual whose Personal Identification is the subject of that Personal Identity Event for the primary purpose of mitigating the effects of such Personal Identity Event.

CIP(l) "Privacy Policy" means any policy in any form regarding the collection, dissemination, storage, or treatment of information regarding customers, visitors to an Internet site, or other persons.

CIP(m) "Suit" means a civil proceeding seeking monetary relief that is commenced by the service of a summons and a complaint or similar pleading. "Suit" shall also include a binding arbitration proceeding in which monetary relief is alleged and to which the Insured must submit or does submit with the Insurer's prior written consent.

## IV.

Solely with respect to the coverage provided by this endorsement, Clause 2. DEFINITIONS is amended by deleting Definitions (a), (c) and (d) in their entirety and replacing them with the following:

(a) "Claim" means a written demand for payment of money, including a Suit.

(c) "Damages" means any amount that the Insured shall be legally required to pay because of civil judgments or arbitration awards rendered against the Insured, or for settlements negotiated by the Insurer or the Insured in accordance with Clause 9 of the policy. "Damages," however, shall not include civil or criminal fines or penalties imposed by law, punitive, exemplary or liquidated damages, the multiplied portion of multiple damages, taxes, any amount for which an Insured is

*BROKER* Archive Copy END 19

This endorsement, effective *12:01 AM*    *August 1, 2008*        forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
                *THROUGH THE FINANCIAL SALES*
                *PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

not financially liable or which is without legal recourse to an Insured or matters which may be deemed uninsurable under the law pursuant to which this policy is construed.

(d)    "Defense Costs" means reasonable and necessary fees, costs and expenses (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond or to appeal), charged by an attorney and incurred by the Insurer or by the Insured with the Insurer's written consent, and resulting solely from the investigation, adjustment, defense and appeal of any Claim against the Insured. Defense Costs shall not include compensation or expenses of any Insured.

**V.**

Clause 3. EXCLUSIONS of the policy shall not apply to the coverage provided by this endorsement, however, the following exclusions shall apply:

This policy shall not apply to:

**A. Prior Knowledge**
any Personal Identity Event that any of the Named Insured's directors, officers, trustees, governors, management committee members, members of the management board or partners (or the equivalent positions) knew or reasonably could have foreseen prior to the occurrence of that Personal Identity Event;

**B. Bodily Injury**
any Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, and Post Event Services arising out of or resulting, directly or indirectly, from physical injury, sickness, disease, disability, shock or mental anguish sustained by any person, including without limitation, required care, loss of services or death at any time resulting therefrom;

**C. War and Other Events**
any Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, and Post Event Services arising out of or resulting, directly or indirectly, from any of the following:
1. fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, an act of God or any other physical event, however caused;

*BROArchive CopyEND 19*

This endorsement, effective *12:01 AM*    *August 1, 2008*    forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

2. strikes or similar labor action, war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of or amounting to a popular rising, military rising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions; or

3. electrical or mechanical failures, including any electrical power interruption, surge, brownout or blackout; a failure of telephone lines, data transmission lines, satellites or other infrastructure comprising or supporting the Internet, unless such lines or infrastructure were under the Insured's operational control;

## D. Pollution
any Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, and Post Event Services arising out of or resulting, directly or indirectly, from the presence of or the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants (including nuclear materials), or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or in any way respond to or assess the effects of Pollutants;

## E. Late Reporting
any Personal Identity Event that was not properly reported to the Insurer during the Notice Period;

## F. Non-Monetary Relief
any Claim seeking non-monetary relief, including without limitation, injunctive relief, declaratory relief, or other equitable remedies;

## G. Routine Regulatory or Compliance Activities
any expenses incurred as a result of regularly scheduled, recurring or routine regulatory examinations, inquiries or compliance activities;

## H. Contractual Liability
any liability or obligation of any Insured under any contract or agreement; however, this exclusion shall not apply to liability the Insured would have in the absence of such contract or agreement;

## I. Criminal Matters
any Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, and Post Event Services arising out of or resulting, directly or indirectly, from any criminal investigations or proceedings;

*BROKER* Archive Copy *END 19*

This endorsement, effective *12:01 AM    August 1, 2008*    forms a part of
policy number  *00-665-25-96*
issued to  *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**J. Personal Conduct**

any Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, and Post Event Services arising out of or resulting, directly or indirectly, from any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law or the Privacy Policy of the Named Insured, or gaining of any profit or advantage to which the Insured is not legally entitled, if committed by any of the Named Insured's:

1. directors, officers, trustees, governors, management committee members, members of the management board or partners (or the equivalent positions), whether acting alone or in collusion with other persons; or

2. employees or Insured Agents (other than officers) of the Named Insured if any of the Named Insured's elected or appointed officers possessed, at any time, knowledge of any dishonest, fraudulent, malicious, or criminal or malicious act, error or omission, or any intentional or knowing violation of the law or the Privacy Policy of the Named Insured, or gaining of any profit or advantage to which the Insured is not legally entitled, committed by such employee or Insured Agent that caused a Personal Identity Event; provided, however, the Insurer will defend Suits alleging any of the foregoing conduct, until there is a judgment against, final adjudication against, adverse finding of fact against, adverse admission by, or plea of *nolo contendere* or no contest by, the Insured as to such conduct, at which time the Insured shall reimburse the Insurer for Defense Costs;

**K. Securities Claims**

any Claim alleging, arising out of or resulting, directly or indirectly, from any purchase, sale, or offer or solicitation of an offer to purchase or sell securities, or any violation of any securities law, including the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or any regulation promulgated under the foregoing statutes, or any federal, state or local laws similar to the foregoing statutes (including "Blue Sky" laws), whether such law is statutory, regulatory or common law;

**L. Security**

any Personal Identity Event resulting from failure of the Insured:

1. to use, maintain and update at a minimum every ninety (90) days, when necessary, antivirus software, firewall software on all broadband or high-speed connections to the Internet and software security patches; or

2. to comply with all data security standards issued by credit card issuers or financial institutions with whom the Insured transacts business, if the Insured processes, stores or handles credit card information;

*BROKER Archive Copy END 19*

This endorsement, effective  *12:01 AM*      *August 1, 2008*           forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

**M. Retroactive Date**

any Personal Identity Event that first occurred prior to 8/1/2008;

**N. Intellectual Property**

any Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, and Post Event Services arising out of or resulting, directly or indirectly, from the infringement of copyright, patent, trademark, trade secret or other intellectual property rights;

**O. Discrimination**

any Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, and Post Event Services Expenses alleging, arising out of or resulting, directly or indirectly, from any discrimination against any person or entity on any basis, including but not limited to: race, creed, color, religion, ethnic background, national origin, age, handicap, disability, sex, sexual orientation or pregnancy; or

**P. Insured versus Insured**

any Claim against an Insured that is brought, directly or indirectly, by or on behalf of:
1. any Insured;
2. any entity that is owned, managed or operated, directly or indirectly, in whole or in part, by an Insured; or
3. any parent company, subsidiary, director, officer, partner, trustee, successor or assignee of an Insured, or anyone affiliated with an Insured or such business entity through common majority ownership or control;

provided, however, this exclusion shall not apply to any Claim brought by or on behalf of an Insured whose Personal Identification is the subject of an otherwise covered Personal Identity Event. Notwithstanding the foregoing, there shall be no coverage for any counterclaims against such Insured.

Provided further, however, this policy shall apply to Defense Costs incurred in connection with any cross claim for contribution or indemnity that is part of an otherwise covered Claim and is brought by one Insured against another Insured.

*BROKER**Archive Copy**END 19*

This endorsement, effective *12:01 AM*  *August 1, 2008*  forms a part of
policy number *00-665-25-96*
issued to  *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

## VI.

Solely with respect to the coverage provided by this endorsement, Clause 4. LIMITS OF LIABILITY - (INCLUDING DEFENSE COSTS) is amended by adding the following to the end thereof:

The Aggregate Limit of CIP Insurance indicated in Item 7. of the Declarations of this policy will be the most the Insurer shall pay for all coverages provided under the CORPORATE IDENTITY PROTECTION AMENDATORY endorsement combined, regardless of the number of Personal Identity Events, persons, entities, Claims or Administrative Actions covered by this policy, or claimants, Claims or Administrative Actions made and regardless of the total of all Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, and Post Event Services resulting from all Personal Identity Events first discovered by an Insured during the Policy Period and reported to the Insurer within the Notice Period.

All Claims, Administrative Actions, Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, and Post Event Services resulting from the same, continuous, related or repeated Personal Identity Event shall be subject to the terms, conditions, exclusions and Aggregate Limit of CIP Insurance of this policy and the CORPORATE IDENTITY PROTECTION AMENDATORY endorsement issued by the Insurer to the Named Insured first named in item 1 of the Declarations of this policy in effect at the time the first such Personal Identity Event is first discovered by an Insured.

The most the Insurer shall pay for the total of all:
1. Administrative Expenses is the Administrative Expenses Sublimit of Insurance indicated in the Item 8 of the Declarations;
2. Notification Costs is the Notification Costs Sublimit of Insurance indicated in Item 8 of the Declarations;
3. Crisis Expenses is the Crisis Expenses Sublimit of Insurance indicated in Item 8 of the Declarations; and
4. Post Event Services is the Post Event Services Sublimit of Insurance indicated in Item 8 of the Declarations;

regardless of the number of Personal Identity Events first discovered by an Insured during the Policy Period and reported to the Insurer within the Notice Period. The applicable Sublimits of Insurance shall be part of, and not in addition to, the Aggregate

BRO*Archive Copy*END 19

This endorsement, effective *12:01 AM*   *August 1, 2008*   forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

Limit of CIP Insurance, and shall be excess of any applicable Deductible, resulting from all Personal Identity Events first discovered by an Insured during the Policy Period and reported to the Insurer within the Notice Period.

Solely with respect to Insuring Agreement 1.D, PERSONAL IDENTITY LIABILITY, the Insurer shall also pay all interest on that amount of any judgment for a covered Personal Identity Event that is within the applicable Limit of Insurance:
1. which accrues after entry of judgment; and
2. before the Insurer has paid, offered to pay, or deposited in court that part of the judgment within the applicable Limit of Insurance.
Any such payment shall be part of, and not in addition to, the Aggregate Limit of CIP Insurance.

In all events, the Aggregate Limit of CIP Insurance and each and every Limit of Insurance described above shall be part of, and not in addition to, the Aggregate Limit of Liability set forth in Item 3 of the Declarations of the policy.

## VII.

Solely with respect to the coverage provided by this endorsement, Clause 5. DEDUCTIBLE is amended by adding the following to the end thereof:

The Insured shall be responsible for the Deductible set forth in the in Item 8 of the Declarations. The Deductible applies to each Personal Identity Event. In the event that a Personal Identity Event triggers more than one Deductible amount, then as to that Personal Identity Event, the highest of such Deductible amounts shall be deemed the Deductible applicable to all Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses and Post Event Services arising from such Personal Identity Event. The Deductible shall be applied to Notification Costs, Crisis Expenses, Post Event Services, Administrative Expenses, Damages and Defense Costs in that order.

Solely with respect to Insuring Agreement 1.D., for each Personal Identity Event that results in a Class Action Claim, the Insurer shall only pay amounts the Insured becomes legally required to pay as Damages and Defense Costs that exceed the applicable Deductible amount for such Class Action Claims indicated in Item 8 of the Declarations.

BROKER *Archive Copy* END 19

This endorsement, effective *12:01 AM*      *August 1, 2008*        forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

The amount equal to the applicable Deductible shall be borne by the Insured and remain uninsured.

COINSURANCE

If a Coinsurance percentage is shown in Item 8 of the Declarations, the Insurer shall only pay Administrative Expenses, Notification Costs, Crisis Expenses and Post Event Services in excess of any applicable Deductible minus the Coinsurance.

The Coinsurance shall be applied to Administrative Expenses, Notification Costs, Crisis Expenses and Post Event Services arising out of each Personal Identity Event and shall be applied subsequent to the applicable Deductible for each Personal Identity Event.

The amount equal to the Coinsurance shall be borne by the Insured and remain uninsured.

**XIII.**

Solely with respect to the coverage provided by this endorsement, Clause 7. TERRITORY is deleted in its entirety and replaced with the following:

**TERRITORY**

Subject to its terms, conditions and exclusions, this policy applies to a Personal Identity Event occurring anywhere in the world, but the Insurer shall only pay for Damages, Defense Costs, Administrative Expenses, Notification Costs, Crisis Expenses, Post Event Services incurred in the United States of America, its territories and possessions, or Canada.

**IX.**

Solely with respect to the coverage provided by this endorsement, Clause 8. NOTICE/CLAIM REPORTING PROVISIONS is deleted in its entirety.

BRO*Archive Copy*ER END 19

This endorsement, effective *12:01 AM*    *August 1, 2008*        forms a part of
policy number  *00-665-25-96*
issued to  *WOODBURY FINANCIAL SERVICES, INC.*
          *THROUGH THE FINANCIAL SALES*
          *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

## X.

Solely with respect to the coverage provided by this endorsement, Clause 9. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING ADVANCEMENT OF DEFENSE COSTS) is deleted in its entirety and replaced with the following:

### DEFENSE

Solely with respect to coverage afforded under Insuring Agreement 1.D, PERSONAL IDENTITY LIABILITY:

A.  *Insurer's Duty To Defend Insureds:* The Insurer has the right and the duty to defend a Suit brought against any Insured arising from an otherwise covered Personal Identity Event, even if the Suit is groundless or fraudulent.

B.  *Insurer's Right to Settle Claims:* The Insurer has the right, but not the duty, to settle any Claim, with the written consent of the Insured, if the Insurer believes that it is proper.

C.  *Defense Costs*: The Insurer shall pay for Defense Costs any Insured incurs with the Insurer's prior written consent in the defense of a Suit for covered Personal Identity Events occurring during the Policy Period. The Insurer has the right, but not the duty, to investigate any Claim against any Insured. In the event the Insurer investigates any Claim and the Insured incurs Defense Costs with the Insurer's prior written consent as a result of such investigation, the Insurer shall pay such Defense Costs.

D.  *Insureds' Right To Settle*: The Insured may settle any Claim or Suit to which this insurance applies provided that the Insured does so (i) on behalf of all Insureds, and (ii) for an amount not exceeding the applicable Deductible (inclusive of Defense Costs).

E.  *When the Insurer's Duty to Defense Ends:* The Insurer's duty to defend ends upon the exhaustion of the Aggregate Limit of Liability set forth in Item 3 of the Declarations, Aggregate Limit of CIP Insurance set forth in Item 7 of the Declarations or applicable Sublimit of Insurance set forth in Item 8 of the Declarations by payment of Damages and/or Defense Costs. The Insurer's duty to defend also ends if any Insured fails or refuses to consent to any settlement the Insurer recommends and the claimant will accept. The Insured must then defend the Claim at the Insured's own expense. As a consequence of such failure or refusal, the Insurer's liability shall not exceed the amount for which the Claim could have been settled if such recommendation was consented to, plus Defense Costs incurred by the Insurer, or incurred by the Insured with the Insurer's written consent, prior to the date of such refusal.

*BROKER Archive Copy END 19*

This endorsement, effective *12:01 AM*      *August 1, 2008*         forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

## XI.

Solely with respect to the coverage provided by this endorsement, Clause 12. ACTION AGAINST INSURER is deleted in its entirety and replaced with the following:

### ACTION AGAINST INSURER

1. With respect to Insuring Agreement 1.D., no person or organization has a right under this policy:
   a) to join the Insurer as a party or otherwise bring the Insurer into a Suit asking for Damages from an Insured; or
   b) to sue the Insurer on this policy unless all of its terms have been fully complied with.

   A person or organization may sue the Insurer to recover on an agreed settlement or on a final judgment against an Insured obtained after an actual trial, but the Insurer will not be liable for Damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by the Insurer, the Insured and the claimant or the claimant's legal representative.

2. Except as provided in Clause 19. ARBITRATION of this policy, with respect to Insuring Agreements 1.E. and 1.F., no legal action may be brought or made against the Insurer under this policy unless:
   a) there has been full compliance with all of the terms of this policy; and
   b) with respect to Insuring Agreement 1. F., the action is brought within two (2) years after the date on which a Personal Identity Event is first discovered by an Insured.

## XII.

Solely with respect to the coverage provided by this endorsement, Clause 14. OTHER INSURANCE AND INDEMNIFICATION is deleted in its entirety and replaced with the following:

*BROKER* *Archive Copy* *END 19*

This endorsement, effective *12:01 AM*   *August 1, 2008*      forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
                    *THROUGH THE FINANCIAL SALES*
                    *PROFESSIONALS RISK PURCHASING GROUP*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## OTHER INSURANCE

The coverage provided under Insuring Agreements 1.D, 1.E and 1.F shall be primary with respect to any other valid and collectible insurance available to any Insured, unless such other valid and collectible insurance is also stated to be primary. In that case, the Insurer will share with all other insurance by the method described below.

1.    If all of the other insurance permits contribution by equal shares, the Insurer will follow this method also. Under this approach, each insurer shall contribute equal amounts in excess of the applicable Deductible until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

2.    If any of the other insurance does not permit contribution by equal shares, the Insurer will contribute by limits. Under this method, each insurer's share shall be based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## XIII.

Solely with respect to the coverage provided by this endorsement, the policy shall be amended by adding the following clauses:

## DUTIES IN THE EVENT OF A PERSONAL IDENTITY EVENT

A. Before coverage will apply under this policy, the Insured shall notify the Insurer in writing as soon as practicable within the Notice Period of a Personal Identity Event first discovered by an Insured during the Policy Period. Notice must include:

1.    How, when, and where the Personal Identity Event took place;

2.    The number of individuals and type of Personal Identification involved in the Personal Identity Event; and

3.    Upon request by the Insurer, the names and addresses of individuals affected by the Personal Identity Event.

B. The Insured shall also provide the Insurer written notice of any Claim or Administrative Action arising from such Personal Identity Event reported in accordance with paragraph A above, as soon as practicable after such Claim or Administrative Action is made.

This endorsement, effective *12:01 AM*      *August 1, 2008*        forms a part of policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

In the event of a Claim, the Insured shall immediately record the specifics of the Claim and the date such Insured first received such Claim. The Insured shall also:

1.  Immediately send the Insurer copies of all demands, notices, summonses or other legal documents received in connection with the Claim;
2.  Authorize the Insurer to obtain records and other information; and
3.  Give the Insurer and any counsel the Insurer selects to represent an Insured in connection with a Suit or to investigate any Claim, full cooperation and such information as the Insurer or such counsel may reasonably require, including, but not limited to, assisting the Insurer or such counsel in:
    (i)     any investigation of a Claim, or other matter relating to the coverage afforded under this policy (including submission to an examination by the Insurer or its designee, under oath if required by the Insurer);
    (ii)    making settlements;
    (iii)   enforcing any legal rights the Insured or the Insurer may have against any person or entity who may be liable to the Insured;
    (iv)    attending depositions, hearings and trials;
    (v)     securing and giving evidence, and obtaining the attendance of witnesses; and
    (vi)    any inspection or survey conducted by the Insurer.

In the event of an Administrative Action, the Insured shall notify the Insurer whether the Insured has any other insurance policy, prepaid legal service contract or legal practitioner retainer agreement available to him/her with respect to such Administrative Action. The Insured shall also:

1.  Send to the Insurer, as soon as practicable, copies of any notices, complaints or other legal papers received in connection with any Administrative Action; and
2.  Furnish the Insurer, upon its request, with records and other information and submit to an interview by the Insurer or its representative concerning the full extent of their knowledge of the events leading to the Administrative Action. The Insurer shall also be entitled to immediately receive upon request copies of any regulatory agency correspondence the Insured received relating to such Administrative Action, including without limitation any correspondence which may have predated the date of application for coverage under this policy.

C.  Under all circumstances, no Insured shall admit any liability, assume any financial obligation, pay any money, or incur any expense in connection with any Personal Identity Event without the Insurer's prior written consent. If any Insured does, it will be at such Insured's own expense. The foregoing sentences of this paragraph C shall not apply to a settlement pursuant to the final paragraph of Clause 9 of this policy so

BRO*Archive Copy*ENDER *END 19*

This endorsement, effective *12:01 AM*     *August 1, 2008*     forms a part of
policy number   *00-665-25-96*
issued to   *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

long as the Insured provides the Insurer written notice of such settlement as soon as practicable, but in no case later than thirty (30) days after such settlement is reached in principle.

D.  The Insured shall take reasonable steps to prevent a Personal Identity Event and to mitigate the Damages arising out of a Personal Identity Event. In all events, no Insured shall take any action, or fail to take any action, without the Insurer's prior written consent, which prejudices the Insurer's rights under this policy, except as indicated in the final paragraph of Clause 9 of this policy.

## AUDIT

In addition to all other duties and obligations contained elsewhere in this policy, the Named Insured shall allow the Insurer to examine and audit all of the Named Insured's records that relate to coverage provided by the CORPORATE IDENTITY PROTECTION AMENDATORY endorsement. The Insurer may conduct the audits during regular business hours during the Policy Period and within three (3) years after the Policy Period ends.

## NO POST POLICY PERIOD DISCOVERY

There shall be no coverage for any Personal Identity Event first discovered by an Insured after the effective date and time of the expiration, cancellation or non-renewal of this policy.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy*
. American International Group, Inc. All rights reserved.
*BROKER          END 19*

This endorsement, effective *12:01 AM      August 1, 2008*          forms a part of
policy number    *00-665-25-96*
issued to *WOODBURY FINANCIAL SERVICES, INC.*
            *THROUGH THE FINANCIAL SALES*
            *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**TERRORISM EXCLUSION**

This insurance does not apply to loss, injury, damage, claim or suit, arising directly or indirectly as a result of, in connection with, or relating to "terrorism" including but not limited to:

1.  Any action taken in hindering or defending against an actual or expected incident of "terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage; and
2.  Any contemporaneous or ensuing loss caused by explosion, fire, heat, vandalism, looting, theft, civil commotion, rebellion or insurrection.

However, this exclusion only applies if one or more of the following are attributable to an incident of "terrorism":

1.  The total of damages and/or loss to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include the replacement cost, without deduction for depreciation, for all damage sustained by any property affected by the "terrorism" and business interruption losses sustained by owners or occupants of damaged property; or
2.  Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:
    a.  Physical injury that involves a substantial risk of death; or
    b.  Protracted and obvious physical disfigurement; or
    c.  Protracted loss of or impairment of the function of any bodily member or organ; or
3.  The "terrorism" involves the actual, alleged or threatened use, release, escape, dispersal, application and or existence of:
    a.  Any nuclear reaction;
    b.  Radioactive materials or "nuclear materials" in any form and from any source;
    c.  Radionuclides;
    d.  Radiation emitted from any radioactive source whether natural or manmade; and/or
    e.  Electromagnetic pulses; or
4.  The "terrorism" involves the actual, alleged or threatened use, release, escape, dispersal and/or application of pathogenic or poisonous chemical or "biological" materials, whether natural, manmade, living or dead.

Multiple incidents of "terrorism" that occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership will be considered to be one incident.

DEFINITIONS - The following definitions shall apply:

1.  "Terrorism" means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
**END 020**

commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

   a.    A government;

   b.    The civilian population of a country, state or community; or

   c.    To disrupt the economy of a country, state or community.

2.    "Nuclear materials" means "source material," "special nuclear material" or "by-product material." "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

3.    "Biological" materials includes all microorganisms, viruses, rickettsia, prions, nucleic acids, toxins, toxin-producing agents, and poisons produced by biological organisms.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

*END 020*

<u>ENDORSEMENT#</u> *21*

This endorsement, effective *12:01 AM*     *August 1, 2008*     forms a part of policy number    *00-665-25-96*
issued to *WOODBURY FINANCIAL SERVICES, INC.*
        *THROUGH THE FINANCIAL SALES*
        *PROFESSIONALS RISK PURCHASING GROUP*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**COVERAGE TERRITORY ENDORSEMENT**

Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

_____
AUTHORIZED REPRESENTATIVE

*END 021*

This endorsement, effective *12:01 AM*     *August 1, 2008*     forms a part of policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
          *THROUGH THE FINANCIAL SALES*
          *PROFESSIONALS RISK PURCHASING GROUP*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

### MINNESOTA CANCELLATION/NON-RENEWAL AMENDATORY ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

### CANCELLATION/NONRENEWAL

A.     No Insurer may cancel a policy of commercial liability and/or property insurance that has been in effect for ninety (90) days or more, except for one or more of the following reasons:

     (1)     nonpayment of premium;

     (2)     misrepresentation or fraud made by or with the knowledge of the Insured or Other Insured(s) in obtaining the policy or in pursuing a claim under the policy;

     (3)     actions by the Insured or Other Insured(s) that have substantially increased or substantially changed the risk insured;

     (4)     refusal of the Insured or Other Insured(s) to eliminate known conditions that increase the potential for loss after notification by the Insurer that the condition must be removed;

     (5)     substantial change in the risk assumed, except to the extent that the Insurer should reasonably have foreseen the change or contemplated the risk in writing the contract;

     (6)     loss of reinsurance by the Insurer which provided coverage to the Insurer for a significant amount of the underlying risk insured. A notice of cancellation under this clause shall advise the Insured that the Insured has ten (10) days from the date of receipt of the notice to appeal the cancellation to the commissioner of commerce and that the commissioner will render a decision as to whether the cancellation is justified because of the loss of reinsurance within thirty (30) business days after receipt of the appeal;

76587 (08/02)    *BRO**Archive** Copy**END 22***

This endorsement, effective *12:01 AM       August 1, 2008*            forms a part of
policy number   *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
             *THROUGH THE FINANCIAL SALES*
             *PROFESSIONALS RISK PURCHASING GROUP*
by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

(7)    a determination by the commissioner that the continuation of the policy could place the Insurer in violation of the insurance laws of this state; or

(8)    nonpayment of dues to an association or organization, other than an insurance association or organization, where payment of dues is a prerequisite to obtaining or continuing the insurance. This provision for cancellation for failure to pay dues does not apply to persons who are retired at 62 years of age or older or who are disabled according to social security standards.

B.    Cancellation under A. clauses (2) to (8), shall not be effective before sixty (60) days after notice to the Insured. The notice of cancellation shall contain a specific reason for cancellation as provided in A.

A policy shall not be cancelled for nonpayment of premium pursuant to A. clause (1), unless the Insurer, at least ten (10) days before the effective cancellation date, has given notice to the Insured of the amount of premium due and the due date. The notice shall state the effect of nonpayment by the due date. No cancellation for nonpayment of premium shall be effective if payment of the amount due is made before the effective date in the notice.

C.    NEW POLICIES - A and B do not apply to any insurance policy that has not been previously renewed if the policy has been in effect less than ninety (90) days at the time the notice of cancellation is mailed or delivered. No cancellation under this subdivision is effective until at least ten (10) days after the written notice to the Insured.

D.    LONGER TERM POLICIES - A policy may be issued for a term longer than one year or for an indefinite term with a clause providing for cancellation by the Insurer for the reasons stated in A by giving notice as required by B at least sixty (60) days before any anniversary.

E.    NONRENEWAL (NOTICE REQUIRED) - At least sixty (60) days before the date of expiration provided in the policy, a notice of intention not to renew the policy beyond the agreed expiration date must be made to the Insured by the Insurer. If the notice is not given at least sixty (60) days before the date of expiration provided in the policy, the policy shall continue in force until sixty (60) days after a notice of intent not to renew is received by the Insured.

76587 (08/02)  *BROKER* Archive Copy END 22

This endorsement, effective *12:01 AM*    *August 1, 2008*    forms a part of
policy number    *00-665-25-96*
issued to    *WOODBURY FINANCIAL SERVICES, INC.*
*THROUGH THE FINANCIAL SALES*
*PROFESSIONALS RISK PURCHASING GROUP*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

F.    EXCEPTIONS - E does not apply if the Insured has insured elsewhere, has accepted replacement coverage, or has requested or agreed to nonrenewal.

G.    Unless otherwise specifically required, proof of mailing of any notice shall be sufficient proof of notice.

All other terms, conditions and exclusions shall remain the same.

AUTHORIZED REPRESENTATIVE

*Archive Copy*
©American International Group, Inc. All rights reserved.

76587 (08/02)    *BROKER*        *END 22*

This endorsement, effective *12:01 AM*    *August 1, 2008*        forms a part of
policy number   *00-665-25-96*
issued to *WOODBURY FINANCIAL SERVICES, INC.*
        *THROUGH THE FINANCIAL SALES*
        *PROFESSIONALS RISK PURCHASING GROUP*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 68909 | 10/97 | INSURANCE COMPANY SUPERVISORY ADMITTED DEC |
| 68910 | 10/97 | INS COMPANY SUPERVISORY 68910 (10-97) ADMITTED GUTS |
| | | AMEND DECLARATIONS PAGE - ITEM 3(a) |
| | | AMEND INSURED AGENT DEDUCTIBLE |
| | | AMEND DEFINITION (g) |
| | | AMEND DEFINITION (I) & DEFINTION (1) |
| | | AMEND EXCLUSION (J) |
| | | AMEND DEFINITION (k) |
| | | AMEND DEFINITION (k)(3) |
| | | AMEND DEFINITION (k) FINANCIAL PLANNER/FINANCIAL CONSULTANT EXTENSION |
| | | PROPERTY & CASUALTY EXTENSION |
| | | AMEND EXCLUSION (b) |
| | | AMEND EXCLUSION (g) |
| | | AMEND CLAUSE 3., EXCLUSIONS |
| | | MOLD EXCLUSION |
| | | AMEND SECTION 6(A) DISCOVERY PERIOD |
| | | IMPROPER MUTUAL FUND AND VARIABLE ANNUITY PRACTICES ENDORSEMENT |
| | | AIG NON-STACKING LIMITS ENDORSEMENT |
| | | FEE ARRANGEMENT EXCLUSION |
| | | NEW YORK AMENDATORY |
| | | CORPORATE IDENTITY PROTECTION AMENDATORY |
| 86203 | 07/04 | TERRORISM EXCLUSION |
| 89644 | 07/05 | COVERAGE TERRITORY ENDORSEMENT (OFAC) |

*Archive Copy*    *END 023*

78859 (10/01) *BROKER*    Page 1 of 2

ENDORSEMENT# *23*

This endorsement, effective *12:01 AM*     *August 1, 2008*        forms a part of
policy number    *00-665-25-96*
issued to *WOODBURY FINANCIAL SERVICES, INC.*
         *THROUGH THE FINANCIAL SALES*
         *PROFESSIONALS RISK PURCHASING GROUP*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

## FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 76587 | 08/02 | MINNESOTA CANCELLATION/NON-RENEWAL AMENDATORY ENDORSEMENT |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

CAUSE NO. D-1-GN-12-003985

| | | |
|---|---|---|
| BRIAN O'GRADY, M.D. and | § | IN THE DISTRICT COURT |
| THE O'GRADY FAMILY PARTNERSHIP, | § | |
| LTD. | § | |
| Plaintiffs | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| DAVID MILLER, RIVER OAKS CAPITAL | § | |
| MANAGEMENT, INC., BRETT | § | |
| SCHULICK | § | |
| Defendants | § | 98TH JUDICIAL DISTRICT |

Filed in The District Court
of Travis County, Texas
FEB 2 8 2013
At 2:44 M.
Amalia Rodriguez-Mendoza, Clerk

## FINAL JUDGMENT

ON THIS DAY came to be heard Brian O'Grady, M.D. and The O'Grady Family Partnership, Ltd.'s Motion for Judgment.

Based on that Motion, this Court hereby RENDERS judgment for Plaintiffs, Brian O'Grady, M.D. and The O'Grady Family Partnership, LTD.

Accordingly, this Court orders that Plaintiffs, Brian O'Grady and The O'Grady Family Partnership, Ltd. recover the following from the Defendants, David Miller, Brett Schulick and River Oaks Capital Management, Inc., jointly and severally:

1. $2,868,868.00 in compensatory damages (minus applicable settlement credits which leave compensatory damages at $2,118,921.30).

2. Pre-judgment interest in the amount of $41,115.69. Prejudgment interest was calculated at the rate of 5% per annum from and including September 25, 2008, through and including the date of this Judgment and after applying all settlement credits.

3. Reasonable and necessary attorney fees in the amount of $819,314.50.

4. $300,000.00 in punitive damages.

5. After applying all applicable credits and recalculating prejudgment interest as noted above, the total recovery by Plaintiffs, Brian O'Grady and The O'Grady Family



EXHIBIT

B

P142
96

Partnership, Ltd. from Defendants, David Miller, Brett Schulick and River Oaks Capital Management, Inc. jointly and severally is: **$3,279,351.49**.

6. In addition to the Judgment minus credits listed in paragraph number 5 above, Plaintiffs Brian O'Grady and The O'Grady Family Partnership, LTD. shall recover from the Defendants, David Miller, Brett Schulick and River Oaks Capital Management, Inc., jointly and severally post-judgment interest on $3,279,351.49 at the highest rate allowed by Texas law, compounded annually, from the date this Final Judgment is entered until all amounts are paid in full.

7. This judgment finally disposes of all claims and all parties and is appealable.

8. The Court orders execution to issue for this Judgment.

Signed this the 28th day of February, 2013.

_____
Judge Presiding

Approved as to form:

X _____
Warren C. Wills on
behalf of Plaintiffs

X _____
Andrew Leibowitz by printen by
Andrew Leibowitz on
behalf of Defendants

on 2/28/13
at 2:06 p.m.

P2of3

CAUSE NO. D-1-GN-12-003985

| | | |
|---|---|---|
| BRIAN O'GRADY, M.D. and | § | IN THE DISTRICT COURT |
| THE O'GRADY FAMILY PARTNERSHIP, | § | |
| LTD. | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| DAVID MILLER, RIVER OAKS CAPITAL | § | |
| MANAGEMENT, INC., BRETT SCHULICK | § | |
| Defendants. | § | 98TH JUDICIAL DISTRICT |

## ORDER REQUIRING TURNOVER

The Court considered the Application for Post-Judgment Turnover Over filed by BRIAN O'GRADY, M.D. and THE O'GRADY FAMILY PARTNERSHIP, LTD. (collectively "Plaintiffs" or "Applicants"), reviewed the papers on file, as well as all arguments, and believes that Applicants hold and are entitled to collect upon a final, valid and subsisting judgment against David Miller, River Oaks Capital Management, Inc., and Brett Schulick (collectively "Defendants" or "Respondents").

Findings: Plaintiffs have good faith reasons to believe that Defendants own non-exempt rights to present or future property that cannot be attached or levied upon by ordinary legal process, like assignable rights and/or causes of action belonging to Defendants. Plaintiffs further have good faith reasons to believe that Defendants are insolvent and have no other way to satisfy the February 28, 2013 final judgment against them than through turnover relief.

Judgment Amount: Applicants own an unpaid final judgment against Respondents, dated February 28, 2013, in the principal amount of $3,279,351.49 plus interest.

The following are orders of this Court.

1.    Assignment of Non-Exempt Property. This Court finds, determines and adjudges that Defendants are insolvent. This Court further orders that Plaintiffs are deemed owners of any



ORDER REQUIRING TURNOVER

1

98

causes of action that Defendants may have against any third party, including but not limited to Defendants' insurers. Specifically, it is ordered that Plaintiffs are now the owner of any potential causes of action that might be asserted by or on behalf of the Respondents against National Union Fire Insurance Company of Pittsburg, Pennsylvania, regarding National Union Professional Liability Insurance Policy No. 00-665-25-96 and the Insured, Woodbury Financial Services, Inc. It is further ordered that, although not necessary in light of the above order deeming Plaintiffs owners of any and all non-exempt property and/or interests, including but not limited to any causes of action that Defendants may have against any third party, including but not limited to Defendants' insurers, Defendants are ordered to execute assignments in favor of Plaintiffs with regard to all causes of action belonging to Defendants, including but not limited to any claims that might be asserted by or on behalf of Defendants against National Union Fire Insurance Company of Pittsburg, Pennsylvania, regarding National Union Professional Liability Insurance Policy No. 00-665-25-96 and the Insured, Woodbury Financial Services, Inc. Said assignments must be produced within fourteen (14) days of entry of this Order to counsel for Plaintiffs.

2. <u>No interference.</u> Every person with notice of this order is ordered to assist and not to interfere with Plaintiffs in the carrying out of this Order.

3. <u>Relief in this Order is without prejudice.</u> The relief granted in this Order is without prejudice to further relief that can be requested through subsequent applications for turnover relief.

Signed on ___JUNE 25_____, 2013.

_____
JUDGE PRESIDING
TIM SULAK

2

**APPENDIX**

**TAB E**

**AMERICAN ARBITRATION ASSOCIATION**
**MANAGEMENT ORDER NO. 1**
**(C.R. 310-311)**

| | | |
|---|---|---|
| BRIAN O'GRADY, M.D. and | § | IN THE DISTRICT COURT OF |
| THE O'GRADY FAMILY | § | |
| PARTNERSHIP, LTD., as owners of | § | |
| the claim of David Miller, Brett | § | |
| Schulick, and River Oaks Capital, Inc. | § | |
| per the June 28, 2013 Turnover Order | § | |
| of Judge Tim Sulak | § | |
|            Plaintiffs, | § | TRAVIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| NATIONAL UNION FIRE INSURANCE | § | |
| COMPANY OF PITTSBURGH, PA., | § | |
| | § | |
| | § | |
|            Defendant. | § | 53rd JUDICIAL DISTRICT |

## ORDER CONFIRMING ARBITRATION AWARD AND FINAL JUDGMENT

Pending before the Court is Defendant National Union Fire Insurance Company of Pittsburgh, Pa.'s ("National Union") Motion to Confirm Arbitration Award and the Motion to Vacate or Modify Arbitration Award filed by Plaintiffs Brian O'Grady, M.D. and The O'Grady Family Partnership, Ltd. ("Plaintiffs"). In American Arbitration Association ("AAA") Case No. 01-14-0000-1777, panel members Hon. Raul A. Gonzalez, Susan G. Perin, and John K. Boyce, III (the "Panel") found no genuine issue of material fact regarding the lack of coverage under Insurance Agents Professional Liability Insurance Policy No. 665-25-96 (the "Policy") for a FINRA arbitration award entered against David Miller, Brett Schulick, and River Oaks Capital Management, Inc. ("Miller and Schulick"). The Panel found that National Union and American International Group, Inc. ("AIG") are entitled to an award as a matter of law. The Panel held:

- that Miller and Schulick did not perform "professional services" as defined by the Policy in Endorsements 7 and 8, and that the Policy therefore provides no coverage.

- that the FINRA award's finding of "punitive damages pursuant to the Texas Deceptive Trade Practices Act ("DTPA"), and gross negligence" constitutes

"dishonest, malicious, [or] knowingly wrongful" acts, and coverage under the Policy is excluded.

- that coverage for the Art Purchase Agreement and Team 02 is excluded under Endorsement 12 of the Policy.

- that AIG is neither an insurer under the Policy nor a party to the Policy.

After considering the motion, any responses, replies, and argument of counsel, the Court finds the motion to confirm should be GRANTED and the motion to vacate should be DENIED.

IT IS THEREFORE ORDERED that the Final Summary Award dated February 6, 2015, issued in AAA Case No. 01-14-0000-1777 by the Panel is CONFIRMED.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiffs Brian O'Grady, M.D. and The O'Grady Family Partnership, Ltd., as owners of the claim of David Miller, Brett Schulick, and River Oaks Capital, Inc., TAKE NOTHING on their claims against National Union and AIG.

All relief requested in this case and not expressly granted is denied.

Signed this ___ day of _____, 2015.

_____
JUDGE PRESIDING

312

**APPENDIX**

**TAB F**

**TEX. CIV. PRAC. & REM. CODE § 171.088**

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
      Chapter 171. General Arbitration (Refs & Annos)
        Subchapter D. Court Proceedings (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.088

§ 171.088. Vacating Award

Currentness

(a) On application of a party, the court shall vacate an award if:

(1) the award was obtained by corruption, fraud, or other undue means;

(2) the rights of a party were prejudiced by:

(A) evident partiality by an arbitrator appointed as a neutral arbitrator;

(B) corruption in an arbitrator; or

(C) misconduct or wilful misbehavior of an arbitrator;

(3) the arbitrators:

(A) exceeded their powers;

(B) refused to postpone the hearing after a showing of sufficient cause for the postponement;

(C) refused to hear evidence material to the controversy; or

(D) conducted the hearing, contrary to Section 171.043, 171.044, 171.045, 171.046, or 171.047, in a manner that substantially prejudiced the rights of a party; or

(4) there was no agreement to arbitrate, the issue was not adversely determined in a proceeding under Subchapter B, [1] and the party did not participate in the arbitration hearing without raising the objection.

(b) A party must make an application under this section not later than the 90th day after the date of delivery of a copy of the award to the applicant. A party must make an application under Subsection (a)(1) not later than the 90th day after the date the grounds for the application are known or should have been known.

(c) If the application to vacate is denied and a motion to modify or correct the award is not pending, the court shall confirm the award.

**Credits**

Added by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (276)

Footnotes

1       V.T.C.A., Civil Practice & Remedies Code § 171.021 et seq.

V. T. C. A., Civil Practice & Remedies Code § 171.088, TX CIV PRAC & REM § 171.088

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX**

**TAB G**

**TEX. CIV. PRAC. & REM. CODE § 171.091**

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
      Chapter 171. General Arbitration (Refs & Annos)
        Subchapter D. Court Proceedings (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.091

§ 171.091. Modifying or Correcting Award

Currentness

(a) On application, the court shall modify or correct an award if:

(1) the award contains:

(A) an evident miscalculation of numbers; or

(B) an evident mistake in the description of a person, thing, or property referred to in the award;

(2) the arbitrators have made an award with respect to a matter not submitted to them and the award may be corrected without affecting the merits of the decision made with respect to the issues that were submitted; or

(3) the form of the award is imperfect in a manner not affecting the merits of the controversy.

(b) A party must make an application under this section not later than the 90th day after the date of delivery of a copy of the award to the applicant.

(c) If the application is granted, the court shall modify or correct the award to effect its intent and shall confirm the award as modified or corrected. If the application is not granted, the court shall confirm the award.

(d) An application to modify or correct an award may be joined in the alternative with an application to vacate the award.

**Credits**
Added by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (58)

V. T. C. A., Civil Practice & Remedies Code § 171.091, TX CIV PRAC & REM § 171.091
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX**

**TAB H**

**9. U.S.C.A § 10**

United States Code Annotated
   Title 9. Arbitration (Refs & Annos)
     Chapter 1. General Provisions (Refs & Annos)

9 U.S.C.A. § 10

§ 10. Same; vacation; grounds; rehearing

Effective: May 7, 2002
Currentness

**(a)** In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--

   **(1)** where the award was procured by corruption, fraud, or undue means;

   **(2)** where there was evident partiality or corruption in the arbitrators, or either of them;

   **(3)** where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

   **(4)** where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

**(b)** If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

**(c)** The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.

**CREDIT(S)**
   (July 30, 1947, c. 392, 61 Stat. 672; Nov. 15, 1990, Pub.L. 101-552, § 5, 104 Stat. 2745; Aug. 26, 1992, Pub.L. 102-354, § 5(b)(4), 106 Stat. 946; May 7, 2002, Pub.L. 107-169, § 1, 116 Stat. 132.)

Notes of Decisions (1553)

9 U.S.C.A. § 10, 9 USCA § 10
Current through P.L. 114-40 approved 7-30-2015

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX**

**TAB I**

**TEX. CIV. PRAC. & REM. CODE § 41.001-41.003**

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 2. Trial, Judgment, and Appeal
      Subtitle C. Judgments
        Chapter 41. Damages (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 41.001

§ 41.001. Definitions

Effective: September 1, 2003
Currentness

In this chapter:

(1) "Claimant" means a party, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff, seeking recovery of damages. In a cause of action in which a party seeks recovery of damages related to injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery of damages.

(2) "Clear and convincing" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.

(3) "Defendant" means a party, including a counterdefendant, cross-defendant, or third-party defendant, from whom a claimant seeks relief.

(4) "Economic damages" means compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages.

(5) "Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages are neither economic nor noneconomic damages. "Exemplary damages" includes punitive damages.

(6) "Fraud" means fraud other than constructive fraud.

(7) "Malice" means a specific intent by the defendant to cause substantial injury or harm to the claimant.

(8) "Compensatory damages" means economic and noneconomic damages. The term does not include exemplary damages.

(9) "Future damages" means damages that are incurred after the date of the judgment. Future damages do not include exemplary damages.

(10) "Future loss of earnings" means a pecuniary loss incurred after the date of the judgment, including:

(A) loss of income, wages, or earning capacity; and

(B) loss of inheritance.

(11) "Gross negligence" means an act or omission:

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

(12) "Noneconomic damages" means damages awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages.

(13) "Periodic payments" means the payment of money or its equivalent to the recipient of future damages at defined intervals.

**Credits**

Added by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, eff. Sept. 2, 1987. Amended by Acts 1995, 74th Leg., ch. 19, § 1, eff. Sept. 1, 1995; Acts 2003, 78th Leg., ch. 204, § 13.02, eff. Sept. 1, 2003.

Notes of Decisions (178)

V. T. C. A., Civil Practice & Remedies Code § 41.001, TX CIV PRAC & REM § 41.001
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 2. Trial, Judgment, and Appeal
      Subtitle C. Judgments
        Chapter 41. Damages (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 41.002

§ 41.002. Applicability

Effective: September 1, 2005
Currentness

(a) This chapter applies to any action in which a claimant seeks damages relating to a cause of action.

(b) This chapter establishes the maximum damages that may be awarded in an action subject to this chapter, including an action for which damages are awarded under another law of this state. This chapter does not apply to the extent another law establishes a lower maximum amount of damages for a particular claim.

(c) Except as provided by Subsections (b) and (d), in an action to which this chapter applies, the provisions of this chapter prevail over all other law to the extent of any conflict.

(d) Notwithstanding any provision to the contrary, this chapter does not apply to:

  (1) Section 15.21, Business & Commerce Code (Texas Free Enterprise and Antitrust Act of 1983);

  (2) an action brought under the Deceptive Trade Practices-Consumer Protection Act (Subchapter E, Chapter 17, Business & Commerce Code) [1] except as specifically provided in Section 17.50 of that Act;

  (3) an action brought under Chapter 36, Human Resources Code; [2] or

  (4) an action brought under Chapter 21, Insurance Code. [3]

**Credits**

Added by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, eff. Sept. 1, 1987. Amended by Acts 1989, 71st Leg., ch. 380, § 5, eff. Sept. 1, 1989; Acts 1995, 74th Leg., ch. 19, § 1, eff. Sept. 1, 1995; Acts 1995, 74th Leg., ch. 260, § 9, eff. May 30, 1995; Acts 1997, 75th Leg., ch. 165, § 4.01, eff. Sept. 1, 1997; Acts 2003, 78th Leg., ch. 204, § 13.03, eff. Sept. 1, 2003; Acts 2005, 79th Leg., ch. 806, § 18, eff. Sept. 1, 2005.

Notes of Decisions (17)

Footnotes

1       V.T.C.A., Bus. & Com. Code § 17.41 et seq.

2       V.T.C.A., Human Resources Code § 36.001 et seq.

3       V.T.C.A., Insurance Code art. 21.01 et seq.

V. T. C. A., Civil Practice & Remedies Code § 41.002, TX CIV PRAC & REM § 41.002

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
　Civil Practice and Remedies Code (Refs & Annos)
　　Title 2. Trial, Judgment, and Appeal
　　　Subtitle C. Judgments
　　　　Chapter 41. Damages (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 41.003

§ 41.003. Standards for Recovery of Exemplary Damages

Effective: September 1, 2003
Currentness

(a) Except as provided by Subsection (c), exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from:

(1) fraud;

(2) malice; or

(3) gross negligence.

(b) The claimant must prove by clear and convincing evidence the elements of exemplary damages as provided by this section. This burden of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence, bad faith, or a deceptive trade practice.

(c) If the claimant relies on a statute establishing a cause of action and authorizing exemplary damages in specified circumstances or in conjunction with a specified culpable mental state, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the damages result from the specified circumstances or culpable mental state.

(d) Exemplary damages may be awarded only if the jury was unanimous in regard to finding liability for and the amount of exemplary damages.

(e) In all cases where the issue of exemplary damages is submitted to the jury, the following instruction shall be included in the charge of the court:

"You are instructed that, in order for you to find exemplary damages, your answer to the question regarding the amount of such damages must be unanimous."

**Credits**

Added by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, eff. Sept. 1, 1987. Amended by Acts 1995, 74th Leg., ch. 19, § 1, eff. Sept. 1, 1995; Acts 2003, 78th Leg., ch. 204, § 13.04, eff. Sept. 1, 2003.

Notes of Decisions (282)

V. T. C. A., Civil Practice & Remedies Code § 41.003, TX CIV PRAC & REM § 41.003
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX

# TAB J

# AAA COMMERCIAL RULES AND MEDIATION PROCEDURES



# Commercial

Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**



AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/commercial**

Rules Amended and Effective October 1, 2013

# Regional Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia**
P. Jean Baker, Esq.
Vice President
Phone: 202.223.7093
Email: BakerJ@adr.org

**States: Texas**
Andrew Barton
Vice President
Phone: 210.998.5750
Email: BartonA@adr.org

**States: Alabama, Georgia**
John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org

**States: Louisiana, Mississippi, Texas**
Ingeuneal C. Gray, Esq.
Vice President
Phone: 832.308.7893
Email: GrayI@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**
Karen Jalkut
Vice President
Phone: 617.695.6062
Email: JalkutK@adr.org

**States: Alaska, California, Hawaii, Oregon, Washington**
Serena K. Lee, Esq.
Vice President
Phone: 415.671.4053
Email: LeeS@adr.org

**States: Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, West Virginia**
Michelle M. Skipper
Vice President
Phone: 704.643.8605
Email: SkipperM@adr.org

**States: Florida**
Rebecca Storrow, Ph.D.
Vice President
Phone: 954.372.4341
Email: StorrowR@adr.org

**States: Arizona, Colorado, Kansas, Idaho, Montana, Nebraska, Nevada, New Mexico, Oklahoma, Utah, Wyoming**
Lance K. Tanaka
Vice President
Phone: 303.831.0824
Email: TanakaL@adr.org

**States: Arkansas, Illinois, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, Wisconsin**
A. Kelly Turner, Esq.
Vice President
Phone: 312.361.1116
Email: TurnerK@adr.org

**States: New York**
Jeffrey T. Zaino, Esq.
Vice President
Phone: 212.484.3224
Email: ZainoJ@adr.org

# Case Management Vice Presidents and Directors

Jeffrey Garcia
Vice President
Phone: 559.490.1860
Email: GarciaJ@adr.org
**Administers cases in: AK, AZ, CA, HI, ID, MT, NM, NV, OR, UT, WA**

John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org
**Administers cases in: AL, DC, FL, GA, IN, KY, MD, NC, OH, SC, TN, VA**

Harry Hernandez
Director
Phone: 972.702.8222
Email: HernandezH@adr.org
**Administers cases in: AR, CO, IA, IL, KS, LA, MN, MO, MS, ND, NE, OK, SD, TX, WI, WY**

Yvonne Baglini
Director
Phone: 866.293.4053
Email: BagliniY@adr.org
**Administers cases in: CT, DE, MA, ME, MI, NH, NJ, NY, PA, RI, VT, WV**

# Table of Contents

Important Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Standard Arbitration Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Large, Complex Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9


Commercial Arbitration Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    R-1. Agreement of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    R-2. AAA and Delegation of Duties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    R-3. National Roster of Arbitrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    R-4. Filing Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    R-5. Answers and Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

    R-6. Changes of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    R-7. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    R-8. Interpretation and Application of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    R-9. Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    R-10. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    R-11. Fixing of Locale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    R-12. Appointment from National Roster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

    R-13. Direct Appointment by a Party. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

    R-14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties. . . . . . .16

    R-15. Nationality of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

    R-16. Number of Arbitrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

    R-17. Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

    R-18. Disqualification of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

    R-19. Communication with Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

    R-20. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

    R-21. Preliminary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

    R-22. Pre-Hearing Exchange and Production of Information . . . . . . . . . . . . . . . . . . . . . .19

    R-23. Enforcement Powers of the Arbitrator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

    R-24. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

    R-25. Attendance at Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    R-26. Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    R-27. Oaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

R-28. Stenographic Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

R-29. Interpreters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-30. Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-31. Arbitration in the Absence of a Party or Representative . . . . . . . . . . . . . . . . . . . .22

R-32. Conduct of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-33. Dispositive Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-34. Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-35. Evidence by Written Statements and Post-Hearing Filing of Documents or
Other Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-36. Inspection or Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-37. Interim Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-38. Emergency Measures of Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-39. Closing of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

R-40. Reopening of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-41. Waiver of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-42. Extensions of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-43. Serving of Notice and Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-44. Majority Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-45. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-46. Form of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-47. Scope of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-48. Award Upon Settlement—Consent Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-49. Delivery of Award to Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-50. Modification of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-51. Release of Documents for Judicial Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . .29

R-52. Applications to Court and Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-53. Administrative Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-54. Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-55. Neutral Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-56. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-57. Remedies for Nonpayment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-58. Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Preliminary Hearing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

    P-1. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

    P-2. Checklist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32


Expedited Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

    E-1. Limitation on Extensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

    E-2. Changes of Claim or Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

    E-3. Serving of Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

    E-4. Appointment and Qualifications of Arbitrator . . . . . . . . . . . . . . . . . . . . . . .34

    E-5. Exchange of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

    E-6. Proceedings on Documents and Procedures for the Resolution of Disputes
    Through Document Submission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

    E-7. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

    E-8. The Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

    E-9. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

    E-10. Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36


Procedures for Large, Complex Commercial Disputes . . . . . . . . . . . . . . . . . . . . . .37

    L-1. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

    L-2. Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

    L-3. Management of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38


Administrative Fee Schedules (Standard and Flexible Fees) . . . . . . . . . . . . . . . . . .38


Commercial Mediation Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

    M-1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

    M-2. Initiation of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

    M-3. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

    M-4. Appointment of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

    M-5. Mediator's Impartiality and Duty to Disclose . . . . . . . . . . . . . . . . . . . . . . . .40

    M-6. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

    M-7. Duties and Responsibilities of the Mediator . . . . . . . . . . . . . . . . . . . . . . . .41

    M-8. Responsibilities of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

    M-9. Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

    M-10. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

    M-11. No Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-12. Termination of Mediation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M-13. Exclusion of Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M-14. Interpretation and Application of Procedures . . . . . . . . . . . . . . . . . . . . . . . 43

M-15. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M-16. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-17. Cost of the Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# Commercial Arbitration Rules and Mediation Procedures

(Including Procedures for Large, Complex Commercial Disputes)



## Important Notice

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA®. To ensure that you have the most current information, see our web site at **www.adr.org.**

## Introduction

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association® (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on various forms of alternative dispute resolution.

## Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:

> *Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

> *We, the undersigned parties, hereby agree to submit to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules the following Controversy: (describe briefly). We further agree that the above controversy be submitted to (one) (three) arbitrator(s). We further agree that we will faithfully observe this agreement and the rules, that we will abide by and perform any award rendered by the arbitrator(s), and that a judgment of any court having jurisdiction may be entered on the award.*

The services of the AAA are generally concluded with the transmittal of the award. Although there is voluntary compliance with the majority of awards, judgment on the award can be entered in a court having appropriate jurisdiction if necessary.

## Administrative Fees

The AAA charges a filing fee based on the amount of the claim or counterclaim. This fee information, which is included with these rules, allows the parties to exercise control over their administrative fees. The fees cover AAA administrative services; they do not cover arbitrator compensation or expenses, if any, reporting services, or any post-award charges incurred by the parties in enforcing the award.

## Mediation

Subject to the right of any party to opt out, in cases where a claim or counterclaim exceeds $75,000, the rules provide that the parties shall mediate their dispute upon the administration of the arbitration or at any time when the arbitration is pending. In mediation, the neutral mediator assists the parties in

reaching a settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional filing fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

Although these rules include a mediation procedure that will apply to many cases, parties may still want to incorporate mediation into their contractual dispute settlement process. Parties can do so by inserting the following mediation clause into their contract in conjunction with a standard arbitration provision:

> *If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission agreement:

> *The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

## Large, Complex Cases

Unless the parties agree otherwise, the procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $500,000 exclusive of claimed interest, arbitration fees and costs. The key features of these procedures include:

> A highly qualified, trained Roster of Neutrals;
> A mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference;
> Broad arbitrator authority to order and control the exchange of information, including depositions;
> A presumption that hearings will proceed on a consecutive or block basis.

# Commercial Arbitration Rules

## R-1. Agreement of Parties*

**(a)** The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a Demand for Arbitration or Submission Agreement received by the AAA. Any disputes regarding which AAA rules shall apply shall be decided by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

**(b)** Unless the parties or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $75,000, exclusive of interest, attorneys' fees, and arbitration fees and costs.

Parties may also agree to use these procedures in larger cases. Unless the parties agree otherwise, these procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures.

**(c)** Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000 or more, exclusive of claimed interest, attorneys' fees, arbitration fees and costs. Parties may also agree to use the procedures in cases involving claims or counterclaims under $500,000, or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Sections L-1 through L-3 of these rules, in addition to any other portion of these rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

**(d)** Parties may, by agreement, apply the Expedited Procedures, the Procedures for Large, Complex Commercial Disputes, or the Procedures for the Resolution of Disputes through Document Submission (Rule E-6) to any dispute.

**(e)** All other cases shall be administered in accordance with Sections R-1 through R-58 of these rules.

*\* A dispute arising out of an employer promulgated plan will be administered under the AAA's Employment Arbitration Rules and Mediation Procedures.*

## R-2. AAA and Delegation of Duties

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices. Arbitrations administered under these rules shall only be administered by the AAA or by an individual or organization authorized by the AAA to do so.

## R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Arbitrators ("National Roster") and shall appoint arbitrators as provided in these rules. The term "arbitrator" in these rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

## R-4. Filing Requirements

**(a)** Arbitration under an arbitration provision in a contract shall be initiated by the initiating party ("claimant") filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration.

**(b)** Arbitration pursuant to a court order shall be initiated by the initiating party filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of any applicable arbitration agreement from the parties' contract which provides for arbitration.

    **i.** The filing party shall include a copy of the court order.

    **ii.** The filing fee must be paid before a matter is considered properly filed. If the court order directs that a specific party is responsible for the filing fee, it is the responsibility of the filing party to either make such payment to the AAA and seek reimbursement as directed in the court order or to make other such arrangements so that the filing fee is submitted to the AAA with the Demand.

    **iii.** The party filing the Demand with the AAA is the claimant and the opposing party is the respondent regardless of which party initiated the court action. Parties may request that the arbitrator alter the order of proceedings if necessary pursuant to R-32.

**(c)** It is the responsibility of the filing party to ensure that any conditions precedent to the filing of a case are met prior to filing for an arbitration, as well as any time requirements associated with the filing. Any dispute regarding whether a condition precedent has been met may be raised to the arbitrator for determination.

**(d)** Parties to any existing dispute who have not previously agreed to use these rules may commence an arbitration under these rules by filing a written submission agreement and the administrative filing fee. To the extent that the parties' submission agreement contains any variances from these rules, such variances should be clearly stated in the Submission Agreement.

**(e)** Information to be included with any arbitration filing includes:

    **i.** the name of each party;

    **ii.** the address for each party, including telephone and fax numbers and e-mail addresses;

    **iii.** if applicable, the names, addresses, telephone and fax numbers, and e-mail addresses of any known representative for each party;

    **iv.** a statement setting forth the nature of the claim including the relief sought and the amount involved; and

    **v.** the locale requested if the arbitration agreement does not specify one.

**(f)** The initiating party may file or submit a dispute to the AAA in the following manner:

    **i.** through AAA WebFile, located at **www.adr.org;** or

    **ii.** by filing the complete Demand or Submission with any AAA office, regardless of the intended locale of hearing.

**(g)** The filing party shall simultaneously provide a copy of the Demand and any supporting documents to the opposing party.

**(h)** The AAA shall provide notice to the parties (or their representatives if so named) of the receipt of a Demand or Submission when the administrative filing requirements have been satisfied. The date on which the filing requirements are satisfied shall establish the date of filing the dispute for administration. However, all disputes in connection with the AAA's determination of the date of filing may be decided by the arbitrator.

**(i)** If the filing does not satisfy the filing requirements set forth above, the AAA shall acknowledge to all named parties receipt of the incomplete filing and inform the parties of the filing deficiencies. If the deficiencies are not cured by the date specified by the AAA, the filing may be returned to the initiating party.

## R-5. Answers and Counterclaims

**(a)** A respondent may file an answering statement with the AAA within 14 calendar days after notice of the filing of the Demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of any answering statement to the claimant and to all other parties to the arbitration. If no answering statement is filed within the stated time, the respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

**(b)** A respondent may file a counterclaim at any time after notice of the filing of the Demand is sent by the AAA, subject to the limitations set forth in Rule R-6. The respondent shall send a copy of the counterclaim to the claimant and all other parties to the arbitration. If a counterclaim is asserted, it shall include a statement setting forth the nature of the counterclaim including the relief sought and the amount involved. The filing fee as specified in the applicable AAA Fee Schedule must be paid at the time of the filing of any counterclaim.

**(c)** If the respondent alleges that a different arbitration provision is controlling, the matter will be administered in accordance with the arbitration provision submitted by the initiating party subject to a final determination by the arbitrator.

**(d)** If the counterclaim does not meet the requirements for filing a claim and the deficiency is not cured by the date specified by the AAA, it may be returned to the filing party.

## R-6. Changes of Claim

**(a)** A party may at any time prior to the close of the hearing or by the date established by the arbitrator increase or decrease the amount of its claim or counterclaim. Written notice of the change of claim amount must be provided to the AAA and all parties. If the change of claim amount results in an increase in administrative fee, the balance of the fee is due before the change of claim amount may be accepted by the arbitrator.

**(b)** Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have a period of 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

## R-7. Jurisdiction

**(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-8. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

## R-9. Mediation

In all cases where a claim or counterclaim exceeds $75,000, upon the AAA's administration of the arbitration or at any time while the arbitration is pending, the parties shall mediate their dispute pursuant to the applicable provisions of the AAA's Commercial Mediation Procedures, or as otherwise agreed by the parties. Absent an agreement of the parties to the contrary, the mediation shall take place concurrently with the arbitration and shall not serve to delay the arbitration proceedings. However, any party to an arbitration may unilaterally opt out of this rule upon notification to the AAA and the other parties to the arbitration. The parties shall confirm the completion of any mediation or any decision to opt out of this rule to the AAA. Unless agreed to by all parties and the mediator, the mediator shall not be appointed as an arbitrator to the case.

## R-10. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, mediation of the dispute, potential exchange of information, a timetable for hearings, and any other administrative matters.

## R-11. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. Any disputes regarding the locale that are to be decided by the AAA must be submitted to the AAA and all other parties within 14 calendar days from the date of the AAA's initiation of the case or the date established by the AAA. Disputes regarding locale shall be determined in the following manner:

(a) When the parties' arbitration agreement is silent with respect to locale, and if the parties disagree as to the locale, the AAA may initially determine the place of

arbitration, subject to the power of the arbitrator after appointment, to make a final determination on the locale.

**(b)** When the parties' arbitration agreement requires a specific locale, absent the parties' agreement to change it, or a determination by the arbitrator upon appointment that applicable law requires a different locale, the locale shall be that specified in the arbitration agreement.

**(c)** If the reference to a locale in the arbitration agreement is ambiguous, and the parties are unable to agree to a specific locale, the AAA shall determine the locale, subject to the power of the arbitrator to finally determine the locale.

The arbitrator, at the arbitrator's sole discretion, shall have the authority to conduct special hearings for document production purposes or otherwise at other locations if reasonably necessary and beneficial to the process.

## R-12. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

**(a)** The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

**(b)** If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 14 calendar days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. The parties are not required to exchange selection lists. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable to that party. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

**(c)** Unless the parties agree otherwise, when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

## R-13. Direct Appointment by a Party

**(a)** If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with the name and address of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

**(b)** Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Section R-18 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Section R-18(b) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

**(c)** If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

**(d)** If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 14 calendar days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

## R-14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

**(a)** If, pursuant to Section R-13, either the parties have directly appointed arbitrators, or the arbitrators have been appointed by the AAA, and the parties have authorized them to appoint a chairperson within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint the chairperson.

**(b)** If no period of time is specified for appointment of the chairperson, and the party-appointed arbitrators or the parties do not make the appointment within 14 calendar days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

**(c)** If the parties have agreed that their party-appointed arbitrators shall appoint the chairperson from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-12, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Section.

## R-15. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these rules.

## R-16. Number of Arbitrators

**(a)** If the arbitration agreement does not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the Demand or Answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

**(b)** Any request for a change in the number of arbitrators as a result of an increase or decrease in the amount of a claim or a new or different claim must be made to the AAA and other parties to the arbitration no later than seven calendar days after receipt of the R-6 required notice of change of claim amount. If the parties are unable to agree with respect to the request for a change in the number of arbitrators, the AAA shall make that determination.

## R-17. Disclosure

**(a)** Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration. Failure on the part of a party or a representative to comply with the requirements of this rule may result in the waiver of the right to object to an arbitrator in accordance with Rule R-41.

**(b)** Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

**(c)** Disclosure of information pursuant to this Section R-17 is not an indication that the arbitrator considers that the disclosed circumstance is likely to affect impartiality or independence.

## R-18. Disqualification of Arbitrator

**(a)** Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for:

i. partiality or lack of independence,

ii. inability or refusal to perform his or her duties with diligence and in good faith, and

iii. any grounds for disqualification provided by applicable law.

**(b)** The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Section R-13 shall be non-neutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

**(c)** Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

## R-19. Communication with Arbitrator

**(a)** No party and no one acting on behalf of any party shall communicate *ex parte* with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate *ex parte* with a candidate for direct appointment pursuant to R-13 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

**(b)** Section R-19(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Section R-18(b), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Section R-18(b), the AAA shall as an administrative practice suggest to the parties that they agree further that Section R-19(a) should nonetheless apply prospectively.

**(c)** In the course of administering an arbitration, the AAA may initiate communications with each party or anyone acting on behalf of the parties either jointly or individually.

**(d)** As set forth in R-43, unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

## R-20. Vacancies

**(a)** If for any reason an arbitrator is unable or unwilling to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

**(b)** In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

**(c)** In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

## R-21. Preliminary Hearing

**(a)** At the discretion of the arbitrator, and depending on the size and complexity of the arbitration, a preliminary hearing should be scheduled as soon as practicable after the arbitrator has been appointed. The parties should be invited to attend the preliminary hearing along with their representatives. The preliminary hearing may be conducted in person or by telephone.

**(b)** At the preliminary hearing, the parties and the arbitrator should be prepared to discuss and establish a procedure for the conduct of the arbitration that is appropriate to achieve a fair, efficient, and economical resolution of the dispute. Sections P-1 and P-2 of these rules address the issues to be considered at the preliminary hearing.

## R-22. Pre-Hearing Exchange and Production of Information

**(a)** *Authority of arbitrator.* The arbitrator shall manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses.

**(b)** *Documents.* The arbitrator may, on application of a party or on the arbitrator's own initiative:

   **i.** require the parties to exchange documents in their possession or custody on which they intend to rely;

   **ii.** require the parties to update their exchanges of the documents on which they intend to rely as such documents become known to them;

   **iii.** require the parties, in response to reasonable document requests, to make available to the other party documents, in the responding party's possession or custody, not otherwise readily available to the party seeking the documents, reasonably believed by the party seeking the documents to exist and to be relevant and material to the outcome of disputed issues; and

**iv.** require the parties, when documents to be exchanged or produced are maintained in electronic form, to make such documents available in the form most convenient and economical for the party in possession of such documents, unless the arbitrator determines that there is good cause for requiring the documents to be produced in a different form. The parties should attempt to agree in advance upon, and the arbitrator may determine, reasonable search parameters to balance the need for production of electronically stored documents relevant and material to the outcome of disputed issues against the cost of locating and producing them.

## R-23. Enforcement Powers of the Arbitrator

The arbitrator shall have the authority to issue any orders necessary to enforce the provisions of rules R-21 and R-22 and to otherwise achieve a fair, efficient and economical resolution of the case, including, without limitation:

**(a)** conditioning any exchange or production of confidential documents and information, and the admission of confidential evidence at the hearing, on appropriate orders to preserve such confidentiality;

**(b)** imposing reasonable search parameters for electronic and other documents if the parties are unable to agree;

**(c)** allocating costs of producing documentation, including electronically stored documentation;

**(d)** in the case of willful non-compliance with any order issued by the arbitrator, drawing adverse inferences, excluding evidence and other submissions, and/or making special allocations of costs or an interim award of costs arising from such non-compliance; and

**(e)** issuing any other enforcement orders which the arbitrator is empowered to issue under applicable law.

## R-24. Date, Time, and Place of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 calendar days in advance of the hearing date, unless otherwise agreed by the parties.

## R-25. Attendance at Hearings

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person.

## R-26. Representation

Any party may participate without representation (*pro se*), or by counsel or any other representative of the party's choosing, unless such choice is prohibited by applicable law. A party intending to be so represented shall notify the other party and the AAA of the name, telephone number and address, and email address if available, of the representative at least seven calendar days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

## R-27. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

## R-28. Stenographic Record

(a) Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three calendar days in advance of the hearing. The requesting party or parties shall pay the cost of the record.

(b) No other means of recording the proceedings will be permitted absent the agreement of the parties or per the direction of the arbitrator.

(c) If the transcript or any other recording is agreed by the parties or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

(d) The arbitrator may resolve any disputes with regard to apportionment of the costs of the stenographic record or other recording.

## R-29. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

## R-30. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

## R-31. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

## R-32. Conduct of Proceedings

**(a)** The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

**(b)** The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

**(c)** When deemed appropriate, the arbitrator may also allow for the presentation of evidence by alternative means including video conferencing, internet communication, telephonic conferences and means other than an in-person presentation. Such alternative means must afford a full opportunity for all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute and, when involving witnesses, provide an opportunity for cross-examination.

**(d)** The parties may agree to waive oral hearings in any case and may also agree to utilize the Procedures for Resolution of Disputes Through Document Submission, found in Rule E-6.

## R-33. Dispositive Motions

The arbitrator may allow the filing of and make rulings upon a dispositive motion only if the arbitrator determines that the moving party has shown that the motion is likely to succeed and dispose of or narrow the issues in the case.

## R-34. Evidence

(a) The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

(b) The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

(c) The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

(d) An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

## R-35. Evidence by Written Statements and Post-Hearing Filing of Documents or Other Evidence

(a) At a date agreed upon by the parties or ordered by the arbitrator, the parties shall give written notice for any witness or expert witness who has provided a written witness statement to appear in person at the arbitration hearing for examination. If such notice is given, and the witness fails to appear, the arbitrator may disregard the written witness statement and/or expert report of the witness or make such other order as the arbitrator may consider to be just and reasonable.

(b) If a witness whose testimony is represented by a party to be essential is unable or unwilling to testify at the hearing, either in person or through electronic or other means, either party may request that the arbitrator order the witness to appear in person for examination before the arbitrator at a time and location where the witness is willing and able to appear voluntarily or can legally be compelled to do so. Any such order may be conditioned upon payment by the requesting party of all reasonable costs associated with such examination.

(c) If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

## R-36. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

## R-37. Interim Measures

**(a)** The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

**(b)** Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

**(c)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

## R-38. Emergency Measures of Protection

**(a)** Unless the parties agree otherwise, the provisions of this rule shall apply to arbitrations conducted under arbitration clauses or agreements entered on or after October 1, 2013.

**(b)** A party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile or e-mail or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

**(c)** Within one business day of receipt of notice as provided in section (b), the AAA shall appoint a single emergency arbitrator designated to rule on emergency applications. The emergency arbitrator shall immediately disclose any circumstance likely, on the basis of the facts disclosed on the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

**(d)** The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such a schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone or video conference or on written submissions as alternatives to a formal hearing. The emergency arbitrator shall have the authority vested in the tribunal under Rule 7, including the authority to rule on her/his own jurisdiction, and shall resolve any disputes over the applicability of this Rule 38.

**(e)** If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore.

**(f)** Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the panel is constituted; thereafter such a request shall be addressed to the panel. The emergency arbitrator shall have no further power to act after the panel is constituted unless the parties agree that the emergency arbitrator is named as a member of the panel.

**(g)** Any interim award of emergency relief may be conditioned on provision by the party seeking such relief for appropriate security.

**(h)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with this rule, the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in this rule and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

**(i)** The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the tribunal to determine finally the apportionment of such costs.

## R-39. Closing of Hearing

**(a)** The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

**(b)** If documents or responses are to be filed as provided in Rule R-35, or if briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If no documents, responses, or briefs are to be filed, the arbitrator shall declare the hearings closed as of the date of the last hearing (including telephonic hearings). If the case was heard without any oral hearings, the arbitrator shall close the hearings upon the due date established for receipt of the final submission.

**(c)** The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing. The AAA may extend the time limit for rendering of the award only in unusual and extreme circumstances.

## R-40. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties , the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award (14 calendar days if the case is governed by the Expedited Procedures).

## R-41. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

## R-42. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any extension.

## R-43. Serving of Notice and Communications

**(a)** Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

**(b)** The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile transmission (fax), or electronic (e-mail) to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by e-mail or other methods of communication.

**(c)** Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

**(d)** Unless otherwise instructed by the AAA or by the arbitrator, all written communications made by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

**(e)** Failure to provide the other party with copies of communications made to the AAA or to the arbitrator may prevent the AAA or the arbitrator from acting on any requests or objections contained therein.

**(f)** The AAA may direct that any oral or written communications that are sent by a party or their representative shall be sent in a particular manner. The failure of a party or their representative to do so may result in the AAA's refusal to consider the issue raised in the communication.

## R-44. Majority Decision

**(a)** When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement or section (b) of this rule, a majority of the arbitrators must make all decisions.

**(b)** Where there is a panel of three arbitrators, absent an objection of a party or another member of the panel, the chairperson of the panel is authorized to resolve any disputes related to the exchange of information or procedural matters without the need to consult the full panel.

## R-45. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 calendar days from the date of closing the hearing, or, if oral hearings have been waived, from the due date set for receipt of the parties' final statements and proofs.

## R-46. Form of Award

**(a)** Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the form and manner required by law.

**(b)** The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

### R-47. Scope of Award

**(a)** The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

**(b)** In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

**(c)** In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

**(d)** The award of the arbitrator(s) may include:

    **i.** interest at such rate and from such date as the arbitrator(s) may deem appropriate; and

    **ii.** an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

### R-48. Award Upon Settlement—Consent Award

**(a)** If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses.

**(b)** The consent award shall not be released to the parties until all administrative fees and all arbitrator compensation have been paid in full.

### R-49. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at their last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

### R-50. Modification of Award

Within 20 calendar days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other

parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto.

## R-51. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party to the arbitration, furnish to the party, at its expense, copies or certified copies of any papers in the AAA's possession that are not determined by the AAA to be privileged or confidential.

## R-52. Applications to Court and Exclusion of Liability

**(a)** No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**(b)** Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

**(c)** Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

**(d)** Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

**(e)** Parties to an arbitration under these rules may not call the arbitrator, the AAA, or AAA employees as a witness in litigation or any other proceeding relating to the arbitration. The arbitrator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding.

## R-53. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe administrative fees to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable. The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

## R-54. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and

the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

## R-55. Neutral Arbitrator's Compensation

**(a)** Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation.

**(b)** If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

**(c)** Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

## R-56. Deposits

**(a)** The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

**(b)** Other than in cases where the arbitrator serves for a flat fee, deposit amounts requested will be based on estimates provided by the arbitrator. The arbitrator will determine the estimated amount of deposits using the information provided by the parties with respect to the complexity of each case.

**(c)** Upon the request of any party, the AAA shall request from the arbitrator an itemization or explanation for the arbitrator's request for deposits.

## R-57. Remedies for Nonpayment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment.

**(a)** Upon receipt of information from the AAA that payment for administrative charges or deposits for arbitrator compensation have not been paid in full, to the extent the law allows, a party may request that the arbitrator take specific measures relating to a party's non-payment.

**(b)** Such measures may include, but are not limited to, limiting a party's ability to assert or pursue their claim. In no event, however, shall a party be precluded from defending a claim or counterclaim.

**(c)** The arbitrator must provide the party opposing a request for such measures with the opportunity to respond prior to making any ruling regarding the same.

**(d)** In the event that the arbitrator grants any request for relief which limits any party's participation in the arbitration, the arbitrator shall require the party who is making a claim and who has made appropriate payments to submit such evidence as the arbitrator may require for the making of an award.

**(e)** Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative or at the request of the AAA or a party, may order the suspension of the arbitration. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**(f)** If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full deposits requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.

## R-58. Sanctions

**(a)** The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

**(b)** The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.

# Preliminary Hearing Procedures

## P-1. General

**(a)** In all but the simplest cases, holding a preliminary hearing as early in the process as possible will help the parties and the arbitrator organize the proceeding in a manner that will maximize efficiency and economy, and will provide each party a fair opportunity to present its case.

**(b)** Care must be taken to avoid importing procedures from court systems, as such procedures may not be appropriate to the conduct of arbitrations as an alternative form of dispute resolution that is designed to be simpler, less expensive and more expeditious.

## P-2. Checklist

**(a)** The following checklist suggests subjects that the parties and the arbitrator should address at the preliminary hearing, in addition to any others that the parties or the arbitrator believe to be appropriate to the particular case. The items to be addressed in a particular case will depend on the size, subject matter, and complexity of the dispute, and are subject to the discretion of the arbitrator:

**(i)** the possibility of other non-adjudicative methods of dispute resolution, including mediation pursuant to R-9;

**(ii)** whether all necessary or appropriate parties are included in the arbitration;

**(iii)** whether a party will seek a more detailed statement of claims, counterclaims or defenses;

**(iv)** whether there are any anticipated amendments to the parties' claims, counterclaims, or defenses;

**(v)** which

**(a)** arbitration rules;

**(b)** procedural law; and

**(c)** substantive law govern the arbitration;

**(vi)** whether there are any threshold or dispositive issues that can efficiently be decided without considering the entire case, including without limitation,

**(a)** any preconditions that must be satisfied before proceeding with the arbitration;

**(b)** whether any claim or counterclaim falls outside the arbitrator's jurisdiction or is otherwise not arbitrable;

**(c)** consolidation of the claims or counterclaims with another arbitration; or

**(d)** bifurcation of the proceeding.

**(vii)** whether the parties will exchange documents, including electronically stored documents, on which they intend to rely in the arbitration, and/or make written requests for production of documents within defined parameters;

**(viii)** whether to establish any additional procedures to obtain information that is relevant and material to the outcome of disputed issues;

**(ix)** how costs of any searches for requested information or documents that would result in substantial costs should be borne;

**(x)** whether any measures are required to protect confidential information;

**(xi)** whether the parties intend to present evidence from expert witnesses, and if so, whether to establish a schedule for the parties to identify their experts and exchange expert reports;

**(xii)** whether, according to a schedule set by the arbitrator, the parties will

**(a)** identify all witnesses, the subject matter of their anticipated testimonies, exchange written witness statements, and determine whether written witness statements will replace direct testimony at the hearing;

**(b)** exchange and pre-mark documents that each party intends to submit; and

**(c)** exchange pre-hearing submissions, including exhibits;

**(xiii)** the date, time and place of the arbitration hearing;

**(xiv)** whether, at the arbitration hearing,

**(a)** testimony may be presented in person, in writing, by videoconference, via the internet, telephonically, or by other reasonable means;

**(b)** there will be a stenographic transcript or other record of the proceeding and, if so, who will make arrangements to provide it;

**(xv)** whether any procedure needs to be established for the issuance of subpoenas;

**(xvi)** the identification of any ongoing, related litigation or arbitration;

**(xvii)** whether post-hearing submissions will be filed;

**(xviii)** the form of the arbitration award; and

**(xix)** any other matter the arbitrator considers appropriate or a party wishes to raise.

**(b)** The arbitrator shall issue a written order memorializing decisions made and agreements reached during or following the preliminary hearing.

# Expedited Procedures

## E-1. Limitation on Extensions

Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the Demand for Arbitration or counterclaim as provided in Section R-5.

## E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, upon the agreement of the other party, or the consent of the arbitrator. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $75,000, the case will be administered under the regular procedures unless all parties and the arbitrator agree that the case may continue to be processed under the Expedited Procedures.

## E-3. Serving of Notices

In addition to notice provided by Section R-43, the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

## E-4. Appointment and Qualifications of Arbitrator

(a) The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

(b) The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

(c) The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Section R-18. The parties shall notify the AAA within seven calendar days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

## E-5. Exchange of Exhibits

At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

## E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission

Where no party's claim exceeds $25,000, exclusive of interest, attorneys' fees and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. Where cases are resolved by submission of documents, the following procedures may be utilized at the agreement of the parties or the discretion of the arbitrator:

**(a)** Within 14 calendar days of confirmation of the arbitrator's appointment, the arbitrator may convene a preliminary management hearing, via conference call, video conference, or internet, to establish a fair and equitable procedure for the submission of documents, and, if the arbitrator deems appropriate, a schedule for one or more telephonic or electronic conferences.

**(b)** The arbitrator has the discretion to remove the case from the documents-only process if the arbitrator determines that an in-person hearing is necessary.

**(c)** If the parties agree to in-person hearings after a previous agreement to proceed under this rule, the arbitrator shall conduct such hearings. If a party seeks to have in-person hearings after agreeing to this rule, but there is not agreement among the parties to proceed with in-person hearings, the arbitrator shall resolve the issue after the parties have been given the opportunity to provide their respective positions on the issue.

**(d)** The arbitrator shall establish the date for either written submissions or a final telephonic or electronic conference. Such date shall operate to close the hearing and the time for the rendering of the award shall commence.

**(e)** Unless the parties have agreed to a form of award other than that set forth in rule R-46, when the parties have agreed to resolve their dispute by this rule, the arbitrator shall render the award within 14 calendar days from the date the hearing is closed.

**(f)** If the parties agree to a form of award other than that described in rule R-46, the arbitrator shall have 30 calendar days from the date the hearing is declared closed in which to render the award.

**(g)** The award is subject to all other provisions of the Regular Track of these rules which pertain to awards.

## E-7. Date, Time, and Place of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, and place of the hearing, to be scheduled to take place within 30 calendar days of confirmation of the arbitrator's appointment. The AAA will notify the parties in advance of the hearing date.

## E-8. The Hearing

**(a)** Generally, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two business days after the hearing. For good cause shown, the arbitrator may schedule additional hearings within seven business days after the initial day of hearings.

**(b)** Generally, there will be no stenographic record. Any party desiring a stenographic record may arrange for one pursuant to the provisions of Section R-28.

## E-9. Time of Award

Unless otherwise agreed by the parties, the award shall be rendered not later than 14 calendar days from the date of the closing of the hearing or, if oral hearings have been waived, from the due date established for the receipt of the parties' final statements and proofs.

## E-10. Arbitrator's Compensation

Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

# Procedures for Large, Complex Commercial Disputes

## L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA shall, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call. The conference will take place within 14 calendar days after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

**(a)** to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

**(b)** to discuss the views of the parties about the technical and other qualifications of the arbitrators;

**(c)** to obtain conflicts statements from the parties; and

**(d)** to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

## L-2. Arbitrators

**(a)** Large, complex commercial cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. With the exception in paragraph (b) below, if the parties are unable to agree upon the number of arbitrators and a claim or counterclaim involves at least $1,000,000, then three arbitrator(s) shall hear and determine the case. If the parties are unable to agree on the number of arbitrators and each claim and counterclaim is less than $1,000,000, then one arbitrator shall hear and determine the case.

**(b)** In cases involving the financial hardship of a party or other circumstance, the AAA at its discretion may require that only one arbitrator hear and determine the case, irrespective of the size of the claim involved in the dispute.

**(c)** The AAA shall appoint arbitrator(s) as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator(s) shall not have served as the mediator in the mediation phase of the instant proceeding.

## L-3. Management of Proceedings

**(a)** The arbitrator shall take such steps as deemed necessary or desirable to avoid delay and to achieve a fair, speedy and cost-effective resolution of a Large, Complex Commercial Dispute.

**(b)** As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be scheduled in accordance with sections P-1 and P-2 of these rules.

**(c)** The parties shall exchange copies of all exhibits they intend to submit at the hearing at least 10 calendar days prior to the hearing unless the arbitrator(s) determines otherwise.

**(d)** The parties and the arbitrator(s) shall address issues pertaining to the pre-hearing exchange and production of information in accordance with rule R-22 of the AAA Commercial Rules, and the arbitrator's determinations on such issues shall be included within the Scheduling and Procedure Order.

**(e)** The arbitrator, or any single member of the arbitration tribunal, shall be authorized to resolve any disputes concerning the pre-hearing exchange and production of documents and information by any reasonable means within his discretion, including, without limitation, the issuance of orders set forth in rules R-22 and R-23 of the AAA Commercial Rules.

**(f)** In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions to obtain the testimony of a person who may possess information determined by the arbitrator to be relevant and material to the outcome of the case. The arbitrator may allocate the cost of taking such a deposition.

**(g)** Generally, hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

## Administrative Fee Schedules (Standard and Flexible Fees)

*FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT* ***www.adr.org/feeschedule.***

# Commercial Mediation Procedures

## M-1. Agreement of Parties

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

## M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via WebFile at **www.adr.org.**

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

(i)   A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.

(ii)  The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.

(iii) A brief statement of the nature of the dispute and the relief requested.

(iv)  Any specific qualifications the mediator should possess.

## M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

## M-4. Appointment of the Mediator

If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

**(i)** Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

**(ii)** If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

**(iii)** If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-5. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the *Model Standards of Conduct for Mediators* in effect at the time a mediator is appointed to a case. Where there is a conflict between the *Model Standards* and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-6. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

## M-7. Duties and Responsibilities of the Mediator

**(i)** The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

**(ii)** The mediator is authorized to conduct separate or *ex parte* meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

**(iii)** The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

**(iv)** The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

**(v)** In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

**(vi)** The mediator is not a legal representative of any party and has no fiduciary duty to any party.

## M-8. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-9. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-10. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

- **(i)** Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;
- **(ii)** Admissions made by a party or other participant in the course of the mediation proceedings;
- **(iii)** Proposals made or views expressed by the mediator; or
- **(iv)** The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-12. Termination of Mediation

The mediation shall be terminated:

**(i)** By the execution of a settlement agreement by the parties; or

**(ii)** By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or

**(iii)** By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or

**(iv)** When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

## M-13. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

## M-14. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

## M-15. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

## M-16. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

## M-17. Cost of the Mediation

*FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT www.adr.org/feeschedule.*

© 2015 American Arbitration Association, Inc. All rights reserved. These rules are the copyrighted property of the
American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services.
Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws.
Please contact 800.778.7879 or websitemail@adr.org for additional information.

# Regional Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia**
P. Jean Baker, Esq.
Vice President
Phone: 202.223.7093
Email: BakerJ@adr.org

**States: Texas**
Andrew Barton
Vice President
Phone: 210.998.5750
Email: BartonA@adr.org

**States: Alabama, Georgia**
John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org

**States: Louisiana, Mississippi, Texas**
Ingeuneal C. Gray, Esq.
Vice President
Phone: 832.308.7893
Email: GrayI@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**
Karen Jalkut
Vice President
Phone: 617.695.6062
Email: JalkutK@adr.org

**States: Alaska, California, Hawaii, Oregon, Washington**
Serena K. Lee, Esq.
Vice President
Phone: 415.671.4053
Email: LeeS@adr.org

**States: Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, West Virginia**
Michelle M. Skipper
Vice President
Phone: 704.643.8605
Email: SkipperM@adr.org

**States: Florida**
Rebecca Storrow, Ph.D.
Vice President
Phone: 954.372.4341
Email: StorrowR@adr.org

**States: Arizona, Colorado, Kansas, Idaho, Montana, Nebraska, Nevada, New Mexico, Oklahoma, Utah, Wyoming**
Lance K. Tanaka
Vice President
Phone: 303.831.0824
Email: TanakaL@adr.org

**States: Arkansas, Illinois, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, Wisconsin**
A. Kelly Turner, Esq.
Vice President
Phone: 312.361.1116
Email: TurnerK@adr.org

**States: New York**
Jeffrey T. Zaino, Esq.
Vice President
Phone: 212.484.3224
Email: ZainoJ@adr.org

# Case Management Vice Presidents and Directors

Jeffrey Garcia
Vice President
Phone: 559.490.1860
Email: GarciaJ@adr.org
**Administers cases in: AK, AZ, CA, HI, ID, MT, NM, NV, OR, UT, WA**

John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org
**Administers cases in: AL, DC, FL, GA, IN, KY, MD, NC, OH, SC, TN, VA**

Harry Hernandez
Director
Phone: 972.702.8222
Email: HernandezH@adr.org
**Administers cases in: AR, CO, IA, IL, KS, LA, MN, MO, MS, ND, NE, OK, SD, TX, WI, WY**

Yvonne Baglini
Director
Phone: 866.293.4053
Email: BagliniY@adr.org
**Administers cases in: CT, DE, MA, ME, MI, NH, NJ, NY, PA, RI, VT, WV**



AMERICAN ARBITRATION ASSOCIATION®

800.778.7879 | websitemail@adr.org | adr.org

**APPENDIX**

**TAB K**

*Leshin v. Oliva*, --- S.W.3d ---,
**2015 WL4554333 (Tex.App.—San Antonio, July 29, 2015, no pet. h.)**

2015 WL 4554333
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas,
San Antonio.

Richard Leshin, Successor Trustee of The
Davila Family Trust, Trust A, Appellant
v.
Juan Gerardo Oliva and Rosina Oliva,
Individually and as Successor Trustee of The
Davila Family Trusts B, C, and D, Appellees

No. 04–14–00657–CV    |
Delivered and Filed: July 29, 2015

From the 406th Judicial District Court, Webb County, Texas,
Trial Court No. 2008–CVF–000855–D4, Honorable Oscar J.
Hale Jr., Judge Presiding

**Attorneys and Law Firms**

Carlos M. Zaffirini Sr., Zaffirini & Castillo, Guadalupe
Castillo, Laredo, TX, for Appellant.

Allen F. Cazier, David Claybourne Snell, San Antonio, TX,
for Appellee.

Sitting: Karen Angelini, Justice, Marialyn Barnard, Justice,
Rebeca C. Martinez, Justice

**MEMORANDUM OPINION**

Opinion by: Marialyn Barnard, Justice

**\*1**  This is an appeal from a trial court's judgment confirming
an arbitration award in favor of appellees, Juan Gerardo Oliva
and Rosina Oliva, Individually and as Successor Trustee of
The Davila Family Trusts B, C, and D (collectively "the
Olivas"). On appeal, appellant Richard Leshin, Successor
Trustee of The Davila Family Trust, Trust A, raises two
related issues, contending the trial court erred in confirming
the award because the arbitrator exceeded his powers by
issuing an award against him in his individual capacity when
he was not subject to the claims or served with notice.
Because we conclude the arbitrator exceeded his powers, we

reverse the trial court's judgment and remand the matter for
further proceedings so that the trial court may consider the
issue of arbitrability and conduct an independent review on
that issue.

**BACKGROUND**

Pioquinto Ramon Davila and his wife, Guadalupe Rosalinda
Davila, created The Davila Family Trust, naming themselves
trustees and lifetime beneficiaries of the trust. The Davilas
funded the trust with all of their property, including a
substantial amount of stock in the International Bank
of Commerce of Laredo, now known as International
Bankshares Corp. and sometimes referred to as IBC Bank.
The trust was set up as a revocable trust to become partially
irrevocable upon the death of either Pioquinto or Guadalupe,
whichever occurred first. It also included the following
arbitration agreement:

> Any controversy between the Trustees
> and any controversy between the
> Trustee and any other parties to
> this Trust, including Beneficiaries,
> involving the construction or
> application of any of the terms,
> provisions, or conditions of this Trust
> shall, on the written request of any
> disagreeing party served on the other
> or others, be submitted to arbitration.
> The parties to such arbitration shall
> each appoint one person to hear
> and determine the dispute and, if
> they are unable to agree, then the
> persons so chosen shall select another
> impartial arbitrator whose decision
> shall be final and conclusive upon
> all parties. The cost of arbitration
> shall be borne by the losing party
> or parties, in such proportion as
> decided in arbitration proceedings.
> Such arbitration shall comply with
> the Commercial Arbitration Rules of
> the American Arbitration Association,
> 140 West 51st Street, New York, New
> York, 10020.

Guadalupe died first, and pursuant to the trust's terms, it
was divided into four separate trusts, now known as Trusts

A, B, C, and D. Trust D was also known as the GST Trust. Pioquinto served as trustee of each trust until his death. Pioquinto executed two amendments to Trust A, providing that all his personal and household effects of every kind be distributed to Juan Gerardo upon Pioquinto's death, appointing Leshin to serve as successor trustee to Trust A, and increasing the bequest for his new wife, Alma Guadalupe Lozano Davila. Shortly thereafter, a dispute arose between the Olivas and Pioquinto, and the Olivas filed a petition for an accounting in Webb County District Court. In response, Pioquinto filed a motion to compel arbitration, which was granted. The Olivas then filed their claim with the American Arbitration Association ("AAA"). As the matter proceeded to arbitration, Pioquinto died. After Pioquinto's death, Leshin was named successor trustee of Trust A and Rosina was ultimately named successor trustee of Trusts B, C, and D. The Olivas eventually agreed not to prosecute their claim, and the case was closed. However, in 2013, Rosina filed an "Original Claim in Arbitration" with the AAA, requesting an accounting and seeking a declaratory judgment. Juan Gerardo intervened, alleging Leshin failed to take possession of Pioquinto's personal and household effects and deliver them to him when Pioquinto died. An arbitration proceeding was held, and at the conclusion of arbitration, the arbitrator issued an arbitration award in favor of Juan Gerardo and Rosina. As is relevant to this appeal, the award included the following provisions:

**\*2** Richard Leshin, Trustee, shall provide to Juan Gerardo Oliva within thirty (30) days a full and complete accounting, and distribution of all of the personal and household effects of Pioquinto Ramon Davila as of September 11, 2010. If such property cannot be distributed to Claimant Juan Gerardo Oliva, Juan Gerardo Oliva is awarded money damages equal to the fair and reasonable value of the property, which amount is $79,426.00 against Richard Leshin, Individually and as Trustee.

\* \* \*

Claimant, Juan Gerardo Oliva, is awarded reasonable and necessary attorney's fees and litigation expenses in the sum of $5,755.00 to be paid by Richard L. Leshin.

Claimant, Juan Gerardo Oliva, is awarded American Arbitration Association expenses in the sum of the amount of $5,595.01 to be paid by Richard L. Leshin.

\* \* \*

Claimant, Rosina Oliva, Successor Trustee, is awarded reasonable and necessary attorney's fees and litigation expenses in the sum of $4,175.00 to be paid by Richard Leshin.

Claimant, Rosina Oliva, Successor Trustee, is awarded American Arbitration Association expenses in the sum of $12,950.91, as shown by the records of the AAA in this case, to be paid 60% by Richard Leshin. Therefore, Richard Leshin, shall reimburse Rosina Oliva the additional sum of $7,770.55, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Rosina Oliva.

Despite the arbitrator's award, Leshin failed to distribute any of the relevant property to Juan Gerardo. Rather, in his capacity as Successor Trustee of Trust A, he filed an application to vacate the award on the basis that the arbitrator exceeded his powers when he issued an award against Leshin in his individual capacity. The trial court rendered judgment confirming the award. This appeal followed.

## ANALYSIS

Leshin contends the trial court erred in confirming the award against him in his individual capacity because he was never a party in his individual capacity, nor was he served with notice in his individual capacity. Although stated as two separate issues, we construe Leshin's ultimate complaint to be that the arbitrator exceeded his powers in issuing an award against him in his individual capacity, and therefore, the trial court's judgment confirming the award must be reversed.

### *Standard of Review*

We review a trial court's decision to confirm or vacate an arbitration award de novo. *Centex/Vestal v. Friendship W. Baptist Church,* 314 S.W.3d 677, 683 (Tex.2010); *GJR Mgmt. Holdings, L.P. v. Jack Raus, Ltd.,* 126 S.W.3d 257, 263 (Tex.App.–San Antonio 2003, pet. denied). This standard for reviewing arbitration awards stems from our state's policy strongly favoring the arbitration of disputes. *See Rachal v. Reitz,* 403 S.W.3d 840, 842 (Tex.2013); *CVN Grp. v. Delgado,* 95 S.W.3d 234, 238 (Tex.2002). Because an arbitration award has the same effect as a judgment of a court of last resort, we give the award great deference and indulge

every reasonable presumption in favor of the award and none against it. *CVN Grp.,* 95 S.W.3d at 238; *City of Laredo v. Mojica,* 399 S.W.3d 190, 195 (Tex.App.–San Antonio 2012, pet. denied). We may not substitute our judgment for that of the arbitrator merely because we would have reached a different decision. *Kosty v. S. Short Harbour Cmty. Ass'n, Inc.,* 226 S.W.3d 459, 463 (Tex.App.–Houston [1st Dist.] 2006, pet. denied). Accordingly, the review of an arbitration award is "extraordinarily narrow," and only in extreme cases will a trial court vacate an award. *Centex/Vestal,* 314 S.W.3d at 683; *CVN Grp.,* 95 S.W.3d at 238; *Mojica,* 399 S.W.3d at 195; *GJR Mgmt. Holdings,* 126 S.W.3d at 263.

 **\*3** A reviewing court will not set aside an arbitration award for a mere mistake of fact or law. *Mojica,* 399 S.W.3d at 195. In fact, absent specific common law or statutory grounds for vacating, modifying, or correcting an award, a reviewing court must confirm an arbitration award. *CVN Grp.,* 95 S.W.3d at 238. Statutory grounds for vacating, modifying, or correcting an award can be found in the Federal Arbitration Act as well as the Texas General Arbitration Act. 9 U.S.C. § 10(a); TEX. CIV. PRAC. & REM.CODE ANN. § 171.088(a)(3) (West 2014). Pursuant to these statutes, a trial court may vacate an arbitration award for any one of several enumerated reasons, including the contention that the arbitrator exceeded his powers. 9U.S.C. § 10(a); TEX. CIV. PRAC. & REM.CODE ANN. § 171.087 (West 2014); *Elgohary v. Herrera,* 405 S.W.3d 785, 789 (Tex.App.–Houston [1st Dist.] 2013, no pet.); *Rapid Settlements, Ltd. v. Green,* 294 S.W.3d 701, 706 (Tex.App.–Houston [1st Dist.] 2009, no pet.).

An arbitrator exceeds his powers if he decides matters not properly before him. *Elgohary,* 405 S.W.3d at 789. He also exceeds his power, as Leshin asserts in this matter, when he issues an award against a party who is not subject to arbitration. *Id.*; *Rapid Settlements,* 294 S.W.3d at 706. Therefore, we must determine whether the arbitrator exceeded his powers when he concluded Leshin—in his individual capacity—was bound to arbitrate and subject to an individual award. *See Elgohary,* 405 S.W.3d at 789; *Rapid Settlements,* 294 S.W.3d at 706. [1]

### Arbitrator Exceeded His Powers?

As stated above, we construe Leshin's ultimate complaint to be that the arbitrator exceeded his powers by issuing an award against him in his individual capacity when he was neither a party to the arbitration agreement in his individual capacity, nor served with a notice of claim in his individual capacity. Accordingly, he contends he was not subject, in his individual capacity, to arbitration or any award stemming therefrom.

In response, Juan Gerardo contends Leshin failed to come forth with a complete record to establish the basis for his claims, and therefore, this court cannot vacate the award. Alternatively, should we hold the record is sufficient to determine Leshin's claims, the Olivas argue the arbitrator did not exceed his powers because the arbitrator had the power to determine whether Leshin, as an individual, was a party subject to arbitration. In other words, the Olivas contend the arbitrator had the power to determine the issue of arbitrability—what claims may be submitted to arbitration and who is bound by an arbitration agreement—based on the broad language of the arbitration agreement, the AAA Commercial Arbitration Rules, and sections 114.008(a) and 114.0832(d) of the Texas Property Code. *See Saxa Inc. v. DFD Architecture Inc.,* 312 S.W.3d 224, 229 (Tex. App–Dallas 2010, pet. denied). Accordingly, it is the Olivas' position that Leshin failed to establish a statutory or common law ground for vacating the award.

### a. *Complete Record*
 **\*4** Juan Gerardo contends we cannot hold the trial court erred in confirming the award against Leshin individually because Leshin failed to come forth with a complete record for us to review to support his arguments. Specifically, Juan Gerardo complains the absence of the arbitration transcript prevents this court from determining whether the award should be vacated. We disagree.

We recognize a non-prevailing party who seeks to vacate an arbitration award bears the burden of bringing forth a complete record in the trial court that establishes the basis for vacating the award. *See Centex/Vestal,* 314 S.W.3d at 684. Generally, without a complete record and specifically without an arbitration transcript, we presume the evidence was adequate to support the award, and accordingly, we will uphold it. *Id.; see also Anzilotti v. Gene D. Liggin, Inc.,* 899 S.W.2d 264, 267 (Tex. App–Houston [14th Dist.] 1995, no pet.) ("Without a record, we are to presume that adequate evidence was presented to support the arbitration award") In accordance with this principle, several Texas appellate courts have held that there can essentially be no appellate review of an arbitrator's decision without a complete record of the evidence presented to the arbitrator. *See Statewide Remodeling, Inc. v. Williams,* 244 S.W.3d

564, 568–69 (Tex.App.–Dallas 2008, no pet.) (refusing to determine if arbitrator committed gross mistake due to lack of complete record); *Gamble v. Grand Homes 2000, L.P.,* 334 S.W.3d 1, 1 (Tex.App.–Dallas 2007, no pet.) (noting lack of record of arbitration proceedings as reason for rejecting appellants' arguments); *Grand Homes 96, L.P. v. Loudermilk,* 208 S.W.3d 696, 706 (Tex.App.–Fort Worth 2006, pet. denied) ("[T]he lack of a record of the arbitration proceedings prevents review of these issues."); *GJR Mgmt. Holdings, L.P.,* 126 S.W.3d at 263–64 ("Because we have no record [of the arbitration proceedings], we have no way of judging whether bad faith or failure to exercise honest judgment in fact occurred").

However, in some cases, the application of the general rule only limits—rather than prevents—an appellate court's ability to determine whether an arbitrator exceeded his powers. *See Centex/Vestal,* 314 S.W.3d at 685. Typically, the scope of an arbitrator's power is derived from the arbitration pleadings, motions, and documents containing the arbitration agreement. *Id.* Here, the appellate record consists of the arbitration award, the pleadings regarding Leshin's request to vacate the award, and a copy of the trust agreement containing the arbitration agreement. Accordingly, because the scope of the arbitrator's powers is ultimately derived from these documents, we conclude the lack of the arbitration transcript does not preclude this court from considering the merits of Leshin's appeal. *See id.* Therefore, we will consider Leshin's claim that the arbitrator exceeded his powers, and the Olivas' contention that Leshin's status was a matter for the arbitrator to decide, i.e., an issue of arbitrability. However, in doing so, we presume any existing evidence supports the award. *See id.*

**b.** *Arbitrability*

In this case, as previously noted, Leshin contends the arbitrator exceeded his powers when he issued an award against Leshin in his individual capacity. Leshin presents two bases for this contention. Leshin first asserts the arbitrator exceeded his powers when he implicitly determined Leshin, in his individual capacity, was a party to the arbitration agreement. According to Leshin, he was not a party to the arbitration agreement in his individual capacity, only in his capacity as trustee. Therefore, Leshin concludes we must reverse the trial court's judgment confirming the award and render judgment that Leshin, in his individual capacity, was not a party to the arbitration agreement, and therefore, not subject to the award issued against him in that capacity. To support his position, Leshin relies on cases involving non-signatories to arbitration agreements, arguing there is clear

and unmistakable evidence that he, in his individual capacity, did not agree to arbitrate the issue of arbitrability, i.e., who is bound by an arbitration agreement. *See Saxa Inc.,* 312 S.W.3d at 229.

**\*5** The Olivas counter, arguing the arbitrator did not exceed his powers because the decision to determine whether Leshin, in his individual capacity, was a party to the arbitration agreement and bound thereby was within the arbitrator's power. To support this contention, the Olivas point to the broad language of the arbitration agreement and the arbitration agreement's reference to the AAA Commercial Arbitration Rules as clear and unmistakable evidence that Leshin agreed in his individual capacity to submit the determination of whether he is a party to the arbitration agreement to the arbitrator. The Olivas also assert the arbitrator's powers to determine this issue arise from sections 114.008(a) and 114.0832(d) of the Texas Property Code.

To address these arguments, we begin with the fundamental concept that arbitration is a matter of contract law. *Roe v. Ladymon,* 318 S.W.3d 502, 510 (Tex.App.–Dallas 2010, no pet.). It is a universally accepted principle of contract law that an individual must be a party to a contract in order to be bound by it. *Rapid Settlements,* 294 S.W.3d at 706. In other words, under general rules of contract law, a contract cannot bind a nonparty, i.e. a non-signatory. *Id.* Similarly, an arbitration agreement between specific parties cannot generally bind nonparties, i.e. non-signatories. *GM Oil Properties, Inc. v. Wade,* No. 01–08–00757–CV, 2012 WL 246041 at \*6 (Tex. App–Houston [1st Dist.] Jan. 26, 2012, no pet.) (mem.op.) ("It is a foundational principle that a party cannot be compelled to arbitrate when a party has not agreed to do so."); *Roe,* 318 S.W.3d at 511. However, in certain instances, a nonparty, i.e. a non-signatory, may be bound by the terms of an arbitration agreement just as a nonparty, i.e. non-signatory, may be bound by any other contract. *Roe,* 318 S.W.3d at 511.

Whether a person or entity is a party to an arbitration agreement, and therefore bound by any award issued as a result of the arbitration proceeding, is a question of arbitrability. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002); *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943–44 (1995). The question of arbitrability encompasses what claims may be submitted to arbitration and who can be bound to an arbitration agreement. *See Saxa Inc. v. DFD Architecture Inc.,* 312 S.W.3d 224, 229 (Tex. App–Dallas 2010, pet. denied) ("These 'gateway matters' include

whether the parties agreed to arbitrate and whether a claim or dispute is encompassed in the agreement to arbitrate."). The case before us raises the issue of arbitrability only with regard to the question of who is bound to and by the arbitration agreement and any award; there is no issue with regard to what claims were submitted. The specific question is who —the arbitrator or the courts—decides who is a party to the arbitration agreement and bound thereby.

On more than one occasion, the United States Supreme Court has concluded that the question of arbitrability is a "gateway" issue for judicial determination absent evidence that the parties clearly and unmistakably provided otherwise. *See Howsam,* 537 U.S. at 83 ("[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide."); *First Options,* 514 U.S. at 946 (holding that question about whether party is required to arbitrate dispute is subject to independent review by courts). Likewise, the Texas Supreme Court has stated the question of arbitrability is a "gateway matter" to be determined by a court, rather than an arbitrator, unless the parties clearly and unmistakably provide otherwise. *In re Labatt Food Serv., L.P.,* 279 S.W.3d 640, 644 (Tex.2009); *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 131 (Tex.2005). In cases where the reviewing court determines that the parties "clearly and unmistakably" agreed to submit the issue of arbitrability to the arbitrator, then it should defer to the arbitrator's decision on the issue. *First Options,* 514 U.S. at 943; *Elgohary,* 405 S.W.3d at 790; *Roe,* 318 S.W.3d at 514. On the other hand, in the absence of "clear and unmistakable evidence" that the parties agreed to the contrary, then the ultimate power to decide the issue of arbitrability lies with the courts. *First Options,* 514 U.S. at 943; *Elgohary,* 405 S.W.3d at 790; *Roe,* 318 S.W.3d at 514. Accordingly, in determining whether the arbitrator exceeded his powers by implicitly deciding Leshin, in his individual capacity, was a party to the arbitration agreement, we must determine whether Leshin, individually, and the Olivas clearly and unmistakably agreed to submit the issue of arbitrability—who was a party to and bound by the arbitration agreement—to the arbitrator. *See First Options,* 514 U.S. at 943; *Elgohary,* 405 S.W.3d at 790; *Roe,* 318 S.W.3d at 514. In making this determination, as noted above, we must presume any existing evidence supports the award. *Centex/Vestal,* 314 S.W.3d at 685.

**\*6** The Olivas point to the broad language of the arbitration agreement and its governance by the AAA Commercial Arbitration Rules as clear and unmistakable evidence that Leshin, individually, and the Olivas agreed to arbitrate the

issue of arbitrability. Thus, according to the Olivas, it was within the arbitrator's power to implicitly conclude that Leshin, in his individual capacity, was a party subject to the arbitration award. The Olivas rely on *Saxa Inc. v. DFD Architecture Inc.* for the proposition that a broad arbitration clause can create a presumption of arbitrability. 312 S.W.3d at 229–31. In *Saxa,* the court stated "a court must examine the arbitration agreement to decide if, when construed under the relevant state law, the agreement evidences a clear and unmistakable intention that the arbitrators will have the authority to determine the scope of arbitration." *Id.* at 229. The court then went on to address the language of the arbitration agreement. *Id.* However, in *Saxa,* the parties to the arbitration agreement, DFD Architecture, Inc. and Saxa, Inc., did not dispute that they both entered into a written arbitration agreement; instead, at issue was whether that arbitration agreement bound third parties, who sought to join an arbitration proceeding already pending between DFD Architecture, Inc. and Saxa, Inc. *Id.* at 226–27. In considering the broad language of the arbitration agreement, the court recognized it was not "confronted with a non-signatory to the arbitration agreement contesting whether it is bound by a signatory's agreement to arbitrate." *Id.* at 230.

The case before us, contrary to *Saxa Inc. v. DFD Architecture Inc.,* involves a non-signatory—Leshin, who in his individual capacity did not sign the trust agreement that included the arbitration agreement. *See Elgohary,* 405 S.W.3d at 789. An agent in his individual capacity is a non-signatory when that agent signs an agreement with an arbitration provision in his representative capacity. *See Elgohary,* 405 S.W.3d at 789 (identifying Herrera, in individual capacity, as non-signatory when he signed arbitration agreement as partner of L.P.); *Roe,* 318 S.W.3d at 515 (indicating partner's signature on contract does not render him party to contract in individual capacity, and thus, issue is whether non-signatory can be bound by arbitration). Here, Leshin signed the trust agreement, which contained the arbitration provision, in his capacity as trustee. Accordingly, Leshin, in his individual capacity, is a non-signatory. *See Elgohary,* 405 S.W.3d at 789; *Roe,* 318 S.W.3d at 515. Therefore, we hold the court's analysis in *Saxa Inc. v. DFD Architecture Inc.* is inapplicable here. *See Elgohary,* 405 S.W.3d at 789; *Roe,* 318 S.W.3d at 515.

In cases involving non-signatories, courts do not consider the terms of the arbitration agreement as any evidence when looking for "clear and unmistakable evidence" as to whether parties agreed to arbitrate the issue of arbitrability. *First Options,* 514 U.S. at 943 (focusing on intent of parties to

dispute rather than arbitration agreement); *Elgohary,* 405 S.W.3d at 790 (stating that terms of contracting parties' agreement is not evidence that nonparty agreed to arbitrate); *Roe,* 318 S.W.3d at 514 ("We find it significant that when the [United States] Supreme Court in *First Options* looked for clear evidence of an agreement to arbitrate arbitrability, it did not even address the terms of the arbitration agreement."). Therefore, although we generally presume any existing evidence supports the award, the broad language of the arbitration clause, which is the evidence relied upon by the Olivas as clear and unmistakeable evidence, is no evidence in this case because Leshin is a non-signatory. To constitute evidence in cases involving non-signatories, we must look at whether the parties to the dispute before the courts—i.e., Leshin, in his individual capacity, and the Olivas—clearly and unmistakably agreed to arbitrate the issue of arbitrability, rather than whether the parties to the contract containing the arbitration clause—i.e. Leshin, in his capacity as trustee, and the Olivas—agreed to arbitrate the issue of arbitrability. *See First Options,* 514 U.S. at 943; *Elgohary,* 405 S.W.3d at 790; *Roe,* 318 S.W.3d at 514.

In the context of non-signatories, i.e. agents in their individual capacity, appellate courts have recognized a number of situations in which the evidence did not amount to clear and unmistakable evidence of the parties' agreement to arbitrate the issue of arbitrability, and thus was not evidence to support an arbitration award. For example, evidence that an individual signed the arbitration agreement as an agent in his representative capacity is not clear and unmistakable evidence that the individual, in his individual capacity, agreed to arbitrate the issue of arbitrability. *See Elgohary,* 405 S.W.3d at 790–91; *Roe,* 318 S.W.3d at 515–16. Also, evidence that the arbitration agreement references the AAA Commercial Arbitration Rules, and the fact that those rules allow an arbitrator to decide his own jurisdiction is also not clear and unmistakable evidence of a non-signatory's agreement to arbitrate the issue of arbitrability. *See Elgohary,* 405 S.W.3d at 791–92 (holding partner's agreement to arbitrate under AAA rules is not clear and unmistakable evidence partner, in individual capacity, agreed to arbitrate under AAA rules); *Roe,* 318 S.W.3d at 517 (holding L.L.P.'s agreement to arbitrate in accordance with AAA rules was not clear and unmistakable evidence of individual's agreement to submit gateway issue of arbitrability to arbitrator). Lastly, an agreement's "successors and assigns clause" does not amount to clear and unmistakable evidence of an agreement to arbitrate the issue of arbitrability. *See Elgohary,* 405 S.W.3d at 792–93. Accordingly, we disagree with the Olivas and

conclude that neither the broad language of the arbitration agreement, nor the reference to AAA Commercial Arbitration Rules, even if considered together, constitutes clear and unmistakable evidence that Leshin, in his individual capacity, agreed to submit the gateway issue of arbitrability to the arbitrator. *See First Options,* 514 U.S. at 943; *Elgohary,* 405 S.W.3d at 791–92; *Roe,* 318 S.W.3d at 517. Therefore, there is no evidence upon which we can uphold the arbitration award. *See Centex/Vestal,* 314 S.W.3d at 685.

**\*7** The Olivas next direct our attention to sections 114.008(a) and 114.0832(d) of the Texas Property Code, arguing these provisions vest the arbitrator with the power to determine that Leshin, in his individual capacity, was a party to the arbitration agreement. Section 114.0832(d) of the Texas Property Code indicates a trustee can be held personally liable for tortious acts committed when acting as trustee, and section 114.008 of the Texas Property Code outlines the ways a court may compel a trustee to remedy such a breach of trust. TEX. PROP.CODE ANN. §§ 114.008 and 114.0832 (West 2014). The Olivas' argument is misplaced. Whether sections 114.008(a) and 114.0832(d) of the Texas Property Code compel a non-signatory to arbitrate is a question for the trial court to determine when conducting an independent determination on the issue of arbitrability. *See Elgohary,* 405 S.W.3d at 793 (recognizing theories which court could compel non-signatory to arbitrate during its independent review).

Accordingly, we hold because there is no clear and unmistakable evidence that Leshin, in his individual capacity, agreed to submit the gateway issue of arbitrability to the arbitrator, there is no evidence upon which we can uphold the arbitration award. *See First Options,* 514 U.S. at 943; *Elgohary,* 405 S.W.3d at 791–92; *Roe,* 318 S.W.3d at 517. Here, the trial court, not the arbitrator, should have decided the "gateway issue" of whether Leshin, in his individual capacity, agreed to arbitrate the issue of arbitrability. *See First Options,* 514 U.S. at 943; *Elgohary,* 405 S.W.3d at 790; *Roe,* 318 S.W.3d at 514. Having decided the question of arbitrability is one for judicial determination, we hold the arbitrator exceeded his powers by implicitly determining Leshin, individually, was a party to the arbitration agreement, and thereby bound by any award in his individual capacity.

### *Rendition or Remand?*

Leshin asserts that if we conclude the arbitrator exceeded his powers, we must render judgment that he was not a party to the arbitration agreement, and therefore, not bound by the award. Leshin essentially asks this court to determine whether he was, individually, a party to the arbitration provision. Leshin's request loses sight of the fact that the trial court acted prematurely in confirming the award.

As explained above, the gateway issue of determining whether a non-signatory is a party to the arbitration agreement was for the trial court—not the arbitrator—to determine. When given that opportunity, the trial court must conduct an independent review of whether there are any applicable theories in which a court could compel a non-signatory to arbitrate. *See Elgohary,* 405 S.W.3d at 793. We have reviewed the record and nowhere therein did the trial court conduct an independent review to determine whether any theory compelled Leshin, in his individual capacity, to arbitrate. *See id* at 793 (requiring independent review to determine whether court could compel non-signatory to arbitration); *Roe,* 318 S.W.3d at 514 (remanding case for independent review regarding arbitrability absent clear and unmistakable evidence party agreed to arbitrate). Rather, at the hearing on the motion to vacate the arbitration award, the trial court erroneously concluded the issue of arbitrability was within the arbitrator's jurisdiction as a general rule of arbitration. Therefore, the trial court confirmed the arbitration award on the basis that "there is no evidence to convince this court that the arbitrator did not have jurisdiction to include Leshin as an individual" without first considering the theories

that could bind a non-signatory to arbitration. *See Elgohary,* 405 S.W.3d at 794.

Accordingly, we reverse the trial court's judgment confirming the arbitration award. However, we remand the matter for further proceedings to allow the trial court to conduct an independent review to determine whether Leshin, in his individual capacity, could be compelled by a court to arbitrate under any legal theory. *See id.* Because of our disposition, we need not consider Leshin's issue concerning lack of service.

### CONCLUSION

 **\*8** Based on the foregoing, we hold the arbitrator exceeded his powers by implicitly determining Leshin was a party to the arbitration agreement and issuing an award against Leshin in his individual capacity. Whether Leshin was a party to the arbitration agreement under some legal theory is a question of arbitrability, which is for the trial court to determine. Therefore, we reverse the trial court's judgment confirming the arbitration award and remand the matter to the trial court for further proceedings. Specifically, we remand for the trial court to consider the arbitrability issue and determine whether there is any legal theory that would allow the trial court to compel Leshin, in his individual capacity, to arbitrate and be bound by any ensuing award.

**All Citations**

Not Reported in S.W.3d, 2015 WL 4554333

Footnotes

1    We recognize there is disagreement between the Olivas regarding whether the arbitrator actually issued an award against Leshin in his individual capacity. Juan Gerardo maintains that portions of the award are against Leshin in his individual capacity, not merely in his capacity as trustee. However, in her brief and at oral argument, Rosina attempts to concede that the award of attorney's fees and AAA costs in her favor are against Leshin only in his capacity as trustee, not in his individual capacity. In other words, Rosina contends the arbitration award, at least as to her, is not against Leshin in his individual capacity. However, as we explain below, whether Leshin, individually, is a party to the arbitration and subject to an award emanating therefrom is a gateway issue for the trial court. Moreover, the language in the award with regard to attorney's fees and AAA costs is essentially the same with regard to both Juan Gerardo and Rosina. Thus, we hold Rosina's attempted concession has no impact on our holding or judgment.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## NO. 13-15-00312-CV

## IN THE COURT OF APPEALS
## FOR THE THIRTEENTH JUDICIAL DISTRICT OF TEXAS
## AT CORPUS CHRISTI

---

### BRIAN O'GRADY, M.D. AND
### THE O'GRADY FAMILY PARTNERSHIP, LTD.
*Appellants,*

v.

### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A.,
*Appellee.*

---

### Appealed from the 53rd District Court of Travis County, Texas

---

### VERIFICATION

---

Before me, the undersigned notary, on this day personally appeared Emily J. Seikel, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1.  "My name is Emily J. Seikel. I am over 18 years of age, of sound mind, and capable of making this affidavit. I am the attorney of Appellants' Brian O'Grady, M.D. and The O'Grady Family Partnership, Ltd. The facts in this affidavit are within my personal knowledge and are true and correct.

2.  "I certify and verify that I have reviewed the Appellants' Brief and concluded that every factual statement in the Brief is supported by competent evidence included in the appendix or record, and that the items contained in the Appendix and the Clerk's Record are accurate copies of pleadings and other court papers that are material to the Appellants' Brief.

_____
Emily J. Seikel

STATE OF TEXAS          §
                        §
TRAVIS COUNTY           §

      SUBSCRIBED AND SWORN TO before me on this the 19th day of August 2015, to certify which witness my hand and seal of office.



Notary Public In and For State of Texas

KATY HENNINGS
NOTARY PUBLIC
State of Texas
Comm. Exp. 05-03-2017

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was served upon the following parties via electronic mail by the Court's CM-ECF system on this the 19th day of August 2015, as follows:

Robert S. Harrell
Jon C. Rice
Andrea L. Fair
Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, Texas  77010
*Counsel for Appellee*

/s/ Emily J. Seikel
Emily J. Seikel